## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ANDREW DEAN SNELLING,

     Plaintiff,

vs.                                     No. CIV 19-0686 JB/GJF

TRIBAL VAPORS; SMOKE FREE
TECHNOLOGIES, INC. d/b/a
VAPORBEAST.COM and SHENZHEN
MXJO TECHNOLOGY CO., LTD.,

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Plaintiff's Motion for Entry of Default as to Defendants Tribal Vapors, Smoke Free Technologies, Inc. d/b/a Vaporbeast.com, and Shenzhen MXJO Technology Co., Ltd., filed March 30, 2020 (Doc. 8)("Default Motion"). The primary issues are: (i) whether the Court has personal jurisdiction over Defendants Tribal Vapors, Smoke Free Technologies, Inc. d/b/a Vaporbeast.com ("Smoke Free"), and Shenzhen MXJO Technology Co., Ltd. ("Shenzhen MXJO"), which the Court must determine before entering judgment by default against a party who has not appeared in the case; (ii) if the Court has jurisdiction over the Defendants, whether the Court should enter default judgment as to the Defendants' liability under rule 55(b) of the Federal Rules of Civil Procedure, because the Defendants have "failed to plead or otherwise defend," pursuant to rule 55(a), in response to the Plaintiff Andrew Dean Snelling's properly served Complaint and Demand for Jury Trial, filed July 26, 2019 (Doc. 1)("Complaint"); (iii) whether the Court should enter default judgment as to Snelling's requested $933,508.04 damages amount, because the damages are for a "sum certain or a sum that can be made certain by computation," Fed. R. Civ. P. 55(b)(1); and (iv) whether the Court should set a date for a jury

trial, because, Snelling requested a jury trial in his Complaint ¶ 199, at 54, and, under rule 38(d), the parties have not dually consented to a withdrawal of Snelling's jury trial request.  The Court concludes that: (i) it has general jurisdiction over Tribal Vapors, because Snelling has established that Tribal Vapors' contacts with New Mexico are so continuous and systematic that it is essentially at home in New Mexico; (ii) it does not have general jurisdiction or specific jurisdiction over Smoke Free or Shenzhen MXJO, however, because Snelling does not establish that Smoke Free's or Shenzhen MXJO's contacts with New Mexico are so continuous and systematic that they are essentially at home in New Mexico, nor does Snelling establish that Smoke Free or Shenzhen MXJO have sufficient minimum contacts with New Mexico to comport with the federal Due Process Clause's requirements; (iii) because the Court only has personal jurisdiction over Tribal Vapors, it can only enter default judgment against Tribal Vapors; (iv) it will enter default judgment, pursuant to rule 55(b), as to Tribal Vapors' liability, because (a) Snelling properly served his summons and Complaint on Tribal Vapors pursuant to rule 4(m); (b) Tribal Vapors has "failed to plead or otherwise defend" in response to Snelling's Complaint under rule 55(a); and (c) Snelling properly obtained the an entry of default from the Clerk of the Court of the United States District Court of the United States District of New Mexico under rule 55(a), see Clerk's Entry of Default at 1, filed April 17, 2020 (Doc. 15)("Default Entry"); (v) the Court will not, however, enter default judgment as to Snelling's requested $933,508.04 damages amount, because: (a) Snelling's requested general damages and special damages related to his injuries cannot "be made certain by computation," Fed. R. Civ. P. 55(b)(1), but, rather, "remain[] to be established by proof," Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974); and (b) Snelling's requested costs and disbursements that he incurred pursuant to the litigation, are costs that are awarded after judgment is entered, see D.N.M.LR-Civ. 54.1, or attorney's fees that "may not be awarded without a hearing to determine

the amount," Hunt v. Inter-Globe Energy, Inc., 770 F.2d 145, 148 (10th Cir. 1985); (vi) it will set a date for a jury trial to determine Snelling's damages, because Snelling: (a) requested a jury trial in his Complaint, see Complaint ¶ 199, at 54; (b) properly served that Complaint on Tribal Vapors, see Fed. R. Civ. P. 4(m); and (c) the parties have not dually consented to a withdrawal of Snelling's jury trial request, see Fed. R. Civ. P. 38(d).  Accordingly, the Court enters default judgment only to Tribal Vapors' liability, but will set a date for a jury trial on Snelling's requested damages.

## FINDINGS OF FACT

The Court takes its facts from Snelling's Complaint.  See Complaint ¶¶ 1-197, at 1-53.  In reviewing a default judgment, the Court takes "'the well-pleaded factual allegations' in the complaint 'as true.'"  DIRECTV, Inc. v. Hoa Huynh, 503 F.3d 847, 854 (9th Cir. 2007)(quoting Cripps v. Life Ins. Co. of North America, 980 F.2d 1261, 1267 (9th Cir. 1992) and citing Fed. R. Civ. P. 55(a); Benny v. Pipes, 799 F.2d 489, 495 (9th Cir. 1986)).  "However, a 'defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law.'"  DIRECTV, Inc. v. Hoa Huynh, 503 F.3d at 854 (quoting Nishimatsu Constr. Co. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975)).  "[D]istrict courts have discretion to decline to award default judgment when there are serious doubts as to the merits of the plaintiff's substantive claim."  Sutton v. Heartland Payment Sys., LLC, No. CIV 18-0723 PJK/KK, 2019 WL 5268597, at *1 (D.N.M. Oct. 17, 2019)(Kelly, J.)(citing Eitel v. McCool, 782 F.2d 1470, 1471 (9th Cir. 1986)).

1.      **The Parties.**

1.      Snelling brings a negligence and product liability action against Tribal Vapors, Smoke Free, and Shenzhen MXJO, seeking recovery for his "substantial personal injuries and damages," which he suffered after "purchas[ing] and usi[ing] two MXJO IMR 18650 lithium ion batter[ies]" ("lithium ion batteries").  Complaint ¶ 1, at 1.

2.      Snelling is a citizen and resident of Park Rapids, Minnesota.  See Complaint ¶ 2, at 1.

3.      Tribal Vapors is a New Mexico company, with its principal place of business in Alamogordo, New Mexico, See Complaint ¶ 4, at 1.

4.      Smoke Free is a Delaware corporation, with its principal place of business in Carlsbad, California.  See Complaint ¶ 6, at 2.

5.      Shenzhen MXJO is a corporation organized under the laws of the People's Republic of China, with its principal business address in Xixiang Sub-District, Bao'an District, Shenzhen, People's Republic of China.  See Complaint ¶ 8, at 3.

**2.      The Lithium Ion Batteries.**

6.      The lithium ion batteries that Snelling used were "marketed sold, and distributed by Defendants Tribal Vapors, Smoke Free Technologies, Inc. d/b/a Vaporbeast.com by and through their officers, employees and agents."  Complaint ¶ 1, at 1.

7.      The lithium ion batteries "were designed, manufactured, marketed, distributed and sold by Defendant Shenzhen MXJO Technology Co., Ltd."  Complaint ¶ 1, at 1-2.

**3.      E-Cigarette Manufacture and Distribution.**

8.      "Manufacturers, distributors, and sellers of electronic cigarettes, or "e-cigarettes," as they are more commonly known, claim to provide a tobacco-free and smoke-free alternative to traditional cigarettes."  Complaint ¶ 14, at 4.

9.      "E-cigarettes offer doses of nicotine via a vaporized solution."  Complaint ¶ 14, at 4.

10.     "All e-cigarettes are designed and function in a similar way."  Complaint ¶ 15, at 5.

11.     E-cigarettes consists of three primary components: (i) "a tank or cartridge that is filled with a liquid (known as 'juice' or 'e-liquid')," which generally "contains a concentration of nicotine"; (ii); "an 'atomizer' or 'cartomizer,' which heats and converts the contents of the liquid-filled cartridge to a vapor that the user then inhales (hence the term, 'vaping')" and (iii) "a battery, which provides power for the atomizer."  Complaint ¶ 15, at 5 (no citation for quotation).

12.     The ingredients of juice or e-liquid "vary from brand to brand"; E-Juice, however, "typically contains 95% propylene glycol and glycerin."  Complaint ¶ 15, at 5  n.2

13.     "Hundreds of different types and brands of E-Juice exist, and come in flavors such as cherry, cheesecake, and cinnamon."  Complaint ¶ 15, at 5 n.2.

14.     "The wire is wrapped around the wicking material (usually cotton) in a coil formation; the two ends of the coil are then connected to the casing in a way that permits contact with the battery."  Complaint ¶ 15, at 5.

15.     "When e-liquid is added to the e-cigarette's tank, the wicking material absorbs it. When the user activates the e-cigarette's battery, the coil heats, vaporizing the e-liquid within the wicking material."  Complaint ¶ 15, at 5.

16.     "Heating coils feature a specific resistance, which is measured in ohms."  Complaint ¶ 16, at 6.

17.     "Specific resistance is the measure of the potential electrical resistance of a conductive material. It is determined experimentally using the equation $\rho = RA/l$, where R is the measured resistance of some length of the material, A is its cross-sectional area (which must be uniform), and l is its length."  Complaint ¶ 16, at 6 n. 3.

18.     "Ohms are the standard international unit of electrical resistance, expressing the resistance in a circuit transmitting a current of one ampere when subjected to a potential difference

of one volt."  Complaint ¶ 16, at 6 n.4.

19.     "In order for an e-cigarette to work effectively (and safely) the battery voltage must be carefully balanced with the heating coil resistance.  Complaint ¶ 16, at 6.

20.     "If the battery voltage is too high and the resistance is too low, the heating coil can overheat and damage the battery, allowing for 'thermal runaway'  to occur, whereby the internal battery temperature can cause a fire or explosion, and which is often the result of 'poor design, use of low quality materials . . . [and] manufacturing flaws and defects. . . .'"  Complaint ¶ 16, at 6 (quoting Ben DJ. Burn Care Res. 2009 Nov-Dec; 30(6): 1048)("Burn Car Res. 2009").

21.     "Thermal runaway refers to a chemical reaction in which a repeating cycle of excessive heat causes more heat until an explosion occurs."  Complaint ¶ 16, at 6 n.5 (citing U.S. Fire Administration, "Electronic Cigarette Fires and Explosions in the United States 2009 - 2016," updated July 2017).

22.     "According to the [United States Fire Administration ("USFA")], one of the main causes of thermal runaway is the battery overheating."  Complaint ¶ 16, at 6 n.5 (citing United States. Fire Administration, Electronic Cigarette Fires and Explosions in the United States 2009 - 2016 (updated July 2017).

**4.     E-Cigarette Battery Technology.**

23.     "Some e-cigarette batteries are rechargeable, and others are disposable."  Complaint ¶ 17, at 6.

24.     "Some e-cigarettes are closed systems, in which prefilled tanks are used; others are also open systems that allow the user to manually refill the tank with e-liquid."  Complaint ¶ 17, at 6.

25.     "E-cigarettes come in pen form (these are usually plastic and are modeled after a

traditional cigarette) and in a form known as a 'mod.'" Complaint ¶ 17, at 6.

26.     "Mods are metal devices that are heavier than pen e-cigarettes and carry a much higher capacity for juice and creation of vapor." Complaint ¶ 17, at 6.

27.     "There are many different types of mods, some of which require the use and replacement of atomizer coils like those described above." Complaint ¶ 17, at 6.

28.     "E-cigarette batteries, like the Subject Batteries, typically consist of layers of metallic anode and cathode material separated by a porous film or 'wrapping' which holds liquid electrolytes." Complaint ¶ 18, at 7.

29.     A cathode is "a device in the terminal where the energy current flows out, as where the anode is where the energy current flows in." Complaint ¶ 18, at 7 n.7.

30.     Battery wrapping is "often made of plastic or other porous film and serves to keep the liquid electrolytes within the battery from coming into direct contact with outside sources." Complaint ¶ 18, at 7 n.8.

31.     "The electrolytes used in these batteries are either flammable or combustible liquids." Complaint ¶ 18, at 7.

**5.     E-Cigarettes' American Marketplace Entry and Public Reception.**

32.     "While e-cigarettes were first patented in 2003, they first entered the market exclusively in China in 2004 and did not first appear in the United States until 2007." Complaint ¶ 19, at 7.

33.     "Since that time, U.S. sales of electronic cigarettes have risen dramatically -- from approximately $20 million in 2008 to $2.5 billion in 2014." Complaint ¶ 19, at 7.

34.     "According to some media sources, industry experts predict the e- cigarette industry will reach $32.11 billion by 2021." Complaint ¶ 19, at 7.

35.    "Lithium ion batteries, commonly used in e-cigarettes, pose a risk of fire and explosion."  Complaint ¶ 20, at 7.

36.    "Lithium-ion batteries have been referred to as the 'mini bomb in your pocket' due to its known ability to spontaneously ignite."  Complaint at n.9 (quoting Ben D., Ma B., Liu L, et al., Unusual Burns with Combined Injuries Caused by Mobile Phone Explosion: Watch Out for the "mini Bomb!", Burn Care Res. 2009 at 1048).

37.    "A medical case report of a man in New Jersey, whose e-cigarette exploded in his pocket causing him severe burns, noted, 'the potential for serious burn injuries related to device malfunction is of concern.'"  Complaint ¶ 20, at 7 (quoting Spontaneous Electronic Cigarette Explosion: A Case Report, American Journal of Medical Case Reports, 2015, Vol. 3, No. 4, 93-94, 94).

38.    "Some tout e-cigarettes as a safer alternative to traditional cigarettes because e-cigarettes do not contain tobacco, do not actually burn or create smoke, and do not pose the same risks of second-hand smoke inhalation."  Complaint ¶ 21, at 7.

39.    "However, these supposedly 'safer' alternatives to traditional cigarettes are still the subject of debate, as they still often provide nicotine, which is a neurotoxin and extremely addictive."  Complaint ¶ 20,  at 7 (no citation for quotation).

40.    "Further, the actual and long-term effects of the chemicals in e-liquid and vapor are unknown, as the technology is still relatively new."  Complaint ¶ 21, at 7.

**6.    America's E-Cigarette Regulation.**

41.    "Only a few federal regulations have been promulgated or proposed regarding e-cigarette sales and use."  Complaint ¶ 22, at 8.

42.    "Many of these products are shipped from China and placed into the stream of

commerce without any knowledge as to what is in them, how they were made, or whether they are safe for consumers." Complaint ¶ 22, at 8.

43.     "In 2009, the United States Food and Drug Administration (FDA) first attempted to regulate e-cigarettes under the Food, Drug, and Cosmetic Act (FDCA)." Complaint ¶ 23, at 8.

44.     "E-cigarette manufacturers then successfully sued the FDA, claiming e-cigarettes should not be considered medical devices subject to the provisions of FDCA." Complaint ¶ 23, at 8.

45.     "Because of this ruling and lack of regulatory oversight, e-cigarette sales skyrocketed." Complaint ¶ 23, at 8.

46.     "On April 25, 2014, the FDA released a proposed regulation that would extend the statutory definition of "tobacco product" to include e-cigarettes." Complaint ¶ 24, at 8 (quoting United States Fire Administration, Electronic Cigarette Fires and Explosions, October 2014, at 2).

47.      "While the FDA regulates traditional cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco under its tobacco control authority, e-cigarettes are not yet defined as a tobacco product."   Complaint ¶ 24, at 8.

48.     "An October 2014 report notes the proposed FDA regulations do not include any consideration of the battery or electronic components of the devices, as the FDA is only addressing the health effects of vapor inhalation." Complaint ¶ 25, at 8.

49.     "Further, the U.S. Fire Administration noted the World Health Organization recently proposed member states adopt stringent controls on e-cigarettes, but did not include any language addressing the electronics themselves." Complaint ¶ 25, at 8.

50.     "The U.S. Consumer Product Safety Commission has advised e-cigarettes do not fall under its jurisdiction." Complaint ¶ 25, at 8.

51.     "As noted in October 2014, and as was the case when Plaintiff purchased his e-cigarette and its batteries, 'no regulation, code or law applies to the safety of the electronics or batteries in e-cigarettes. While many consumer products are required to be tested by a nationally recognized test laboratory . . . there are no requirements that e-cigarettes be subjected to the product safety testing.'"  Complaint ¶ 25, at 8-9 (quoting United States Fire Administration at 2).

52.     "On August 8, 2016, a new FDA rule took effect expanding regulation to e-cigarettes."  Complaint ¶ 26, at 9.

53.     "According to the FDA, '[t]his final rule has two purposes: (1) To deem all products that meet the definition of "tobacco product" under the law, except accessories of a newly deemed tobacco product, and subject them to the tobacco control authorities in chapter IX of the FD&C Act and FDA's implementing regulations; and (2) to establish specific restrictions that are appropriate for the protection of the public health for the newly deemed tobacco products.'"  Complaint ¶ 26, at 9 (quoting United States Fire Administration at 2).

**7.     E-Cigarettes Connected to Fires and Explosions in the United States.**

54.     "E-cigarettes and e-cigarette batteries have caused numerous fires and explosions injuring consumers."  Complaint ¶ 27, at 9.

55.     "Federal, state, and local efforts have recently been aimed at protecting public health via regulations on sale and use of e-cigarettes, but not on the safety hazards posed by the products themselves."  Complaint ¶ 27, at 9.

56.     "There is mounting evidence the explosions and fires caused by e-cigarettes and lithium ion batteries are increasing in occurrence."  Complaint ¶ 28, at 9.

57.     "The U.S. Department of Transportation ('DOT') issued a rule banning e-cigarettes from checked bags on airplanes because they have been known to catch fire."  Complaint ¶ 28, at

9.

58.    "The DOT has also determined e-cigarettes may not be used during flight." Complaint ¶ 28, at 9.

59.    "The explosion of e-cigarettes and lithium ion batteries are not novel occurrences; a California man recently lost his eye as a result of an e-cigarette exploding near him."  Complaint ¶ 28, at 9.

60.    "A southern California woman was set on fire after an e-cigarette exploded while she was a passenger in a car."  Complaint ¶ 28, at 9.

61.    "An Atlanta woman's couch and rug caught on fire after an e-cigarette exploded, almost burning her house down."  Complaint ¶ 28, at 9.

62.    "Complaints of injury caused by e-cigarettes continue to rise as the devices' popularity increases."  Complaint ¶ 28, at 9.

63.    "These products continue to be placed into the stream of commerce in an untested and unsafe condition, and will continue to cause injuries unless and until those responsible are held accountable."  Complaint ¶ 28, at 10.

**8.**    **Snelling's Purchase of Defendants' Lithium Ion Batteries and E-Cigarettes.**

64.    "Defendant MXJO sells MXJO IMR 18650 lithium ion batteries such as the Subject Batteries worldwide, including in New Mexico," and "[i]t has been common practice for users and consumers to utilize lithium ion batteries to power their e-cigarette devices since the inception of e-cigarettes in 2003."  Complaint ¶¶ 30-31, at 10.

65.    "Defendant MXJO, its agents, servants and employees, participated in the design, formulation, production, manufacture, construction, assembly, marketing, distribution, delivery, and sale of the MXJO IMR 18650 lithium ion batteries, including the Subject Batteries," while

Defendants Tribal Vapors and VaporBeast," and their "agents, servants and employees, "participated in marketing, distribution and/or sale of MXJO IMR 18650 lithium ion batteries, including the Subject Batteries."  Complaint ¶¶ 33-34, at 10.

66.    "Prior to the date of the incident which forms the basis of this action, Defendant Tribal Vapors purchased the Subject Batteries designed, manufactured and distributed by Defendant MXJO from Defendant VaporBeast." Complaint ¶ 35, at 10.

67.    Snelling "purchased the Subject Batteries designed, manufactured and distributed by Defendant MXJO from Defendant Tribal Vapors."  Complaint ¶ 36, at 10.

**9.    The Lithium Ion Batteries Burn Incident.**

68.    "On or about July 29, 2016," after engaging in his "usual morning routine in getting ready for work at Holloman Airforce Base," but before "walking out the door . . . [Snelling] placed the two subject MXJO IMR 18650 mAh 3000 lithium ion batteries in the front-left pocket of his pants."  Complaint ¶ 37, at 11.

69.    Snelling then arrived at Hollman Airforce Base, located six miles west of Alamogordo, New Mexico, where he worked for several hours.  See Complaint ¶ 38, at 11.

70.    While Snelling was "at his desk reading an email," he heard a "'hissing' sound coming from his pants pocket."  Complaint ¶ 39, at 11 (no citation for quotation).

71.    "[I]mmediately," Snelling "felt an intense pain over his left lower extremity followed up [by] a sudden 'flash' as the Subject Batteries exploded in his pocket."  Complaint ¶ 39, at 11.

72.    Thereafter, Snelling "tipped backward in his desk chair," causing him to "land[] hard on the ground on his back."  Complaint ¶ 40, at 11.

73.    While on his back, Snelling "immediately began to hit his pants pocket to snuff out the flames," and when attempting to snuff out the flames, "he was able to coerce the burning-hot

batteries out of his pocket; burning his hands in the process." Complaint ¶ 41, at 11.

74.     During the snuffing out process, however, Snelling's flesh was scorched. <u>See</u> Complaint ¶¶ 41-42, at 11.

75.     Accordingly, "[a]fter peering down at the scorched flesh on his left lower extremity and his hands," Snelling "immediately rushed to the bathroom and began running cold water over his hands and onto his leg." Complaint ¶ 42, at 11.

76.     Shortly thereafter, paramedics arrived, placing Snelling in a stretcher and then transporting him to Gerald Champion Regional Medical Center in Alamogordo, New Mexico, for Snelling "to receive emergency medical treatment." Complaint ¶ 43, at 11.

77.     Nonetheless, because of "the severity" of Snelling's burn injuries, he was subsequently "medevacked to University Medical Center in Lubbock, Texas for further treatment." Complaint ¶ 43, at 11.

78.     Snelling states that, before the burning incident, he did not have "facts or information sufficient to apprise him, actually or constructively, of the dangers posed by the defective condition of the Subject Batteries." Complaint ¶ 44, at 11.

79.     Snelling similarly alleges that, before the burning incident, he did not have "facts or information which not only apprised him of the defective condition of the Subject Batteries but also imparted knowledge and appreciation of the dangers posed thereby, then proceed[ed] to make use of the Subject Batteries in an unreasonable or unforeseeable manner." Complaint ¶ 45 at 11-12.

80.     Ultimately, because of the lithium ion batteries burning incident, Snelling "has suffered and will continue to suffer "the effects of permanent scarring due to the injuries sustained in the Incident, as well as severe physical pain and mental anguish as a result of the injuries

sustained in the Incident."  Complaint ¶ 46, at 12.

81.    In addition, Snelling "has incurred substantial medical bills totaling more than $130,000.00."  Complaint ¶ 47, at 12.

## PROCEDURAL BACKGROUND

The Court outlines the procedural background in six sections.  First, the Court discusses Snelling's Complaint.  See Complaint ¶¶ 1-199, at 1-56.  Second, the Court discusses Snelling's Default Motion.  See Default Motion at 1-3.  Third, the Court discusses the Affidavit of Andrew Dean Snelling in Support of Motion for Entry of Default as to Defendants Tribal Vapors, Smoke Free Technologies, Inc. d/b/a Vaporbeast.com, and Shenzhen MXJO Technology Co., Ltd. at 1-80, executed on March 28, 2020, filed March 30, 2020 (Doc. 10)("Snelling Aff.").  Fourth, the Court discusses the instruction it gave to Snelling, upon realizing that Snelling was improperly skipping a step under rule 55's two-step process for a default judgment.  See Fed. R. Civ. P. 55. Fifth, the Court discusses Snelling's Praecipe Pursuant to Fed. R. Civ. Pro.55(a), filed April 15, 2020 (Doc. 14)("Praecipe").  Sixth, the Court discusses the Clerk's Entry of Default, filed April 17, 2020 (Doc. 15)("Default Entry").

### 1.    The Complaint.

On July 26, 2019, Snelling filed his Complaint.  See Complaint at 1.  Snelling brings nine causes of action based on the "substantial personal injuries and damages" that he allegedly suffered because of the explosion of the two ion lithium batteries.  See Complaint ¶¶ 51-192, at 13-52. Snelling alleges that Tribal Vapors and Smoke Free Technologies "marketed, sold, and distributed" the ion lithium batteries to him, Complaint ¶ 1, at 1, which, in turn, were "designed, manufactured, marketed, distributed and sold" by Shenzhen MXJO, Complaint ¶ 1, at 1.  Snelling's causes of action include: (i) a strict products liability claim against Tribal Vapors, see Complaint ¶¶ 51-66, at 15-17; (ii) a strict products liability claim against Shenzhen MXJO, see Complaint ¶¶

67-82; at 17-21; (iii) a strict products liability claim against Smoke Free, see Complaint ¶¶ 83-98,

at 21-26; (iv) a negligence claim against Tribal Vapors, see Complaint ¶¶ 99-112, at 27-30; (v) a

negligence claim against Shenzhen MXJO, see Complaint ¶¶ 113-126, at 31-34; (vi) a negligence

claim against Smoke Free, see Complaint ¶¶ 127-140, at 35-38; (vii) a breach of implied warranties

claim against Tribal Vapors, see Complaint ¶¶ 141-157, at 38-43; (viii) a breach of implied

warranties claim against MXJO, see Complaint ¶¶ 158-175, at 43-48; and (ix) a breach of implied

warranties claim against Smoke Free, see Complaint ¶¶ 175-192, at 48-52.  Based on Snelling's

causes of action against Tribal Vapors, Smoke Free, and Shenzhen MXJO, and because Snelling

alleges that the Defendants "each violated a duty to refrain from willful and wanton acts, omissions

and/or misconduct which would foreseeably expose Plaintiff to an unreasonable risk of harm and

cause injury," Complaint ¶ 194, at 52, Snelling requests punitive damages, see Complaint ¶¶ 193-

197, at 52-53.  Snelling alleges that an award of punitive damages "is necessary and appropriate

to punish Defendants for their willful, wanton and/or intentional misconduct and/or reckless

disregard for the health, safety and well-being of Plaintiff and others and to deter said Defendants

and others similarly situated from engaging in like misconduct in the future."  Complaint ¶ 197, at

53.  Finally, in Snelling's Prayer for Relief, he requests:

> (i)     Judgment against Defendant MXJO, Defendant Tribal Vapors and
>         Defendant VaporBeast, jointly and severally;
>
> (ii)    For such sums as actual and other compensatory damages, including pain
>         and suffering and permanent impairment, in an amount as a jury may
>         determine and in excess of the minimum jurisdictional limit of this
>         Honorable Court;
>
> (iii)   For exemplary and punitive damages against Defendant MXJO, Defendant
>         Tribal Vapors and Defendant VaporBeast, in an amount as a jury may
>         determine to halt such conduct;
>
> (iv)    For the costs of this suit, including attorney's fees; and

(v)      For such other and further relief to which they may be entitled, that this Honorable Court deems just and proper.

Complaint Prayer for Relief ¶ 198, at 53-54.  Snelling also requests a "trial by jury."  Complaint Jury Demand ¶ 199, at 54.

**2.      <u>The Motion for Default Judgement</u>.**

Eight months after filing the Complaint, on March 30, 2020, Snelling filed the Default Motion as to Tribal Vapors, Smoke Free, and Shenzhen MXJO.  <u>See</u> Default Motion at 1.  In support of his Default Motion, Snelling explains that he filed suit against Tribal Vapors, Smoke Free, and Shenzhen MXJO on July 26, 2019.  <u>See</u> Default Motion at 1 (citing Affidavit of Adam J. Kress, Esq. In Support of Plaintiff's Response to the Court's Order to Show Cause ¶ 2, at 1, executed on March 27, 2020, filed March 30, 2020 (Doc. 9)("Kress Aff.")).  Relatedly, Snelling contends that, pursuant to rule 12(a)(1)(a) of the Federal Rules of Civil Procedure, he served the summons and Complaint on Tribal Vapors "on August 8 2019, which made its Answer due on or before August 29, 2019 pursuant to Fed. R. Civ. P. 12(A)(1)(a)."  Default Motion ¶ 2, at 1 (citing Kress Aff ¶ 3, at 1; and Affidavit of Carolina Mera, Servicer, as to Service on Tribal Vapors, executed on August 8, 2019, filed March 30, 2020 (Doc. 9-A)("Mera Aff.").  Snelling also notes that he served the Summons and Complaint on Smoke Free on August 1, 2019, "which made its Answer due on or before August 22, 2019 pursuant to Fed. R. Civ. P. 12(A)(1)(a)."  Default Motion at 3 (citing Kress Aff ¶ 4, at 2; and Kevin S. Dunn, Servicer, as to Service on Smoke Free, filed March 30, 2020 (Doc. 9-B)("Dunn Aff").  Finally, "[o]n or about Wednesday, July 31, 2019, Plaintiff's counsel retained the Shreefer Law Firm LLC ('Shreefer Firm') an international litigation support firm, to serve process on Defendant MXJO through The Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ('Hague

Service Convention').''[1]  Default Motion ¶ 4, at 3 (citing Kress Aff ¶ 5, at 2).  "According to Karina

---

[1]According to the American Bar Association, the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents ("Hague Convention") is

> an international treaty formulated in 1964, ratified in the United States in 1967, and proclaimed by President Johnson in 1969. Its purpose was to establish a process whereby documents being served abroad might be served in a simpler and timely manner, to ensure that defendants sued in foreign jurisdictions would receive actual and timely notice of suit, and to facilitate proof of service abroad. *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 698 (1988). There are currently 63 signatories to the Hague Convention, although not all signatory states have agreed to all methods of service addressed by the Convention.

Service in Foreign Jurisdictions at 1, American Bar Association (July 14, 2020), https://www.americanbar.org/groups/gpsolo/publications/gp_solo/2011/april_may/service_in_for eignjurisdictions/ (last visited March 16, 2021)("ABA: Service in Foreign Jurisdictions")(emphasis in original).  Furthermore, as the American Bar Association explains,

> Although Rule 4 speaks of alternative forms of service, the Hague Convention does not.  Article 1 of the Convention states that it applies to *all* civil or commercial matters in which there is occasion to transmit a judicial or extrajudicial document for service abroad.   By virtue of the Supremacy Clause of the United States Constitution, compliance with Convention should by all rights be mandatory in state, as well as federal, litigation.  *Volkswagenwerk,* 486 [U.S.] at 699.

> Each signatory state has designated a "Central Authority" to accept incoming requests (on forms specified by the Hague Convention) for service.  Upon receipt of a request from an applicant, the Central Authority arranges for service in a manner permitted within that state, which may be either by a method provided by the local law in its own domestic actions or by a particular method requested by the applicant, provided that the method is compatible with the local law. The Central Authority *may* require that the document be written in, or translated to, the official language of the state addressed.  (If there is a defect in the request, the Central Authority is required to promptly inform the applicant of any defects.) Once service is effected, the Central Authority returns a certificate of service to the requesting party, which may then be filed in the court.  If the document cannot be served, the Central Authority must provide a certificate setting out the reasons preventing service.  So long as the request for service complies with the terms of the Hague Convention, the state addressed may not refuse to effect service unless it deems that compliance with the request would infringe on its sovereignty or security.  It is specifically provided that the state addressed may *not* refuse to comply based solely on the ground that it claims exclusive jurisdiction over the subject matter of the

Shreefer, Esq. of the Shreefer Firm, the Hague Request was FedExed to the Chinese Central

Authority on August 26, 2019, and FedEx delivered the Request on August 29, 2019."  Default

Motion ¶ 6, at 2 (citing Affidavit of Karina Shreefer ¶ 8, at 2, executed on March 9, 2020, filed

March 30, 2020 (Doc. 11)("Shreefer Aff."); and Kress Aff. ¶ 7, at 2).  Snelling explains that the

Hague Service Convention's Article 15, ¶ 2,

> allows a United States judge to grant default judgment, notwithstanding the absence
> of proof of service, provided that (1) the documents of suit in the action were
> transmitted abroad to the appropriate Central Authority for the purpose of service***;
> (2) A period of time in excess of six months must have lapsed since the suit
> documents were transmitted abroad for the purpose of service***; and (3) no
> certificate of any kind has been received, even though reasonable efforts have been
> made to obtain it through the competent authorities of the state addressed.

Default Motion ¶ 7, at 2 (emphasis in original)(citing Hague Service Convention, Art. 15, ¶ 2;

Kress Aff. ¶ 8, at 2, and Shreefer Aff. ¶ 10, at 3)).

Snelling contends that after Tribal Vapors, Smoke Free, and Shenzhen MXJO were

properly served, none of the Defendants filed any answer or defense, nor did any of the Defendants

provide "any excuse for their failure to do so."  Default Motion ¶ 8, at 3 (citing Kress Aff. ¶ 9, at

2).  Accordingly, Snellings requests that the Court:

> make and enter a judgment for Plaintiff against Defendants in the amount of award
> **$933,509.04** comprised of the principle sum of $926,924.45, and costs of
> $6,584.59, as laid out in the Affidavit of Andrew Dean Snelling ("Snelling Aff.")
> and accruing interest from the date of default at the rate of 8.75%, plus Plaintiff's

---

action, or that its internal law would not permit the action on which the application
is based.

ABA: Service in Foreign Jurisdictions at 1.

attorneys' fees and costs and post-judgment interest as allowed by law.

Default Motion, ¶ 8, at 3 (emphasis in original).

**3.    Snelling's Affidavit.**

As the Court noted above, in Snelling's Default Motion, he moves the Court to enter a

judgment against the Defendants in the total amount of $933,509.04.  See Default Motion ¶ 8, at

3.  He alleges that the total $933,509.04 sum is:

> comprised of the principle sum of $926,924.45, and costs of costs of $6,584.59, as
> laid out in the Affidavit of Andrew Dean Snelling ("Snelling Aff.") and accruing
> interest from the date of default at the rate of 8.75%, plus Plaintiff's attorneys' fees
> and costs and post-judgment interest as allowed by law.

Default Motion ¶ 8, at 3.  Snelling's Aff., in turn, provides a three-part categorized itemization of

Snelling's damages, which includes: (i) "Special Damages," which Snelling characterizes as

damages related to his "medical bills"; (ii) "General Damages," which Snelling characterizes as

damages related to Snelling's "past and future pain, disability, emotional distress, disfigurement,

future medical expense, and loss of earnings and earning capacity;" and (iii) "costs and

disbursements I have necessarily incurred in pursuant of this products liability claim against the

Defendants."  Snelling Aff. ¶ 5-6, at 2-3.  Snelling explains:

My damages resulting from the incident on July 29, 2016 are as follows:

**A.    SPECIAL DAMAGES:**

    a.    Medical Bills:

      i.    Itemization of Medical Bills from Gerald Champion Regional
Medical Center, *July 29, 2016* **(true and accurate copies attached
as Exhibit A) Total: $7,706.25**

      ii.    Itemization of Medical Bills from American Medical Response,
*July 29, 2016* **(true and accurate copies attached as Exhibit B)
Total: $396.20**

      iii.    Itemization of Medical Bills from Air Methods, *July 29, 2016* **(true
and accurate copies attached as Exhibit C) Total: $59,999.00**

     iv.    Itemization of Medical Bills from Lubbock Aid Ambulance, *July 29, 2016* **(true and accurate copies attached as Exhibit D) Total: $670.00**

     v.    Itemization of Medical Bills from University Medical Center, *July 29, 2016 - August 5, 2016* **(true and accurate copies attached as Exhibit E) Total: $8,221.00**

     vi.    Itemization of Medical Bills from Alamogordo Home Healthcare and Hospice, *August 6, 2016 - August 30, 2016* **(true and accurate copies attached as Exhibit F) Total: $99,932.00**

**TOTAL SPECIAL DAMAGES: $176,924,45**

**B.    GENERAL DAMAGES**

     a.    For past and future pain, disability, emotional distress, disfigurement, future medical expense, and loss of earnings and earning capacity **(true and accurate copies of my injuries and scarring attached hereto at Exhibit G and Exhibit H):**

**TOTAL GENERAL DAMAGES: $750,000**

     Additionally, and attached hereto as Exhibit I, is an itemization of the costs and disbursements I have necessarily incurred in pursuant of this products liability claim against the Defendants.  The amount of costs incurred are $6,584.59.

Snelling Aff. ¶ 6, at 2-3 (emphasis and italics in original).

     Snelling supports his "General Damages" request by attaching his medical bills, which include itemized computations of Snelling's medical expenditures related to his injuries.  Snelling Aff. ¶ 6, at 2 (citing Andrew Snelling's Gerald Champion Regional Medical Center Billing Statements: 07/29/2016 to Present at 1-2, filed March 20, 2020 (Doc. 10-A)("GCRMC Billing Statements"); Andrew Snelling's American Medical Response Billing Statements: 07/29/2016 to Present at 1, filed March 20, 2020 (Doc. 10-B)("American Medical Response Billing Statements"); Andrew Snelling's Air Methods Billing Statements: : 07/29/2016 to Present at 1-2, filed March 20, 2020 (Doc. 10-C)("Air Methods Billing Statements"); Andrew Snelling's Lubbock Aid

Ambulance Billing Statements: 07/29/2016 to Present at 1, filed March 20, 2020 (Doc. 10-D)("Lubbock Aid Ambulance Billing Statements"); Andrew Snelling's Texas Tech University Health Sciences Center Billing Statements, at 1-3, filed March 20, 2020 (Doc. 10-E)("TTUHSC Billing Statements"); Andrew Snelling's Alamogordo Home Healthcare and Hospice Billing Statements: 07/29/2016 to Present at 1-2, filed March 20, 2020 (Doc. 10-E)("Alamogordo Billing Statements").  Next, Snelling supports his $750,000 "General Damages" request, related to "past and future pain, disability, emotional distress, disfigurement, future medical expense, and loss of earnings and earning capacity," with photographs documenting his injuries from the lithium ion battery burns.  Snelling Aff. ¶ 6, at 2 (citing Andrew Snelling's Medical Photographs: 07/29/2016-08/08/2016 at 1-30, filed March 20, 2020 (Doc. 10-G)("Medical Photographs: 07/29/2016-08/08/2016"); Andrew Snelling's Medical Photographs: 08/08/2019 at 1-21, filed March 20, 2020 (Doc. 10-H)("Medical Photographs: 08/08/2019")).  Last, Snelling supports his $6,584.59 damage request, which he characterizes as representative of the "costs and disbursements" that he incurred "pursuant to the products liability claim against defendants," Snelling Aff. ¶ 6, at 2, by attaching an itemized bill statement that demonstrates Snelling's expenditures related to, and in anticipation of the litigation against the Defendants.  Snelling Aff. ¶ 6, at 2 (citing Johnson Becker PLLC Customer Balance Detail for Andrew Snelling at 1-2, filed March 20, 2020 (Doc. 10-I)("Johnson Becker PLLC Customer Balance Detail").

**4.      The Court's Instruction to Snelling.**

When the Court reviewed Snelling's Default Motion, it realized that Snelling was improperly skipping a step under rule 55's two-step process for a default judgment.  See United States v. Rivera, 2015 WL 4042197, at *9-12.  Specifically, although Snelling came directly to the Court for a default judgment, under rule 55, he is required to first obtain the Clerk of the Court's entry of default.  See Fed. R. Civ. P. 55(a)("When a party against whom a judgment for affirmative

relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."); Watkins v. Donnelly, 551 F. Appx. 953, 958 (10th Cir. 2014)(unpublished)[2]("Entry of default by the clerk is a necessary prerequisite that must be performed before a district court is permitted to issue a default judgment.").  Second, the party must either request the Clerk to enter default judgment when the claim is for "a sum certain or a sum that can be made certain by computation," Fed. R. Civ. P. 55(b)(1), or, "[i]n all other cases, the party must apply to the court for a default judgment," Fed. R. Civ. P. 55(b)(2).  Based on rule 55's proper default judgment procedure, the Court, accordingly, requested its Courtroom Deputy to contact Snelling and instruct him that he needed to first apply to the Clerk of the Court for an entry of default.  See Fed. R. Civ. P. 55(b)(2).  The Courtroom Deputy Clerk passed on the message to Snelling.

5.      **The Praecipe Pursuant to Rule 55(a) of the Federal Rules of Civil Procedure.**

Accordingly, on April 15, 2020, Snelling filed a Praecipe.  See Praecipe at 1.  In the Praecipe, Snelling

> requests the Clerk to enter a default against Defendant Tribal Vapors ("Tribal Vapors"), Defendant Smoke Free Technologies, Inc. d/b/a Vaporbeast.com ("VaporBeast"), and Defendant Shenzhen MXJO Technology Co., LTD ("MXJO")

---

[2]Watkins v. Donnelly is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Watkins v. Donnelly, 551 F. Appx. 953, 958 (10th Cir. 2014), and the other unpublished opinions cited herein, have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion.

on the basis that the record in this case demonstrates that there has been a failure to plead or otherwise defend as provided by Rule 55(a) of the Federal Rules of Civil Procedure.

Praecipe at 1-2.

### 6.     The Clerk's Entry of Default.

On April 17, 2020, Mitchell R. Elfers, the Clerk of the United States District Court for the District of New Mexico, entered an entry of default, as to Tribal Vapors, Smoke Free, and Shenzhen MXJO, pursuant to rule 55(a) of the Federal Rules of Civil Procedure. See Default Entry at 1. The Default Entry cites the Defendants' "fail[ure] to plead or otherwise defend as provided by the Federal Rules of Civil Procedure." Default Entry at 1.

### LAW REGARDING PERSONAL JURISDICTION

The plaintiff has the burden of proving personal jurisdiction. The court's jurisdiction may rest on general or specific personal jurisdiction. Due process, however, limits any state statutory basis for personal jurisdiction.

### 1.     General and Specific Jurisdiction.

"[W]hen the court's jurisdiction is contested, the plaintiff has the burden of proving jurisdiction exists." Wenz v. Memery Crystal, 55 F.3d 1503, 1505 (10th Cir.1995).

> When jurisdiction is "decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing" of facts that would support the assertion of jurisdiction. [Wenz v. Memery Crystal, 55 F.3d at 1505]. "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavit." Behagen v. Amateur Basketball Ass'n, 744 F.2d at 733. When, however, a defendant presents credible evidence through affidavits or other materials suggesting the lack of personal jurisdiction, the plaintiff must come forward with sufficient evidence to create a genuine dispute of material fact on the issue. See Doe v. Nat'l Med. Servs., 974 F.2d 143, 145 (10th Cir.1992). Only if the plaintiff meets the obligation of contesting the credible evidence that the defendant presents does the court resolve the factual disputes in favor of the plaintiff. See Wenz v. Memery Crystal, 55 F.3d at 1505; Behagen v. Amateur Basketball Ass'n, 744 F.2d at 733.

Clark v. Meijer, Inc., 376 F.Supp.2d 1077, 1082 (D.N.M. 2004)(Browning, J.). When, however,

"personal jurisdiction is assessed in an evidentiary hearing . . . , the plaintiff generally must establish, by a preponderance of the evidence, that personal jurisdiction exists." Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1070 n.4 (10th Cir.2008).

"Where a federal lawsuit is based on diversity of citizenship, the court's jurisdiction over a nonresident defendant is determined by the law of the forum state." Marcus Food Co. v. DiPanfilo, 671 F.3d 1159, 1166 (10th Cir. 2011). "The party seeking to establish personal jurisdiction over a foreign litigant must make two showings: first, that the exercise of jurisdiction is sanctioned by the state's long-arm statute; and second, that it comports with the due process requirements of the Fourteenth Amendment" to the Constitution of the United States of America. Marcus Food Co. v. DiPanfilo, No. CIV 10-3285, 2011 WL 5084997, at *3 (10th Cir. Oct. 27, 2011). New Mexico's long-arm "statute extends the jurisdictional reach of New Mexico courts as far as constitutionally permissible." Tercero v. Roman Catholic Diocese of Norwich, Conn., 2002–NMSC–018, ¶ 6, 48 P.3d 50, 54 (2002). Consequently, the Court "need not conduct a statutory analysis apart from the due process analysis." Marcus Food Co. v. DiPanfilo, 2011 WL 5084997, at 3 (internal quotation marks omitted).

2.   **General and Specific Jurisdiction.**

Depending on the character and extent of a defendant's contacts, a court may exercise general or specific personal jurisdiction. See Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 414 (1984).

> General jurisdiction is based on an out-of-state defendant's "continuous and systematic" contacts with the forum state, and does not require that the claim be related to those contacts. Specific jurisdiction, on the other hand, is premised on something of a quid pro quo: in exchange for "benefitting" from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of jurisdiction for claims related to those contacts.

Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1078 (emphasis in original). Thus,

"[s]uch contacts may give rise to personal jurisdiction over a non-resident defendant either generally, for any lawsuit, or specifically, solely for lawsuits arising out of particular forum-related activities." Shrader v. Biddinger, 633 F.3d 1235, 1239 (10th Cir.2011).

A court may assert specific jurisdiction "if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (citations omitted)(internal quotation marks omitted). In the tort context, a defendant has "purposefully directed" his activities at New Mexico or its residents when he or she has: (i) taken intentional action; (ii) the action was "expressly aimed" at New Mexico; and (iii) the action was taken with the knowledge that "the brunt of th[e] injury" would be felt in New Mexico. Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1069-70 (10th Cir. 2008)(*c*iting Calder v. Jones, 465 U.S. 783, 789-90 (1984)).

Cases involving the internet modify these general personal jurisdiction principles. In these cases, the United States Court of Appeals for the Tenth Circuit focuses on whether the website or internet user "intentionally direct[ed] his/her/its activity or operation at the forum state rather than just having the activity or operation accessible there." Shrader v. Biddinger, 633 F.3d 1235, 1240 (10th Cir.2011)(emphasis in original). Simply posting defamatory statements on a website will not, standing alone, establish personal jurisdiction over the poster in any state where the post may be read. See Shrader v. Biddinger, 633 F.3d at 1241. Instead, courts consider whether the "defendant deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state." Shrader v. Biddinger, 633 F.3d at 1241. In short, "the forum state itself must be the focal point of the tort." Shrader v. Biddinger, 633 F.3d at 1244 (emphasis in original)(quoting Dudnikov v. Chalk & Vermilion Fine

Arts, Inc., 514 F.3d at 1074 n.9)(internal quotation marks omitted).

### 3.     **Due Process and Personal Jurisdiction.**

      The due process analysis is also two-fold: First, [the defendant] must have "minimum contacts" with the forum state, demonstrating that he "purposefully availed" himself of the protections or benefits of the state's laws and "should reasonably anticipate being haled into court there." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473-76 . . . (1985); see also Emp'rs Mut. Cas. Co., 618 F.3d at 1159–60 (reiterating the Burger King standard). Although agreements alone are likely to be insufficient to establish minimum contacts, " 'parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities.'" TH Agric. & Nutrition, LLC v. Ace Eur. Grp. Ltd., 488 F.3d 1282, 1287–88 (10th Cir.2007)(quoting Burger King, 471 U.S. at 473, 478 . . . .

Marcus Food Co. v. DiPanfilo, 2011 WL 5084997, at *4.

      A defendant may reasonably anticipate being subject to suit in the forum state "if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 . . . (1985)(internal citation omitted); see also Hanson v. Denckla, 357 U.S. 235, 253 . . .(1958)("[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State.").

TH Agric. & Nutrition, LLC v. Ace Eur. Grp. Ltd., 488 F.3d at 1287-88.  The Supreme Court of

the United States has held that the mere foreseeability of harm occurring in a particular forum will

not support a finding of minimum contacts.  See World–Wide Volkswagen Corp. v. Woodson, 444

U.S. 286, 295 (1980)(holding that, although "an automobile is mobile by its very design and

purpose," thus indicating that it is foreseeable that a particular automobile may cause injury in a

forum state, " 'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction

under the Due Process Clause").  In Roberts v. Piper Aircraft Corp., 1983-NMCA-110, 100 N.M.

363, 670 P.2d 974, the Court of Appeals of New Mexico similarly rejected the argument that

foreseeability could establish minimum contacts, and found no personal jurisdiction or minimum

contacts in the following circumstances:

> [T]he record is devoid of any contact between Scenic Aviation and New Mexico. Scenic Aviation is a fixed-base operator selling aviation fuel in Las Vegas, Nevada. There is no evidence that Scenic Aviation advertises in New Mexico, or sells fuel to New Mexico residents. Without "contacts, ties, or relations" with New Mexico the fact that fuel sold by Scenic Aviation found its way into our state does not support a valid exercise of personal jurisdiction.

1983-NMCA-110, ¶ 19, 100 N.M. at 367, 670 P.2d at 978. "[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World–Wide Volkswagen Corp. v. Woodson, 444 U.S. at 297. As the Tenth Circuit has further explained, because "mere foreseeability" is not sufficient to establish minimum contacts, a plaintiff "must establish . . . not only that defendants foresaw (or knew) that the effects of their conduct would be felt in the forum state, but also that defendants undertook intentional actions that were expressly aimed at that forum state." Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1077.

Similarly, to find general jurisdiction over a defendant, contacts must be "continuous and systematic"; therefore, "[s]imply because a defendant has a contractual relationship and business dealings with a person or entity in the forum state does not subject him to general jurisdiction there"; "correspondence with a forum resident does not support general jurisdiction;" and "sporadic or isolated visits to the forum state will not subject the defendant to general jurisdiction," because a "[defendant's] lack of a regular place of business in [the forum state] is significant, and is not overcome by a few visits." Shrader v. Biddinger, 633 F.3d at 1247. "[G]eneral jurisdiction over a web site that has no intrinsic connection with a forum state requires commercial activity carried on with forum residents in such a sustained manner that it is tantamount to actual physical presence within the state." Shrader v. Biddinger, 633 F.3d at 1246. When analyzing minimum contacts sufficient for general jurisdiction in regard to the operation of a web site, the Tenth Circuit

has referred to, without adopting, a "sliding scale" framework.  Shrader v. Biddinger, 633 F.3d at

1242 n.5.

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

633 F.3d 1242 n.5 (internal quotation marks omitted).

> If [the defendant] is found to have the requisite minimum contacts with [the forum state], then we proceed to the second step in the due process analysis: ensuring that the exercise of jurisdiction over him "does not off' end 'traditional notions of fair play and substantial justice.'"  See World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 . . . (1980)(quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 . . . (1945)). [The defendant] bears the burden at this stage to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  See Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1080 (10th Cir.2008). We consider the following five factors, . . . in deciding whether the exercise of jurisdiction would be fair:
>
>> (1) the burden on the defendant, (2) the forum state's interests in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effectual relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states or foreign nations in furthering fundamental social policies.
>
> Id. (brackets omitted); see also OMI Holdings, Inc., 149 F.3d at 1095 (applying these factors in a case involving a Canadian corporation). "[T]he reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on minimum contacts, the less a defendant need show in terms of unreasonableness to defeat jurisdiction."  TH Agric. & Nutrition, LLC, 488 F.3d at 1292 (internal quotation marks and brackets omitted).

Marcus Food Co. v. DiPanfilo, 2011 WL 5084997, at *4-5.

In Silver v. Brown, 678 F. Supp. 2d 1187 (D.N.M. 2009)(Browning, J.), the Court

considered whether it had personal jurisdiction over defendants who allegedly slandered, defamed,

and caused the plaintiff -- Michael Silver -- duress, by posting a blog on the internet that portrayed

him in a negative light.  See 678 F. Supp. 2d at 1204.  The Court determined that it did not have

personal jurisdiction over defendant Jack McMullen, because Silver failed to demonstrate that

McMullen "was significantly associated with the blog or controlled it in any way."  678 F.Supp.2d

at 727.  The Court also concluded that it did not have personal jurisdiction over the blog post's

author -- Matthew Brown -- because he was not domiciled in New Mexico, had not traveled to

New Mexico, and did not transact business there.  See 678 F.Supp.2d at 1211.  The Court said that

Brown's blog posts similarly did not establish personal jurisdiction, because

> the blog is closer to an informative website than a commercial website. No services
> are offered, and Brown is not collecting revenue from the website. Brown does not
> interact with the people who post information on the blog. Brown, to the Court's
> knowledge, did not solicit negative postings on the website. Further, even though
> people in New Mexico can view the website, the blog is not a website that is
> directed solely at the people of New Mexico. The number of people who can access
> the website in New Mexico in comparison to those who are able to access the
> website throughout the world, or even in the United States, according to the
> statistics that Silver provided at the hearing, is nominal.

678 F. Supp. 2d at 1211–12.

On appeal, the Tenth Circuit affirmed the Court's holding as to McMullen, but reversed its

decision as to Brown.  See Silver v. Brown, 382 Fed. Appx. at 727-32.  In an opinion that the

Honorable Monrow G. McKay, United States Circuit Judge for the Tenth Circuit, authored, and

Judges Broby and Ebel joined, the Tenth Circuit applied the three-part test from Calder v. Jones to

conclude that the Court had personal jurisdiction over Brown. See Silver v. Brown, 382 Fed.

Appx. at 727-32.

Judge McKay first explained that the posting of the blog was "clearly an intentional act"

designed to damage the plaintiff's reputation. 382 Fed. Appx. at 729.  Second, Judge McKay said

that Brown had "expressly aimed his blog at New Mexico[,]" where Silver, his business, and the

majority of his customers were located.  382 Fed. Appx. at 729.  Judge McKay said: "It was about

a New Mexico resident and a New Mexico company. The blog complained of Mr. Silver's and

[his business'] actions in the failed business deal. Those actions occurred mainly in New Mexico."

382 Fed. Appx. at 729-30.  Third, Judge McKay explained that Brown knew Silver would suffer

the brunt of his injury in New Mexico, as the state was "unquestionably the center of his business

activities."  382 Fed. Appx. at 730.

### 4.    New Mexico's Long Arm Statute.

New Mexico's long-arm statute provides, in relevant part, that its courts may exercise

personal jurisdiction over a party "whether or not a citizen or resident of this state . . . as to any

cause of action arising from: (1) the transaction of business within this state . . . [or] (3) the

commission of a tortious act within this state . . . ." N.M.S.A. § 38-1-16.  For New Mexico courts

> to exercise personal jurisdiction over nonresident, out-of-state defendants, the
> following three-part test must be satisfied: (1) the defendant's act must be one of
> the five enumerated in the long-arm statute; (2) the plaintiff's cause of action must
> arise from the act; and (3) minimum contacts sufficient to satisfy due process must
> be established by the defendant's act.  State Farm Mut. Ins. Co. v. Conyers, 109
> N.M. 243, 244, 784 P.2d 986, 987 (1989)(citing Salas v. Homestake Enterprises,
> Inc., 106 N.M. 344, 345, 742 P.2d 1049, 1050 (1987)). The first and third step of
> this test have been "repeatedly equated" with the due process standard of
> "minimum contacts."

F.D.K. v. Hiatt, 1994-NMSC-044, ¶ 7, 117 N.M. 461, 463, 872 P.2d 879, 881.  "When negligent

acts occur outside New Mexico which cause injury within the state, a 'tortious act' has been

committed for purposes of the long-arm statute."  Tercero v. Roman Catholic Diocese of Norwich,

Conn., 2002-NMSC-018, ¶ 20, 132 N.M. 312, 319, 48 P.3d 50, 57.  "As with the transaction of

business analysis, rather than engage in a technical analysis of whether the defendant committed a

tortious act, we must equate the 'tortious act' which the defendant is alleged to have committed

with minimum contacts to determine if due process has been satisfied."  Tercero v. Roman

Catholic Diocese of Norwich, Conn., 2002-NMSC-018, ¶ 20, 132 N.M. at 319, 48 P.3d at 57 (alteration omitted)(internal quotation marks omitted).

    **5.**    **The Court's Recent Cases.**

    The Court recently decided cases dealing with general and specific jurisdiction.  In Fabara v. GoFit, LLC, a plaintiff injured by an allegedly defective exercise ball in New Mexico brought suit against the manufacturer, which was incorporated and headquartered in Oklahoma.  See 308 F.R.D. 380, 408 (D.N.M. 2015), as amended (Aug. 20, 2015)(Browning, J.).  The manufacturer moved to dismiss the complaint under rule 12(b)(2), arguing that the plaintiff lacked general jurisdiction because its contacts with New Mexico were neither continuous nor systematic.  See 308 F.R.D. at 384.  The plaintiff responded with photographs of the manufacturers' products in several stores, arguing that the manufacturer delivered the exercise balls into the stream of commerce with the expectation that New Mexico customers would purchase and use them.  See 308 F.R.D. at 389.  The Court rejected this theory, explaining that the manufacturer's contacts with New Mexico were not "so systematic and continuous as to make it essentially at home here."  308 F.R.D. at 397.  The Court noted that the manufacturer had almost no physical connections with New Mexico, and that its internet sales of roughly $20,000.00 over nine years were insufficiently "substantial" to support general jurisdiction. 308 F.R.D. at 402.

    In Diener v. Trapeze Asset Management, Inc., No. CIV 15-0566 JBLAM, 2015 WL 8332933 (D.N.M. Nov. 30, 2015)(Browning, J.), the Court considered whether it had specific jurisdiction over a Canadian asset management firm that maintained a passive website, placed its name in a third party's money-manager listing, mailed marketing materials to New Mexico, had telephone conversations with plaintiffs located in New Mexico, and ultimately entered into a contract with plaintiffs located in New Mexico.  See 2015 WL 8332933, at *1.  The Court concluded that it did not have specific jurisdiction for four primary reasons.  See 2015 WL

8332933, at *13.  First, the website was wholly passive and did not allow visitors "the opportunity to invest or interact with the site."  2015 WL 8332933, at *15.  Second, the third-party listing was similarly passive.  See 2015 WL 8332933, at *15.  Third, the Court noted that "phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts," noting that the alleged torts occurred in Canada.   2015 WL 8332933, at *17 (quoting Benton v. Cameco Corp., 375 F.3d 1070, 1077 (10th Cir. 2004)).  Fourth, the plaintiffs reached out to the defendants to create the contractual relationship, distinguishing the case from cases finding purposeful availment.  See 2015 WL 8332933, at *17 (citing Burger King Corp. v. Rudzewicz, 471 U.S. at 473).

## LAW REGARDING SERVICE OF PROCESS

Rule 4(m) of the Federal Rules of Civil Procedure requires a summons to be served within 120 days after the complaint is filed.

> If a defendant is not served within 120 days after the complaint is filed, the court -- on motion or on its own after notice to the plaintiff -- must dismiss the action without prejudice against that defendant or order that service be made within a specific time.  But, if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m).  The burden of establishing validity of service is on the plaintiff.  See F.D.I.C. v. Oaklawn Apartments, 959 F.2d 170, 174 (10th Cir. 1992). In 1993, Congress amended former rule 4(m) and "broaden[ed] the district court's discretion [to permit untimely service of process] by allowing it to extend the time for service even when the plaintiff has not shown good cause." Espinoza v. United States, 52 F.3d 838, 840-41 (10th Cir. 1995).  "A district court abuses its discretion [in deciding whether to dismiss a case for untimely service of process] if its decision is arbitrary, capricious, or whimsical."  Smyers v. County of Atchison, Kan., 336 Fed. Appx. 819, 820-21 (10th Cir. 2009).  Further, "[a] district court that does not exercise its discretion, or makes

a decision without providing reasons, abuses that discretion." ARW Exploration Corp. v. Aguirre, 45 F.3d 1455, 1459 (10th Cir. 1995).

Thus, the Court now employs a two-step analysis for determining whether to grant an extension of time when a summons and complaint has not been timely served. See Salazar v. City of Albuquerque, 278 F.R.D. 623, 626-27 (D.N.M. 2011)(Browning, J.). First, the plaintiff is entitled to a mandatory extension of time if the plaintiff can demonstrate good cause for failing to timely effect service. See Espinoza v. United States, 52 F.3d at 841. "The good cause provision of Rule 4[(m)] should be read narrowly to protect only those plaintiffs who have been meticulous in their efforts to comply with the Rule." Despain v. Salt Lake Area Metro Gang Unit, 13 F.3d 1436, 1438 (10th Cir. 1994)(internal quotation marks omitted). "[I]nadvertence or negligence alone do not constitute 'good cause' for failure of timely service. Mistake of counsel or ignorance of the rules also usually do not suffice." In re Kirkland, 86 F.3d 172, 176 (10th Cir. 1996). Avoiding or evading service of process, however, may constitute "good cause," requiring a mandatory extension of time in which to serve. Hendry v. Schneider, 116 F.3d 446, 449 (10th Cir. 1997).

Second, if the plaintiff fails to show good cause, the court still must exercise its discretion, and either dismiss the case without prejudice or extend the time for service. See Espinoza v. United States, 52 F.3d at 842. In making its determination whether to grant a permissive extension, the court may consider several factors, including whether the applicable statute of limitations would bar the re-filed action and other policy considerations. See Espinoza v. United States, 52 F.3d at 841-42.

> The new subdivision explicitly provides that the court shall allow additional time if there is good cause for the plaintiff's failure to effect service in the prescribed 120 days, and authorizes the court to relieve a plaintiff of the consequences of an application of this subdivision even if there is no good cause shown. Such relief

> formerly was afforded in some cases, partly in reliance on Rule 6(b). Relief may be justified, for example, if the applicable statute of limitations would bar the refiled action, or if the defendant is evading service or conceals a defect in attempted service.

Fed. R. Civ. P. 4(m) Advisory Committee's note (1993 Amend.).   See Salazar v. City of Albuquerque, 278 F.R.D. at 626-27.

## LAW REGARDING WAIVER OF SERVICE OF PROCESS

A defendant may also waive service of process. See Kiro v. Moore, 229 F.R.D. 228, 229-30 (D.N.M. 2005)(Browning, J.).  Under rule 4(i), "[i]f service is not waived, the person effecting service shall make proof thereof to the court."  Fed. R. Civ. P. 4(i).  Rules 12(b)(4) and 12(b)(5) allow a defendant to defend upon the grounds of insufficient service of process.  See rule 12(b)(4); 12(b)(5).  Under rule 12(h), however, the defense of "service of process must be raised in a party's first responsive pleading or by motion before the responsive pleading."  United States v. 51 Pieces of Real Property Roswell, N.M., 17 F.3d 1306, 1314 (10th Cir. 1994).  See Fed. R. Civ. P. 12(h)(1).  "If a party files a pre-answer motion and fails to assert the defenses of lack of personal jurisdiction or insufficiency of service, he waives these defenses."  Fed. Deposit Ins. Corp. v. Oaklawn Apartments, 959 F.2d 170, 175 (10th Cir. 1992)(citing Fed. R. Civ. P. 12(h)(1)).

Rule 4(d)(1) further requires individuals, corporations, or associations that are subject to service under rules 4(e), (f), or (h), to cooperate in saving unnecessary expenses of serving a summons and complaint.  See Fed. R. Civ. P. 4(d)(1).  A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.  See Fed. R. Civ. P. 4(d)(2).  If the waiver is signed and returned, you cannot object to the absence of a summons or of service.  See Fed. R. Civ. P. 4(d)(2). If you waive service you must, within the time specified on the waiver form, serve an answer or a motion under rule

12 on the plaintiff and file a copy with the court.  <u>See</u> Fed. R. Civ. P. 4(d)(3).  By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.  <u>See</u> Fed. R. Civ. P. 4(d)(3).

## LAW REGARDING DEFAULT JUDGMENTS AND THE ENTRY OF DEFAULT UNDER RULE 55

Rule 55 of the Federal Rules of Civil Procedure sets out a two-step process for a default judgment.  <u>See</u> <u>United States v. Rivera</u>, 2015 WL 4042197, at 9-12 (D.N.M. June 30, 2015)(Browning, J.).  First, a party must obtain a Clerk's entry of default.  <u>See</u> Fed. R. Civ. P. 55(a) ("When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."); <u>Watkins v. Donnelly</u>, 551 F. Appx. at 958 ("Entry of default by the clerk is a necessary prerequisite that must be performed before a district court is permitted to issue a default judgment.").  Second, either the party must request the Clerk to enter default judgment when the claim is for "a sum certain or a sum that can be made certain by computation," Fed. R. Civ. P. 55(b)(1), or, "[i]n all other cases, the party must apply to the court for a default judgment," Fed. R. Civ. P. 55(b)(2).

After entering default judgment, a district court takes all of the well-pleaded facts in a complaint as true.  <u>See</u> <u>United States v. Craighead</u>, 176 F. Appx. 922, 925 (10th Cir. 2006) (unpublished); <u>Flaks v. Koegel</u>, at 707 (2d Cir. 1974)("While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation."  (citations omitted)).  "If [a] defendant does not contest the amount prayed for in the complaint [by failing to answer] and the claim is for a sum certain or a sum that can be made certain by computation, the judgment generally will be entered for that amount without any further hearing."  <u>United States v. Craighead</u>, 176 F.

Appx. at 925 (alteration in original)(quoting 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman, Federal Practice & Procedure § 2688 (3d ed. 1998)).  See Fed. R. Civ. P. 8(d) ("Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading.").   A court may enter a default judgment for a damage award without a hearing if the amount claimed is "one capable of mathematical calculation."  Applied Capital, Inc. v. Gibson, 558 F. Supp. 2d 1189, 1202 (D.N.M. 2007)(Browning, J.)(quoting H.B. Hunt v. Inter-Globe Energy, Inc., 770 F.2d at 145, and citing Venable v. Haislip, 721 F.2d at 300)).   "It is a familiar practice and an exercise of judicial power for a court upon default, by taking evidence when necessary or by computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to recover and to give judgment accordingly."   10A Wright & Miller, supra, § 2688 (quoting Pope v. United States, 323 U.S. 1, 12 (1944)).   "If the damages sum is not certain or capable of easy computation, the court may" conduct such hearings or order such references as it deems necessary.  Applied Capital, Inc. v. Gibson, 558 F. Supp. 2d at 1202 (citing Beck v. Atl. Contracting Co., 157 F.R.D. 61, 64 (D. Kan. 1994)(Lungstrum, J.)).   See Fed. R. Civ. P. 55(b)(2)(B) ("The court may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to . . . determine the amount of damages.").

"Default judgments are a harsh sanction."  Ruplinger v. Rains (In re Rains), 946 F.2d 731, 732 (10th Cir. 1991).  The Court has noted that, "[b]ecause default judgment is a harsh sanction involving a court's power to enter and enforce judgments regardless of the merits of a case, courts do not favor such a sanction 'purely as a penalty for delays in filing or other procedural error.'" Noland v. City of Albuquerque, No. CIV 08-0056 JB/LFG, 2009 WL 2424591, at *1 (D.N.M. June 18, 2009)(Browning, J.)(quoting Ruplinger v. Rains (In re Rains), 946 F.2d at 733).

> [S]trong policies favor resolution of disputes on their merits: [T]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party. In that instance, the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights. The default judgment remedy serves as such a protection.

Ruplinger v. Rains (In re Rains), 946 F.2d at 732-33 (citations omitted)(internal quotation marks omitted).  See Noland v. City of Albuquerque, 2009 WL 2124591, at *1 (denying motion for default judgment, because the counsel for the defendant City of Albuquerque "entered an appearance three days after Noland filed his motion for default judgment," and, thus, the Court could not "reasonably say that the City of Albuquerque is an essentially unresponsive party, that the adversary process has been halted, or that Noland faces interminable delay because of the City of Albuquerque's actions").

"The court may set aside an entry of default for good cause, and it may set aside a default judgment under Rule 60(b)."  Fed. R. Civ. P. 55(c).  "[T]he good cause required by Fed. R. Civ. P. 55(c) for setting aside entry of default poses a lesser standard for the defaulting party than the excusable neglect which must be shown for relief from judgment under Fed. R. Civ. P. 60(b)." Pinson v. Equifax Credit Info. Servs., Inc., 316 F. Appx. 744, 750 (10th Cir. 2009)(unpublished) (quoting Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp., 115 F.3d 767, 775 n.6 (10th Cir. 1997)).  See Hunt v. Ford Motor Co., 1995 WL 523646, at *3.  The distinction between setting aside an entry of default and setting aside a default judgment "reflects the different consequences of the two events and the different procedures that bring them about." 10A Wright & Miller, supra, § 2692.

> [T]he clerk or the court may enter a default upon the application of the nondefaulting party. The entry simply is an official recognition of the fact that one party is in default, as, for example, for failure to comply with the rules, to appear as scheduled, or to prosecute the case with due diligence. The entry is an interlocutory step that is taken under Rule 55(a) in anticipation of a final judgment

by default under Rule 55(b).

  In sharp contrast, a final default judgment is not possible against a party in default until the measure of recovery has been ascertained, which typically requires a hearing, in which the defaulting party may participate; in some situations, a jury trial may be made available to determine an issue of damages. Moreover, the entry of a default judgment is a final disposition of the case and an appealable order.

. . . .

  Additional differences between relief from the entry of a default and from a default judgment appear in the grounds that will support the motion being granted. Stated generally, the defaulting party is not entitled to relief from a judgment as a matter of right under Rule 60(b). The movant must present a justification supporting the relief motion and must establish his contentions if challenged. Although whether relief will be granted is a matter within the sound discretion of the trial court, the vacation of a default judgment is subject to the explicit provisions of Rule 60(b), which places additional restraints upon the court's discretion. The motion to set aside a default entry, on the other hand, may be granted for "good cause shown," which gives a court greater freedom in granting relief than is available in the case of default judgments.

10A Wright & Miller, supra, § 2692 (footnotes omitted).

While there are some differences between setting aside the entry of default and setting aside a default judgment, there are some important similarities, including that courts may consider the same factors: whether the party willfully defaulted, whether setting aside the entry of default or default judgment would prejudice the non-movant, and whether the movant has presented a meritorious defense. See Pinson v. Equifax Credit Info Servs., Inc., 316 F. Appx. at 750 ("In deciding whether to set aside an entry of default, courts may consider, among other things, 'whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented.'" (quoting Dierschke v. O'Cheskey (In re Dierschke), 975 F.2d at 183)); United States v. $285,350.00 in U.S. Currency, 547 F. Appx. 886, 887 (10th Cir. 2013)(unpublished)("Three requirements must be met when setting aside a default judgment under Rule 60(b): '(1) the moving party's culpable conduct did not cause the default; (2) the

moving party has a meritorious defense; and (3) the non-moving party will not be prejudiced by setting aside the judgment.'" (quoting <u>United States v. Timbers Pres.</u>, 999 F.2d 452, 454 (10th Cir. 1993), abrogated on other grounds by <u>Degen v. United States</u>, 517 U.S. 820, 825 (1996))).   The United States Court of Appeals for the Tenth Circuit has, at times, listed two factors rather than three for the standard in setting aside a default judgment:

> Rule 60(b) of the Federal Rules of Civil Procedure permits relief from a final judgment only if the movant can demonstrate justifiable grounds, including mistake, inadvertence, surprise or excusable neglect. In the case of default judgments, courts have established the further requirement that a movant demonstrate the existence of a meritorious defense. *E.g.*, *Gomes v. Williams*, 420 F.2d 1364, 1366 (10th Cir. 1970).   A 60(b) motion thus comprehends two distinct aspects[:] justification for relief and a meritorious defense.

<u>In re Stone</u>, 588 F.2d at 1319. <u>See</u> <u>Sawyer v. USAA Ins. Co.</u>, 839 F. Supp. 2d 1189, 1230 (D.N.M. 2012)(Browning, J.)(setting aside a default judgment, because, "when a plaintiff fails to properly serve a defendant, a default judgment is void and should be set aside under rule 60(b)(4)"). "Although how these factors will be evaluated and weighed lies within the discretion of the trial court to a considerable degree, . . . federal courts are willing to grant relief from a default entry more readily and with a lesser showing than they are in the case of a default judgment."  10A Wright & Miller, <u>supra</u>, § 2692 (footnotes omitted).  "The standard for setting aside an entry of default under Rule 55(c) is fairly liberal because '[t]he preferred disposition of any case is upon its merits and not by default judgment.'"  <u>Crutcher v. Coleman</u>, 205 F.R.D. 581, 584 (D. Kan. 2001)(Vratil, J.)(quoting <u>Gomes v. Williams</u>, 420 F.2d 1364, 1366 (10th Cir. 1970)).  <u>See</u> <u>Applied Capital, Inc. v. Gibson</u>, 2007 WL 5685131, at 20-23 (liberally construing a pro se defendant's motion to dismiss as a motion to set aside the default, but concluding that the pro se defendant did not show good cause for the Court to set aside the entry of default, because, although setting aside the entry of default would not prejudice the plaintiff, the pro se defendant was "fully aware of the

need to answer within the given time limitation and chose not to respond timely," and he failed to appear at a hearing to support his allegation that he had a meritorious defense).

## LAW REGARDING RULE 60(b)

Rule 60(b) of the Federal Rules of Civil Procedure allows a court to relieve a party from a judgment or order for "mistake, inadvertence, surprise, or excusable neglect," Fed. R. Civ. P. 60(b)(1), or "any other reason that justifies relief," Fed. R. Civ. P. 60(b)(6).  "Rule 60(b) is an extraordinary procedure permitting the court that entered judgment to grant relief therefrom upon a showing of good cause within the rule." Cessna Fin. Corp. v. Bielenberg Masonry Contracting, Inc., 715 F.2d 1442, 1444 (10th Cir. 1983).  Rule 60(b) "is not a substitute for appeal, and must be considered with the need for finality of judgment." Cessna Fin. Corp. v. Bielenberg Masonry Contracting, Inc., 715 F.2d at 1444 (citing Brown v. McCormick, 608 F.2d 410, 413 (10th Cir. 1979)).  The rule was designed to strike a "delicate balance" between respecting the finality of judgment and, at the same time, recognizing the court's principal interest of executing justice. Cessna Fin. Corp. v. Bielenberg Masonry Contracting, Inc., 715 F.2d at 1444.  Once a case is "unconditionally dismiss[ed]," the court loses all jurisdiction over the case other than the ability to hear motions under rule 60(b). Smith v. Phillips, 881 F.2d 902, 904 (10th Cir. 1989)("We agree with the Seventh Circuit that '[a]n unconditional dismissal terminates federal jurisdiction except for the limited purpose of reopening and setting aside the judgment of dismissal within the scope allowed by [Fed. R. Civ. P.] 60(b)." (alterations in original)).

Motions to obtain relief from a judgment or order based on "mistake, inadvertence, surprise, or excusable neglect" must be brought "within a reasonable time . . . no more than a year after the entry of the judgment or order or the date of the proceeding." Fed. R. Civ. P. 60(c)(1). See Blanchard v. Cortes-Molina, 453 F.3d 40, 44 (1st Cir. 2006)("[R]elief from judgment for

reasons of 'mistake, inadvertence, surprise, or excusable neglect,' must be sought within one year

of the judgment."). This deadline may not be extended and is not subject to the court's

discretion. See Fed. R. Civ. P. 6(b)(2) ("A court must not extend the time to act under Rules 50(b)

and (d), 52(b), 59(b), (d), and (e), and 60(b)." (emphases added)). An appeal's pendency does not

toll the time requirement for pursuing a motion under rule 60(b). See Fed. R. Civ. P.

60(c)(1); Griffin v. Reid, 259 F. Appx. 121, 123 (10th Cir. 2007)(unpublished); Tool Box, Inc. v.

Ogden City Corp., 419 F.3d 1084, 1088 (10th Cir. 2005)("[A]n appeal does not toll or extend the

one-year time limit of Rule 60(b)."). No time limit applies to rule 60(b)(6) other than that the

motion be made within a reasonable time. See Fed. R. Civ. P. 60(c)(1).

1. **Rule 60(b)(1).**

The Tenth Circuit uses three factors in determining whether a judgment may be set aside

in accordance with rule 60(b)(1): (i) whether the moving party's culpable conduct caused the

default; (ii) whether the moving party has a meritorious defense; and (iii) whether the nonmoving

party will be prejudiced by setting aside the judgment. See United States v. Timers Preserve, 999

F.2d 452, 454 (10th Cir. 1993). Under some circumstances, a party can rely on rule 60(b)(1) to

rectify its attorney's mistake or when its attorney acted without its authority. See Yapp v. Excel

Corp., 186 F.3d 1222, 1231 (10th Cir. 1999)("Rule 60(b)(1) motions premised upon mistake are

intended to provide relief to a party . . . when the party has made an excusable litigation mistake

or an attorney has acted without authority . . . ."). Mistake in this context entails either acting

without the client's consent or making a litigation mistake, such as failing to file or comply with

deadlines. See Yapp v. Excel Corp., 186 F.3d at 1231. If the alleged incident entails a mistake,

then it must be excusable, meaning that the party was not at fault. See Pioneer Inv. Servs. v.

Brunswick Assocs. LP, 507 U.S. 380, 394 (1993)("This leaves, of course, the Rule's requirement

that the party's neglect be 'excusable.'"); Cashner v. Freedom Stores, Inc., 98 F.3d 572, 577 (10th

Cir. 1996)("If the mistake alleged is a party's litigation mistake, we have declined to grant relief

under Rule 60(b)(1) when the mistake was the result of a deliberate and counseled decision by the

party."). Cf. Pelican Prod. Corp. v. Marino, 893 F.2d 1143, 1146 (10th Cir. 1990)(holding attorney

carelessness is not a basis for relief under Rule 60(b)(1)).

Courts will not grant relief when the mistake of which the movant complains is the result

of an attorney's deliberate litigation tactics. See Cashner v. Freedom Stores, Inc., 98 F.3d at 577.

This rule exists because a party

> voluntarily chose [the] attorney as his representative in the action, and he cannot
> now avoid the consequences of the acts or omissions of this freely selected agent.
> Any other notion would be wholly inconsistent with our system of representative
> litigation, in which each party is deemed bound by the acts of his lawyer agent and
> is considered to have notice of all facts, notice of which can be charged upon the
> attorney.

Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. at 397 (quoting Link v. Wabash R.R. Co.,

370 U.S. 626, 633-34 (1962))(internal quotation marks omitted). The Tenth Circuit has held that

there is nothing "novel" about "the harshness of penalizing [a client] for his attorney's conduct"

and has noted that those "who act through agents are customarily bound," even though, when "an

attorney is poorly prepared to cross-examine an expert witness, the client suffers the

consequences." Gripe v. City of Enid, Okla., 312 F.3d 1184, 1189 (10th Cir. 2002). The Court

has previously stated:

> There is a tension between how the law treats attorney actions that are without
> authority, thus permitting relief under rule 60(b), and how the law treats those
> attorney actions which are inexcusable litigations decisions, thus failing to qualify
> for relief; although the distinction between those actions may not always be logical,
> it is well established.

Wilson v. Jara, No. CIV 10-0797 JB/WPL, 2012 WL 1684595, at 7 (D.N.M. May 10,

2012)(Browning, J.).

2.      **Rule 60(b)(6).**

Rule 60(b)(6) provides that a court may relieve a party from final judgment, order, or proceeding for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). No time limit applies to rule 60(b)(6) save that the motion be made within a reasonable time. See Fed. R. Civ. P. 60(c)(1). "Thus, to the extent it is applicable, clause (6) appears to offer a means of escape from the one-year limit that applies to motions under clauses (1), (2), and (3)." Wright & Miller, supra, § 2864, at 490. In Pioneer Investment Services Co. v. Brunswick Associates Ltd., 507 U.S. 380 (1993), the Supreme Court reasoned that, to avoid abrogating the one-year time limit for rule 60(b)(1) to (3), rule 60(b)'s "provisions are mutually exclusive, and thus a party who failed to take timely action due to 'excusable neglect' may not seek relief more than a year after the judgment by resorting to subsection (6)." Pioneer Investment Services Co. v. Brunswick Associates Ltd., 507 U.S. at 393 (citing Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 & n.11 (1988)). "If the reasons offered for relief from judgment could be considered under one of the more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule 60(b)(6)." Moore et al., supra, § 60.48[2], at 60-182. Accord Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 863 n.11 ("This logic, of course, extends beyond clause (1) and suggests that clause (6) and clauses (1) through (5) are mutually exclusive.").

Rule 60(b)(6) is a "grand reservoir of equitable power to do justice in a particular case." Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991)(internal quotation marks omitted). "The Rule does not particularize the factors that justify relief, but we have previously noted that it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,' while also cautioning that it should only be applied in 'extraordinary circumstances.'" Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 863. Generally, the situation must be one beyond the control of the party requesting relief

under rule 60(b)(6) to warrant relief. See Ackermann v. United States, 340 U.S. 193, 202 (1950)("The comparison [of prior precedent] strikingly points up the difference between no choice and choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no chance for negligence and inexcusable negligence. Subsection 6 of Rule 60(b) has no application to the situation of petitioner."). Legal error that provides a basis for relief under rule 60(b)(6) must be extraordinary, as the Tenth Circuit discussed in Van Skiver v. United States:

> The kind of legal error that provides the extraordinary circumstances justifying relief under Rule 60(b)(6) is illustrated by Pierce [v. Cook & Co., 518 F.2d 720, 722 (10th Cir. 1975)(en banc) ]. In that case, this court granted relief under 60(b)(6) when there had been a post-judgment change in the law "arising out of the same accident as that in which the plaintiffs . . . were injured." Pierce, 518 F.2d at 723. However, when the post-judgment change in the law did not arise in a related case, we have held that "[a] change in the law or in the judicial view of an established rule of law" does not justify relief under Rule 60(b)(6). Collins v. City of Wichita, 254 F.2d 837, 839 (10th Cir. 1958).

Van Skiver v. United States, 952 F.2d at 1244-45.

"Courts have found few narrowly-defined situations that clearly present 'other reasons justifying relief.'" Wright & Miller, supra, § 2864, at 483. The Supreme Court has expounded:

> To justify relief under subsection (6), a party must show "extraordinary circumstances" suggesting that the party is faultless in the delay. If a party is partly to blame for the delay, relief must be sought within one year under subsection (1) and the party's neglect must be excusable. In Klapprott, for example, the petitioner had been effectively prevented from taking a timely appeal of a judgment by incarceration, ill health, and other factors beyond his reasonable control. Four years after a default judgment had been entered against him, he sought to reopen the matter under Rule 60(b) and was permitted to do so.

Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd., 507 U.S. 380, 393 (1993)(citing Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 863 & n.11; Ackerman v. United States, 340 U.S. at 197-200; Klapprott v. United States, 335 U.S. 601, 613-614 (1949)). See Gonzalez v. Crosby, 545 U.S. 524, 535 (2005)("[O]ur cases have required a movant seeking relief under Rule 60(b)(6) to show 'extraordinary circumstances' justifying the reopening of a final judgment.")(no citation for

quotation).   In <u>Gonzalez v. Crosby</u>, the Supreme Court found a change in the law during the pendency of a habeas petition was not an extraordinary circumstance. <u>See</u> 545 U.S. at 537.

When the Supreme Court first addressed rule 60(b)(6) a year after it was introduced to the federal rules, while the Justices were sharply divided on other issues, no dispute arose from Justice Black's statement: "[O]f course, the one year limitation would control if no more than 'neglect' was disclosed by the petition.   In that event the petitioner could not avail himself of the broad 'any other reason' clause of 60(b)."   <u>Klapprott v. United States</u>, 335 U.S. at 613.   <u>See</u> Wright & Miller, <u>supra</u>, § 2864, at 493.   Examples where courts apply rule 60(b)(6) include "settlement agreements when one party fails to comply" and courts use the rule "to return the parties to the status quo," or in cases where fraud is used by a "party's own counsel, by a codefendant, or by a third-party witness," which does not fit within rule 60(b)(3)'s provision for fraud by an adverse party. Wright & Miller, <u>supra</u>, § 2864, at 485, 487.   The most common application is to grant relief "when the losing party fails to receive notice of the entry of judgment in time to file an appeal." Wright & Miller, <u>supra</u>, § 2864, at 488.   When moving for relief pursuant to rule 60(b)(6), it is not enough to argue the same issues that a court has already addressed.   <u>See</u> <u>Pyeatt v. Does</u>, 19 F. Appx. 785, 788 (10th Cir. 2001)(unpublished)("[A] motion to reconsider [that] simply reasserts information considered by the district court in its initial determination . . . does not meet the extraordinary circumstances standard required for Rule 60(b)(6) relief.").

### <u>LAW REGARDING JURY TRIALS FOLLOWING A DEFAULT JUDGMENT</u>

Rule 38(d) provides that, once made, "a demand for trial by jury . . . may not be withdrawn without the consent of the parties."  Fed. R. Civ. P. 38(d).  The Court discussed the right to a jury trial after entry of default in <u>Mitchell v. Bd. of Cty. Comm'rs</u>, CIV 05-1155, 2007 WL 2219420, at *11-13 (D.N.M. May 9, 2007)(Browning, J.).   "The Court notes that many cases have held 'that

the protection of Rule 38(d) is extended to the defendant after the entry of default, when Rule 55(b)(2) requires a determination of damages.'" Mitchell v. Bd. of Cty. Comm'rs, 2007 WL 2219420, at *12 (quoting Kormes v. Weis, Voisin & Co., Inc., 61 F.R.D. 608, 610 (E.D. Pa. 1974)(Fogel, J.)(ruling that the jury demand associated with the damages hearing could not be unilaterally withdrawn in a case where the defendant made an appearance))(citing Bass v. Hoagland, 172 F.2d 205 (5th Cir. 1949); Cinque v. Langton, 8 Fed. R. Serv. 55 b.224, case 1 (E.D.N.Y. 1944)).  The Court held that rule 38(d)'s plain language requires that the party against whom default is entered must give his or her consent to allow the other party to withdraw a jury demand. See Mitchell v. Bd. of Cty. Comm'rs, 2007 WL 2219420, at *11-13.

Rule 54(d)(1) of the Federal Rules of Civil Procedure provides that, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs -- other than attorney's fees -- should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1).  A district court has broad discretion in deciding whether to award costs.  See Howell Petroleum Corp. v. Samson Resources Co., 903 F.2d 778, 783 (10th Cir. 1990).  There are, however, some limitations on a district court's discretion.  See Cantrell v. Int'l Broth. of Elec. Workers, AFL-CIO, Local 2021, 69 F.3d 456, 458 (10th Cir. 1995).  First, rule 54 creates a presumption that a court will award costs to a prevailing party.  See Cantrell v. Int'l Broth. of Elec. Workers, AFL-CIO, Local 2021, 69 F.3d at 458-59 ("[I]t is well-established that Rule 54 creates a presumption that the district court will award costs to the prevailing party.").  Second, if a court chooses not to award costs to a prevailing party, it must provide a valid reason for doing so.  See Cantrell v. Int'l Broth. of Elec. Workers, AFL-CIO, Local 2021, 69 F.3d at 459.

A district court has discretion in deciding whether to award costs to a party that achieves only partial success in some circumstances.  See Howell Petroleum Corp. v. Samson Res. Co., 903

F.2d at 783.   In Roberts v. Madigan, 921 F.2d 1047 (10th Cir. 1990), the plaintiffs appealed a district court decision to award the defendants their entire costs under rule 54(d), because the defendants had not prevailed on all claims.   See Roberts v. Madigan, 921 F.3d at 1058.   The Tenth Circuit held that a district court does not abuse its discretion when it awards full costs to a party who prevails on the majority of claims and the central claims at issue.   See Roberts v. Madigan, 921 F.3d at 1058.   Thus, the Tenth Circuit affirmed the district court's ruling, basing its holding "on the broad discretion of the district court" to award costs.   Roberts v. Madigan, 921 F.3d at 1058.   The Tenth Circuit also noted that other Courts of Appeals have upheld district court awards of full costs when a party prevailed on only part of its case.   See Roberts v. Madigan, 921 F.3d at 1058 (citing United States v. Mitchell, 580 F.2d 789, 793 (5th Cir. 1978); K-2 Ski Co. v. Head Ski Co., Inc., 506 F.2d 471, 477 (9th Cir. 1974)). In Haynes Trane Service Agency, Inc. v. American Standard, Inc., 573 F.3d 947 (10th Cir. 2009), the Tenth Circuit held that a district court did not abuse its discretion in awarding costs to the defendant where the defendant was unsuccessful on each of its counterclaims, but the plaintiff was similarly unsuccessful on each of its claims. See Haynes Trane Service Agency, Inc. v. American Standard, Inc., 573 F.3d at 967.   It held that "[i]n a case like this in which all claims and counterclaims have failed, costs may be awarded to the counterclaimant if it successfully fend[ed] off a large claim . . . despite failure to prevail on a [smaller] counterclaim."   Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc., 573 F.3d at 967.

## RELEVANT LAW REGARDING ATTORNEY'S FEES

With regard to the award of attorney's fees and costs, the Tenth Circuit follows the "American Rule," under which parties to a lawsuit ordinarily pay their own attorney's fees.   Pound v. Airosol Co., 498 F.3d 1089, 1100 (10th Cir. 2007)(citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240 (1975)).   "There are several exceptions to this principle. Most

notably, there are certain statutory fee-shifting provisions that permit a court to order one party to pay the fees and costs of another." Pound v. Airosol Co., 498 F.3d at 1100 (citing Bennett v. Coors Brewing Co., 189 F.3d 1221, 1238 (10th Cir. 1999)).   Under the American Rule, each party generally pays its own attorney's fees, unless there is a contract or a statute specifying otherwise. See Marx v. Gen. Revenue Corp., 668 F.3d 1174, 1179 (10th Cir. 2011); Mountain Highlands, LLC v. Hendricks, No. CIV 08-0239 JB/ACT, 2010 WL 1631856, at *3 (D.N.M. April 2, 2010)(Browning, J.).   Congress has legislated exceptions for prevailing plaintiffs in actions to enforce federal rights.   See, e.g., 42 U.S.C. § 1988(b); 29 U.S.C. § 216(b); 17 U.S.C. § 505; 28 U.S.C. § 3905(a).   Other statutes make an exception to the American Rule for suits brought in bad faith, brought for purposes of harassment, or known to be meritless.   See 28 U.S.C. § 1875(d)(2); 15 U.S.C. § 1693m(f).

## LAW REGARDING DEFAULT JUDGMENT AND DAMAGES

In the case of a party's motion for a for a default judgment, the Court may enter judgment for liquidated damages, but will need a hearing for unliquidated damages. If the amount is unliquidated, the Court will need to set a separate hearing.

1.   **New Mexico Law.**

With respect to awarding damages upon the issuance of a default judgment, New Mexico and federal law are essentially the same.   Rule 1-055B of the New Mexico Rules of Civil Procedure, and established case law, "clearly states that the trial court must hold a hearing to determine the amount of any unliquidated damages before it may enter a default judgment." DeFillippo v. Neil, 2002-NMCA-085, ¶ 19, 132 N.M. 529, 51 P.3d 1183, 1188 (citing Armijo v. Armijo, 1982-NMCA-124, ¶¶ 12-13, 98 N.M. 518, 520, 650 P.2d 40, 42 ("[W]here the claim for damages is unliquidated, it would be an abuse of discretion not to have a hearing and to put plaintiff

to the test of presenting evidence to support the claim for damages.")).

While rule 1-055B does not expressly require that notice of such a hearing be given to the defaulting defendant, "the damages hearing must be regarded as a hearing on the application for default judgment and [ ] written notice must be given if the [defaulting] party has appeared in the action." Rodriguez v. Conant, 1987-NMSC-0040, ¶ 15, 105 N.M. 746, 749, 737 P.2d 527, 530. At a hearing to assess damages after the entry of a default, the defaulting defendant has the right to cross-examine the plaintiff's witnesses and to introduce affirmative evidence on the mitigation of damages. See Gallegos v. Franklin, 1976-NMCA-019, ¶ 40, 89 N.M. 118, 123, 547 P.2d 1160, 1165. "A punitive damage claim is not admitted by a default. Neither is punitive damages provided for in Rule 55(b)." Gallegos v. Franklin, ¶ 49, 89 N.M. at 125, 547 P.2d at 1167 (remanding to the trial court to hold a hearing at which the parties may present evidence regarding compensatory and punitive damages).

### 2.    Federal Law.

Rule 55(b)(2) of the Federal Rules of Civil Procedure provides:

> If, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearings or order such references as it deems necessary.

Fed. R. Civ. P. 55(b)(2). "A court may enter a default judgment without a hearing only if the amount claimed is a liquidated sum or one capable of mathematical calculation." Hunt v. Inter-Globe Energy, Inc., 770 F.2d 145, 148 (10th Cir.1985)(citing Venable v. Haislip, 721 F.2d 297, 300 (10th Cir. 1983)). If the damages sum is not certain or capable of easy computation, the court may hold whatever hearing or inquiry it deems necessary. See Beck v. Atlantic Contracting Co., 157 F.R.D. at 64. "Similarly, attorney's fees may not be awarded without a hearing to

determine the amount." Hunt v. Inter-Globe Energy, Inc., 770 F.2d at 148.

"Entry of default precludes a trial on the merits." Olcott v. Delaware Flood Co., 327 F.3d 1115, 1119 n. 3 (10th Cir. 2003). Rule 55(b)(2) does not contain an inherent jury requirement; rather, it preserves the right to a jury only when statute requires. See Olcott v. Delaware Flood Co., 327 F.3d at 1124. At least where the parties have not requested a jury before entry of default, the "[d]efendants do not have a constitutional right to a jury trial following entry of default." Olcott v. Delaware Flood Co., 327 F.3d at 1124. See Mitchell v. Bd. of County Comm'rs of the County of Santa Fe, No. CIV 05-1155 JB/ALM, 2007 WL 2219420, at *18-23 (D.N.M. May 9, 2007)(Browning, J.).

Regarding punitive damages, "[a] plaintiff cannot satisfy the certainty requirement simply by requesting a specific amount. [The plaintiff] must also establish that the amount requested is reasonable under the circumstances." Beck v. Atlantic Contracting Co., 157 F.R.D. at 65. A damages hearing may not be required before entering a punitive damages award, however, when the court is familiar with the defendant's conduct and otherwise has sufficient information with which to make a reasonable determination. See James v. Frame, 6 F.3d 307, 310-11 (5th Cir. 1993). With regard to multiple defendants, "when one of several defendants who is alleged to be jointly liable defaults, judgment should not be entered against him until the matter has been adjudicated with regard to all defendants, or all defendants have defaulted" -- this avoids inconsistent liability determinations among joint tortfeasors. H.B. Hunt v. Inter-Globe Energy, Inc., 770 F.2d at 147 (citing Frow v. De La Vega, 82 U.S. (15 Wall.) 552, 21 L.Ed. 60 (1872)).

## NEW MEXICO LAW REGARDING NEGLIGENCE

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the

breach being a cause-in-fact and proximate cause of the plaintiff's damages.  See Coffey v. United States, 870 F.Supp.2d 1202, 1225 (D.N.M. 2012)(Browning, J.)(citing Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 6, 134 N.M. 43, 73 P.3d 181, 185-86).   "In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person."  Ramirez v. Armstrong, 1983-NMSC-104, ¶ 8, 100 N.M. 538, 673 P.2d 822, 825, overruled on other grounds by Folz v. State, 1990-NMSC-075, ¶ 3, 110 N.M. 457, 797 P.2d 246, 249.   Generally, negligence is a question of fact for the jury.  See Schear v. Bd. of Cnty Comm'rs, 1984-NMSC-079, ¶ 4, 101 N.M. 671, 687 P.2d 728, 729.  "A finding of negligence, however, is dependent upon the existence of a duty on the part of the defendant."  Schear v. Bd. of Cnty Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d at 729.  "Whether a duty exists is a question of law for the courts to decide."  Schear v. Bd. of Cnty Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d at 729 (citation omitted).   Once courts recognize that a duty exists, that duty triggers "a legal obligation to conform to a certain standard of conduct to reduce the risk of harm to an individual or class of persons."  Baxter v. Noce, 1988-NMSC-024, ¶ 11, 107 N.M. 48, 752 P.2d 240, 243.

New Mexico courts have stated that foreseeability of a plaintiff alone does not end the inquiry into whether the defendant owes a duty to the plaintiff.  See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 7, 134 N.M. at 48, 73 P.3d at 186.  New Mexico courts have recognized that, "[u]ltimately, a duty exists only if the obligation of the defendant [is] one to which the law will give recognition and effect."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 134 N.M. at 48-49, 73 P.3d at 187 (internal quotation marks omitted).  To determine whether the defendant's obligation is one to which the law will give recognition and effect, courts consider legal precedent, statutes, and other principles of law.  See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 186.

"As a general rule, an individual has no duty to protect another from harm."  Grover v. Stechel, 2002-NMCA-049, ¶ 11, 132 N.M. 140, 45 P.3d 80, 84.  "[C]ertain relationships, however, that give rise to such a duty [include]: (1) those involving common carriers, innkeepers, possessors of land; and (2) those who voluntarily or by legal mandate take the custody of another so as to deprive the other of his normal opportunities for protection."  Grover v. Stechel, 2002-NMCA-049, ¶ 11, 132 N.M. at 140, 45 P.3d at 84.  "[W]hen a person has a duty to protect and the third party's act is foreseeable, 'such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the [person who has a duty to protect] from being liable for harm caused thereby.'"  Reichert v. Atler, 1994-NMSC-056, ¶ 11, 117 N.M. 623, 875 P.2d 379, 382.

"[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 194.  "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case . . . ."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 195.

"A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.  "It need not be the only cause, nor the last nor nearest cause."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.  "It is sufficient if it occurs with some other cause acting at the

same time, which in combination with it, causes the injury." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.

## NEW MEXICO LAW REGARDING STRICT PRODUCTS LIABILITY

"Under the 'product liability' claim, a supplier in the business of putting a product on the market is liable for harm caused by an unreasonable risk of injury resulting from a condition of the product or from a manner of its use." N.M.R.A., Civ. UJI 13-1406 (no citation for quotation). See Stang v. Hertz Corp., 1972-NMSC-031, ¶ 6, 83 N.M. 730, 497 P.2d 732, 734; Trujillo v. Berry, 1987-NMCA-072, ¶ 5 n.1, 106 N.M. 86, 738 P.2d 1331, 1333 n.1 (stating that "the purpose behind the strict products liability doctrine is to allow an injured user . . . to recover against a supplier . . . without the requirement of proving negligence."). For a plaintiff to recover under strict products liability, the plaintiff must prove: (i) "that the product was sold in a defective condition unreasonably dangerous to the user or consumer or to his property"; (ii) "that the seller was engaged in the business of selling such a product"; and "that the product was expected to and did reach the consumer without substantial change in the condition in which it was sold." Standhardt v. Flintkote Co., 1973-NMSC-040, ¶ 14, 84 N.M. 796, 508 P.2d 1283, 1290. The term "seller" is not an exclusive, restrictive term for identifying potential defendants in a strict products liability action. Moreover, the New Mexico's Uniform Jury Instructions use the term "supplier" to identify a liable party under strict products liability, and the term is used with particular purpose. N.M.R.A., Civ. UJI 13-1406 cmt. The committee commentary to the jury instruction states that "certain commercial promotions or other transactions do not involve the business of selling a product, [thus] the committee chose 'business of putting the product on the market'" rather than simply "seller." N.M.R.A., Civ. UJI 13–1406 cmt. The committee stated that "supplier" captures the Supreme Court of New Mexico's rationale for adopting strict products liability better than

"seller," because holding those who put a defective product on the market liable serves the risk-balancing goal of strict products liability. N.M.R.A., Civ. UJI 13-1406 cmt. (citing Escola v. Coca Cola Bottling Co., 24 Cal.2d 453, 150 P.2d 436, 440-41 (1944) for its discussion of risk-distribution, in which the Supreme Court of California states that "public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inhere in defective products that reach the market").

While the Supreme Court of New Mexico has allowed plaintiffs to recover from manufacturers, retailers, and wholesalers, New Mexico courts have specifically declined to hold an employer strictly liable for harm caused by a product that employees use in their course of work. Compare AALCO Mfg. Co. v. City of Espanola, 1980-NMSC-088, ¶¶ 3-6, 95 N.M. 66, 618 P.2d 1230, 1231 (stating that strict liability applies to manufacturers, wholesalers, and retailers), with Trujillo v. Sonic Drive-In/Merritt, 1996-NMCA-106, ¶ 29, 122 N.M. 359, 924 P.2d 1371, 1377 ("[W]e are not persuaded that, under the doctrine of strict products liability, Employer would be considered the supplier . . . thus making it strictly liable for injuries caused by a defect in [an ice cream machine]."). In Trujillo v. Sonic Drive-In/Merritt, the Court of Appeals of New Mexico cited N.M.R.A., Civ. UJI 13-1406, and held that an employer could not be held strictly liable for the injuries a defective ice-cream machine caused to employees, because the employer was not a "supplier" of the machine. 1996-NMCA-106, ¶¶ 29-30, 122 N.M. at 365, 924 P.2d at 1377-78. The Court of Appeals of New Mexico distinguished a prior case which held that the car wash operator could be strictly liable for the injuries that machinery used at the car wash inflicted on a customer. See 1996-NMCA-106, ¶¶ 29-30, 122 N.M. at 365, 924 P.2d at 1378 (distinguishing Trujillo v. Berry (holding that a car-wash operator may be strictly liable for injuries caused by machinery used on its property, if a trial court determines that the car-wash operator

was a "supplier" of the defective machine)). The Court of Appeals of New Mexico explained that the prior case "would only have [imposed strict products liability] if the car-wash defendant was later determined by the trial court to be a supplier," a determination which the trial court did not make in that case. 1996-NMCA-106, ¶ 29, 122 N.M. at 365, 924 P.2d at 1378. The Court of Appeals of New Mexico ruled, therefore, that the employer was not strictly liable for owning a defective machine which inflicted injuries on an employee while the employee operated it. See 1996-NMCA-106, ¶¶ 29-30, 122 N.M. at 365, 924 P.2d at 1378.

The Court has interpreted New Mexico strict-products liability law to foreclose recovery against parties that do not place an allegedly defective product on the market. See Provencio v. Ford Motor Co., 2005 WL 3662957, at *8 (D.N.M. 2005)(Browning, J.). The Court explained that, in Arenivas v. Continental Oil Co., 1983-NMCA-104, 102 N.M. 106, 692 P.2d 31, an operator and part-owner of an oil field was not the supplier of a pumping unit used on the land, because it "did not in any way place the pumping unit in the stream of commerce." Provencio v. Ford Motor Co., 2005 WL 3662957, at *8 (quoting Arenivas v. Continental Oil Co., 1983-NMCA-104, ¶ 15, 102 N.M. 106, 109, 692 P.2d 31, 34). The Court also explained that, in Livingston v. Begay, 1982-NMSC-121, 98 N.M. 712, 652 P.2d 734, the Supreme Court of New Mexico concluded that "a motel operator is not strictly liable for defects in the fixtures and furnishings of the rooms he holds out to the public," because the motel operator has not introduced those items into the "stream of commerce." Provencio v. Ford Motor Co., 2005 WL 3662957, at *8 (quoting Livingston v. Begay, 1982-NMSC-121, ¶ 29, 98 N.M. at 716-17, 652 P.2d at 739). "The thread that binds these cases is that, in each case, the alleged supplier did not sell the defective product to anyone." Provencio v. Ford Motor Co., 2005 WL 3662957 at *8. Accordingly, a party who does not sell or otherwise place an allegedly defective product in the stream of commerce may not be strictly liable for any

alleged harm the product caused, and, thus, may not be jointly and severally liable for harm the product causes under New Mexico's strict products liability law.  See Livingston v. Begay, 1982-NMSC-121, ¶ 29, 98 N.M. at 716-17, 652 P.2d at 739.

## LAW REGARDING BREACH OF WARRANTIES

Under the UCC, there are at least two warranties that the manufacturer makes: (i) the implied warranty of fitness for a particular purpose; and (ii) the implied warranty of merchantability.  In Perfetti v. McGhan Medical, 1983-NMCA-032, 99 N.M. 645, 662 P.2d 646, the Court of Appeals of New Mexico, in considering the claim of an express warranty, stated: "Any express warranty made with respect to the surgeon would inure to plaintiff's benefit on the basis that the surgeon was acting as plaintiff's agent in the use of the prosthesis."  Perfetti v. McGhan Medical, 1983-NMCA-032, ¶ 26, 662 P.2d at 652.  The Court of Appeals of New Mexico concluded that there was no evidence of an express warranty that was breached. See Perfetti v. McGhan Medical, 1983-NMCA-032, ¶ 35, 662 P.2d at 653.  In discussing the claim of an implied warranty, the Court of Appeals of New Mexico explained that the defendant was "incorrect in urging a congruence between products liability and the implied warranty of fitness for a particular purpose.  Products liability requires a defect . . . . [T]he implied warranty of fitness for a particular purpose does not require a defect."  Perfetti v. McGhan Medical, 1983-NMCA-032, ¶ 44, 662 P.2d at 653.

1.     **Breach of the Implied Warranty of Fitness for a Particular Purpose.  .**

Under the UCC, it is the sale of goods that brings the implied-warranty provisions into operation.  See Ortiz v. Gas Co., 1981-NMCA-128, ¶ 13, 97 N.M. 81, 636 P.2d 900, 903.  A "sale" is defined as "the passing of title from the seller to the buyer for a price."  N.M.S.A. § 55-2-106(1).  To succeed on a breach of the implied warranty of fitness for a particular purpose, the

plaintiff must prove: (i) a sale; (ii) that the seller had knowledge of the particular use for which a good was purchased; (iii) that the buyer relied on the seller's skill or judgment regarding the selection of goods; and (iv) that the buyer purchased a product with a particular purpose for that product in mind.  See Daniell v. Ford Motor Co., Inc., 581 F. Supp. 728, 731 (D.N.M. 1984)(Baldock, J.)(citing N.M.S.A. § 55-2-314(2)(c)); Spectron Dev. Lab. v. Am. Hollow Boring Co., 1997-NMCA-025, ¶ 40, 123 N.M. 170, 936 P.2d 852, 861 (citing N.M.S.A. § 55-2-314). N.M.S.A. § 55-2-315 provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

N.M.S.A. § 55-2-315.  The Court of Appeals of New Mexico has stated that, under the implied warranty of fitness for a particular purpose, a plaintiff must prove: (i) that, at the time of contracting, the seller had reason to know the buyer's particular purpose for which the item was being ordered; (ii) that the buyer relied on the seller's skill or judgment; and (iii) that the item was not fit for that purpose.  See Lieb v. Milne, 1980-NMCA-125, ¶ 11, 95 N.M. 716, 625 P.2d at 1237.

## 2. Breach of the Implied Warranty of Merchantability.

New Mexico recognizes that the implied warranty of merchantability is implied by law and is independent of express warranties. See International Paper Co. v. Farrar, 1985-NMSC-046, ¶ 13, 102 N.M. 739, 700 P.2d at 645.  To establish a claim for breach of the implied warranty of merchantability, a plaintiff must prove that the seller sold goods or products that fail to meet the statutory definition of "merchantable."  N.M.S.A. § 55–2–314; N.M.R.A. 2008, Civ. UJI 13-1430. N.M.S.A. § 55-2-314 defines "merchantable":

[1]Section 55-2-314 defines "merchantable":

(1)      Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2)      Goods to be merchantable must be at least such as:

      (a)      pass without objection in the trade under the contract description; and

      (b)       in the case of fungible goods, are of fair average quality within the description; and

      (c)      are fit for the ordinary purposes for which such goods are used; and

      (d)      run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

      (e)      are adequately contained, packaged and labeled as the agreement may require; and

      (f)      conform to the promises or affirmations of fact made on the container or label if any.

(3)      Unless excluded or modified (Section 2–316) other implied warranties may arise from course of dealing or usage of trade.

N.M.S.A. § 55-2-314.

"[A] supplier breaches this warranty if the product is defective and is not fit for the ordinary purposes for which such product is used." Pac. Indem. Co. v. Therm-O-Disc, Inc., 476 F.Supp.2d 1216, 1225 (D.N.M. 2006)(Hansen, J.)("A manufacturer must use ordinary care in the designing, making, inspecting, and packaging of the product. N.M.R.A. 2006, UJI 13-1410. Ordinary care is that care which a reasonably prudent supplier would use in the conduct of its business.")(citing N.M.R.A. 2006, UJI 13-1404).  A breach of the implied warranty of merchantability claim "thus

requires proof of a defect." Pacific Indem Co. v. Therm-O-Disc, Inc., 476 F.Supp.2d at 1225

(citing Perfetti v. McGhan Medical, 1983-NMCA-032, ¶ 44, 662 P.2d at 654). Moreover, a breach

of the implied warranty of merchantability claim also requires proof of proximate cause. See N.M.

Stat. Ann. § 55-2-314 cmt. 13; Jesko v. Stauffer Chemical Co., 1976-NMCA-117, 89 N.M. 786,

558 P.2d 55. Comment 13 to § 55-2-314 states: "In an action based on breach of warranty, it is of

course necessary to show not only the existence of the warranty but the fact that the warranty was

broken and that the breach of the warranty was the proximate cause of the loss sustained."

N.M.S.A. § 55-2-314 cmt. 13. New Mexico Uniform Civil Jury Instruction No. 130-1430

provides:

> A supplier breaches the implied warranty of merchantability:
>
> (1)   [If the goods sold would be rejected by someone knowledgeable in the trade for failure to meet the contract description]; [or]
>
> (2)   [If goods sold in bulk are not of fair average quality for the type of goods described by the contract. The goods need not be the best quality but they must pass without objection in the trade]; [or]
>
> (3)   [If the [goods] [products] are defective and are not fit for the ordinary purposes for which such [goods] [products] are used]; [or]
>
> (4)   [If the goods do not run within variations permitted by the contract for the reason that there are wide differences in type, quality and quantity within delivered units and among all units involved]; [or]
>
> (5)   [If the [goods] [products] are not adequately contained, packaged and labeled as required by the contract]; [or]
>
> (6)   [If the [goods] [products] do not conform to the promises or statements made by the seller on the container or label; [or]
>
> (7)   [If the food or drink is unwholesome or unfit for human consumption].

N.M.R.A. 2008, Civ. UJI 13-1430. The directions for use of this instruction state: "Select the

bracketed material which fits the actual issues and evidence involved in the case. With this

instruction, UJI 13-1429 must also be used. This list of items is not exclusive. Reference should be made to the Uniform Commercial Code 55-2-314 NMSA 1978 for further specifications." N.M.R.A. Civ. UJI 13-1430.

## ANALYSIS

Rule 55 of the Federal Rules of Civil Procedure sets out a two-step process for a default judgment. See United States v. Rivera, 2015 WL 4042197, at *9-12 (D.N.M. June 30, 2015)(Browning, J.). First, a party must obtain a Clerk's entry of default. See Fed. R. Civ. P. 55(a) ("When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."); Watkins v. Donnelly, 551 F. Appx. at 953 ("Entry of default by the clerk is a necessary prerequisite that must be performed before a district court is permitted to issue a default judgment."). Second, either the party can request the Clerk to enter default judgment when the claim is for "a sum certain or a sum that can be made certain by computation," Fed. R. Civ. P. 55(b)(1), or, "[i]n all other cases, the party must apply to the court for a default judgment," Fed. R. Civ. P. 55(b)(2). The Court, in turn, "may conduct hearings or make referrals -- preserving any federal statutory right to a jury trial -- when to enter or effectuate judgment, it needs to (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." Fed. R. Civ. P. 55(b)(2). Under Tenth Circuit law, "judgment by default should not be entered without a determination that the court has jurisdiction over the defendant." Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp., 115 F.3d 767, 771–72 (10th Cir. 1997)(citing Williams v. Life Savings and Loan, 802 F.2d 1200, 1203 (10th Cir. 1986); United States v. 51 Pieces of Real Property, 17 F.3d 1306, 1309 (10th Cir. 1994)). Upon review of the Court's ability to exercise personal jurisdiction over the Defendants, the Court

concludes that (i) it has general jurisdiction over Tribal Vapors, because Snelling has established that Tribal Vapors' contacts with New Mexico are so continuous and systematic that it is essentially at home in New Mexico; but, (ii) it does not have general jurisdiction or specific jurisdiction over Smoke Free or Shenzhen MXJO, because Snelling does not establish that Smoke Free's or Shenzhen MXJO's contacts with New Mexico are so continuous and systematic that they are essentially at home in New Mexico, nor does Snelling establish that Smoke Free or Shenzhen MXJO have sufficient minimum contacts with New Mexico to comport with the federal Due Process Clause's requirements. Accordingly, because the Court has personal jurisdiction only over Tribal Vapors, it can enter default judgment only against Tribal Vapors. Furthermore, as the Court explains in Part III of the Analysis, upon reviewing Snelling's Default Motion, the Court will enter judgment on Tribal Vapors' liability, because the Court concludes that (i) Snelling properly served his summons and Complaint on Tribal Vapors pursuant to rule 4(m) of the Federal Rules of Civil Procedure; (ii) Tribal Vapors has "failed to plead or otherwise defend" in response to Snelling's Complaint under rule 55(a); (iii) Snelling obtained an entry of default from the Clerk of the Court of the District of New Mexico under rule 55(a), see Default Entry at 1; and (iv) Snelling has applied properly to the Court for a default judgment under rule 55(b)(2). As the Court explains in Part IV of the Analysis, the Court will not enter judgment, however, in the amount of $933,508.04 -- Snelling's claimed damages -- without a jury trial, because, (i) Snelling's $176,924,45 requested "Special Damages" amount and $750,000 requested "General Damages" are not "sum[s] certain" under rule 55(b)(1), Snelling Aff. ¶ 6, at 2, and remain to be established by proof, Flaks v. Koegel, 504 F.2d at 707; and (ii) Snelling's requested $6,584.59 "costs and disbursements" amount is a request for costs, which are awarded after judgment is entered, see D.N.M.LR-Civ. 54.1, or attorney's fees, which "may not be awarded without a hearing to determine that amount." Hunt v.

Inter-Globe Energy, Inc., 770 F.2d at 148.  See Venable v. Haislip, 721 F.2d at 300;  United States v. Craighead, 176 F. Appx. at 925.  See also Fed. R. Civ. P. 8(d); Applied Capital, Inc. v. Gibson, 558 F. Supp. 2d at 1202.  Finally, as the Court outlines in Part IV, it will set a date for a jury trial on damages, because Snelling requested a jury trial in the Complaint that he served on Tribal Vapors, see Complaint ¶ 199, at 54, and neither of the parties has consented to a withdraw of Snelling's jury demand.  See Fed. R. Civ. P. 38(d).

## I.   UNDER TENTH CIRCUIT LAW, THE COURT MUST DETERMINE WHETHER IT HAS PERSONAL JURISDICTION OVER TRIBAL VAPORS, SMOKE FREE, AND SHENZHEN MXJO, BEFORE ENTERING DEFAULT JUDGMENT, BECAUSE THE DEFENDANTS HAVE NOT APPEARED IN THE CASE.

"[J]udgment by default should not be entered without a determination that the court has jurisdiction over the defendant."  Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp., 115 F.3d at 771-72 (citing Williams v. Life Savings and Loan, 802 F.2d at 1203 and United States v. 51 Pieces of Real Property, 17 F.3d at 1309).  In Williams v. Life Savings and Loan, the Tenth Circuit explained:

> Defects in personal jurisdiction, however, are not waived by default when a party fails to appear or to respond . . . . Thus, when entry of a default judgment is sought against a party who has failed to plead or otherwise defend, *the district court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties. In reviewing its personal jurisdiction, the court . . . exercises its responsibility to determine that it has the power to enter the default judgment.*  We cite with approval *First National Bank of Louisville v. Bezema,* 569 F. Supp. 818 (S.D. Indiana 1983). The district court there declined to enter a default judgment and transferred the action finding *sua sponte* that it did not have jurisdiction over the defendant who neither appeared nor filed a responsive pleading to plaintiff's complaint.

Williams v. Life Savings and Loan, 802 F.2d at 1202-03 (emphasis in original).  Accordingly, under Tenth Circuit law, "a district court must determine whether it has jurisdiction over the defendant before entering judgment by default against a party who has not appeared in the case." Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp., 115 F.3d at 771 (citing Venable v.

Haislip, 721 F.2d at 300 (holding that an appellate court must grant relief from a default judgment pursuant to rule 60(b) of the Federal Rules of Civil Procedure if the district court does not have personal jurisdiction over the defendant)).  Moreover, "[w]hen considering *sua sponte* dismissal for want of personal jurisdiction, the court is not raising the defense on behalf of the party, but is 'exercising its responsibility to determine that it has the power to enter the default judgment." In re Blutrich Herman & Miller, 227 B.R. 53, 59 (Bankr. S.D.N.Y. 1998)(Brozman, C.J.)(quoting Williams v. Life Savings and Loan, 802 F.2d at 1203).  See Sutton v. Heartland Payment Sys., LLC, 2019 WL 5268597, at *1 ("Before the court may enter a default judgment it must satisfy itself that it has personal jurisdiction over the defendant and there is an adequate basis in the pleadings to support the judgment.")(citing Bixler v. Foster, 596 F.3d 751, 761 (10th Cir. 2010)). See also Onset Fin., Inc. v. Westchester Fire Ins. Co., No. 2:16-CV-00063-JNP/PMW, 2019 WL 943531, at *2 (D. Utah Feb. 26, 2019)(Parrish, J.)(holding that, because the plaintiff failed "to make any allegations establishing a factual basis" for the court's personal jurisdiction over the defendants, "the court may not exercise personal jurisdiction over the Third-Party Defendants and therefore may not enter default judgment or summary judgment against them")(citing Williams v. Life Sav. & Loan, 802 F.2d at 1202-03).

Accordingly, then, because neither Tribal Vapors, Vapor Beast, nor Shenzhen MXJO have appeared in this case in which Snelling seeks default judgment, Snelling Aff. ¶ 6, at 2, before evaluating Snelling's Default Motion, the Court must determine whether it has personal jurisdiction over each Defendant.  See Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp., 115 F.3d at 771.

## II.   THE COURT HAS GENERAL JURISDICTION OVER TRIBAL VAPORS, BUT IT DOES NOT HAVE GENERAL OR SPECIFIC JURISDICTION OVER SMOKE FREE AND SHENZHEN MXJO.

The plaintiff bears the burden of establishing personal jurisdiction, but where, . . . the issue is raised early on in the litigation, based on pleadings (with attachments) and affidavits, that burden can be met by a prima facie showing." Shrader v. Biddinger, 633 F.3d at 1239. To satisfy the requirements of the New Mexico long-arm statute, the Court must apply a three-prong test: (i) did the defendant commit an act or omission set forth in N.M.S.A. § 38-1-16; (ii) does the plaintiff's cause of action arise out of the alleged acts or omissions; and (iii) does the defendant have sufficient minimum contacts with New Mexico to satisfy due process concerns. See Walker v. THI of New Mexico at Hobbs Center, 801 F.Supp.2d 1128, 1143 (D.N.M. 2011)(Browning, J.)(citing Tercero v. Roman Catholic Diocese, 2002-NMSC-018, ¶ 8, 132 N.M. 312, 316, 48 P.3d 50, 54). Because New Mexico has extended the long-arm statute's reach as far as is constitutionally permissible, federal due process principles govern the inquiry. See Walker v. THI of New Mexico at Hobbs Center, 801 F. Supp. 2d at 1143. The Supreme Court of New Mexico has explained:

> Because we have interpreted the long-arm statute as extending our personal jurisdiction as far as constitutionally permissible, it is not necessary to determine whether the [defendant] transacted business within New Mexico in any technical sense. When the state courts have construed the state long-arm statute as being coextensive with the requirements of due process, "the usual two-step analysis collapses into a single search for the outer limits of what due process permits."

Fed. Deposit Ins. Corp. v. Hiatt, 1994-NMSC-044, ¶ 7, 117 N.M. 461, 464, 872 P.2d 879, 881. See Shrader v. Biddinger, 633 F.3d at 1239 ("Where . . . the state long arm statute supports personal jurisdiction to the full extent constitutionally permitted, due process principles govern the inquiry."). The Court will, therefore, address only whether the Defendants' have minimum contacts with New Mexico such that the Court's entry of default judgment against the Defendants

does not "offend traditional notions of fair play and substantial justice." Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1070 (quoting Int'l Shoe Co. v. Washington, 326 U.S. at 316).

A defendant may have "minimum contacts" with the forum state in one of two ways, providing a court either with general or with specific personal jurisdiction. Trierweiler v. Croxton & Trench Holding Corp., 90 F.3d 1523, 1532-33 (10th Cir. 1996). See Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. at 414.

> General jurisdiction is based on an out-of-state defendant's "continuous and systematic" contacts with the forum state, and does not require that the claim be related to those contacts. Specific jurisdiction, on the other hand, is premised on something of a quid pro quo: in exchange for "benefitting" from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of jurisdiction for claims related to those contacts.

Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1078. Thus, "[s]uch contacts may give rise to personal jurisdiction over a non-resident defendant either generally, for any lawsuit, or specifically, solely for lawsuits arising out of particular forum-related activities." Shrader v. Biddinger, 633 F.3d 1235, 1239 (10th Cir. 2011).

Ultimately, the Court concludes that Snelling presents sufficient evidence that the Court has general jurisdiction over Tribal Vapors. Snelling does not present, however, sufficient evidence that the Court has specific or general jurisdiction over Smoke Free or Shenzhen MXJO. Accordingly, the Court can enter default judgment only against Tribal Vapors, but it cannot enter default judgment against Smoke Free or Shenzhen MXJO.[3] The Court, therefore, will proceed in

---

[3]"Subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) requires: (i) complete diversity among the parties; and (ii) that 'the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.'" Thompson v. Intel Corp., 2012 U.S. Dist. LEXIS 126311, at *12 (D.N.M. 2012)(Browning, J.)(quoting 28 U.S.C. § 1332(a)). As the Court has previously explained, "[t]he Supreme Court of the United States has described this statutory diversity requirement as 'complete diversity,' and it is present only when no party on one side of a dispute

the Analysis' Parts III through V by assessing Snelling's default motion against Tribal Vapors.

### A. THE COURT HAS GENERAL JURISDICTION OVER TRIBAL VAPORS, BECAUSE TRIBAL VAPORS HAS ITS HEADQUARTERS AND PRINCIPAL PLACE OF BUSINESS IN NEW MEXICO.

Snelling argues that the Court has general jurisdiction over Tribal Vapors, because Tribal Vapors has its headquarters and principal place of business in New Mexico. See Snelling Complaint ¶ 3, at 2.

> Upon information and belief, Defendant Tribal Vapors is a New Mexico company, with its principal place of business located at 616 E 10th St., Alamogordo, New Mexico 88310. Defendant Tribal Vapors markets, sells and distributes e-cigarette products and accessories, including the Subject Batteries purchased by Plaintiff which are at issue in this lawsuit.

Snelling Complaint ¶ 3, at 2. Under Supreme Court and Tenth Circuit precedent, the Court concludes that it has general jurisdiction over Tribal Vapors, because Tribal Vapors has its headquarters and principal place of business in New Mexico. See Daimler AG v. Bauman, 571 U.S. 117, 137 (2014); Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 927 (2011)("Goodyear"); Monge v. RG Petro-Machinery (Grp.) Co., 701 F.3d 598, 614 (10th Cir. 2012).

---

shares citizenship with any party on the other side of a dispute." McEntire v. Kmart Corp., 2010 U.S. dist. LEXIS 13373, at *3 (D.N.M. 2010)(Browning, J.)(citing Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 267-68 (1806), overruled in part by Louisville & N.R. Co. v. Mottley, 211 U.S. 149 (1908); McPhail v. Deere & Co., 529 F.3d 947, 951 (10th Cir. 2008)). The amount-in-controversy requirement is an "estimate of the amount that will be put at issue in the course of the litigation." Valdez v. Metro. Prop. & Cas. Ins. Co., 867 F. Supp. 2d 1143, 1163 (D.N.M. 2012)(Browning, J.)(citing McPhail v. Deere & Co., 529 F.3d at 956). The Court concludes that it has subject matter jurisdiction over the case, because, (i) the parties are completely diverse, and were completely diverse at the time Snelling filed his Complaint, given that (a) Snelling is a citizen and resident of Park Rapids, Minnesota, see Complaint ¶ 2, at 1; and (b) Tribal Vapors is incorporated in New Mexico, with its principal place of business in New Mexico; and (ii) the amount in controversy -- Snelling's requested $933,508.04 damages amount -- "'exceeds the sum or value of $75,000, exclusive of interest and costs.'" Thompson v. Intel Corp., 2012 U.S. Dist. LEXIS 126311, at *12 (quoting 28 U.S.C. § 1332(a)).

The Supreme Court explained its theory of general jurisdiction in Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915.  That case involves two boys from North Carolina who were killed in a bus accident outside Paris, France.  See 564 U.S. at 918-19.  The boys' parents brought a wrongful-death suit in North Carolina state court against Goodyear Tire and Rubber Company, an Ohio Corporation, and Goodyear Tire's Turkish, French, and Luxembourgian subsidiaries.  See 564 U.S. at 918-19.  The boys' parents alleged, among other things, that the defendants defectively manufactured the bus' tires.  See 564 U.S. at 918-19.  The North Carolina state courts concluded that they could exercise general personal jurisdiction over Goodyear Tire's foreign subsidiaries, because they placed their tires "in the stream of interstate commerce without any limitation on the extent to which those tires could be sold in North Carolina."  564 U.S. at 922 (citation omitted).  The Supreme Court reversed.  See 564 U.S. at 926-29.  In an opinion that the Honorable Ruth Bader Ginsburg, Associate Justice of the Supreme Court, authored, the Supreme Court criticizes the North Carolina courts' stream-of-commerce analysis as "elid[ing] the essential difference between case-specific and all-purpose (general) jurisdiction."  564 U.S. at 927.  She explains that, while placing a product into the stream of commerce "may bolster an affiliation germane to specific jurisdiction," such contacts "do not warrant a determination that, based on those ties, the forum has general jurisdiction over the defendant."  564 U.S. at 927.  Justice Ginsburg clarifies that general personal jurisdiction does not turn on whether the nonresident defendant's contacts with the forum state are in some sense "continuous and systematic," but rather on whether the defendant's contacts "are so continuous and systematic as to render it essentially at home in the forum state."  564 U.S. at 919 (citing International Shoe, 326 U.S. at 317.  Justice Ginsburg concludes that, because Goodyear Tire's subsidiaries "are in no sense at home in North Carolina," they are not subject to general personal jurisdiction there.  564 U.S. at 929.

In case there was any doubt as to <u>Goodyear</u>'s meaning, the Supreme Court revisited the issue of general personal jurisdiction in <u>Daimler AG v. Bauman</u>, 571 U.S. 117.  That case involved claims against Daimler AG, a German manufacturer of Mercedes-Benz vehicles, for the company's collaboration with Argentine state-security forces in alleged human-rights violations. <u>See</u> 571 U.S. at 119-122. The plaintiffs argued that Daimler AG's ties to California -- particularly through one of its subsidiaries, which is the largest supplier of luxury vehicles to the California market -- gave rise to general personal jurisdiction.  <u>See</u> 571 U.S. at 119-123.  The plaintiffs posited that general personal jurisdiction lies wherever a corporation "engages in a substantial, continuous, and systematic course of business."  571 U.S. at 138.  In another opinion that Justice Ginsburg authored, the Supreme Court rejects the plaintiffs' general personal jurisdiction argument as "unacceptably grasping."  571 U.S. at 138.  She explains that the paradigmatic bases for general personal jurisdiction over a corporate defendant are the corporation's "place of incorporation and principal place of business."  571 U.S. at 137.  She notes that the words "continuous and systematic were used in <u>International Shoe</u> to describe instances in which the exercise of *specific* jurisdiction would be appropriate," and reinforces that the relevant inquiry for general personal jurisdiction purposes "is whether that corporation's affiliations with the State are so 'continuous and systematic' as to render it essentially at home in the forum State."  571 U.S. at 119 (quoting <u>Goodyear</u>, 564 U.S. at 919).  The Tenth Circuit has since repeated this standard.  <u>See Monge v. RG Petro-Machinery (Grp.) Co.</u>, 701 F.3d at 614 ("General jurisdiction requires that a defendant have contacts with the forum 'so continuous and systematic as to render it essentially at home in the forum State.'" (quoting <u>Goodyear</u>, 564 U.S. at 919)(brackets omitted)); <u>Fireman's Fund Ins. Co. v. Thyssen Min. Const. of Can., Ltd.</u>, 703 F.3d 488, 493 (10th Cir. 2012)("General jurisdiction requires that a defendant have contacts with the forum 'so continuous and systematic' as to render

it essentially at home in the forum State." (quoting Goodyear, 564 U.S. at 919)(brackets omitted)).

Here, Snelling's allegations against Tribal Vapors meet both the Supreme Court's test and the Tenth Circuit's test for general jurisdiction.  See Daimler AG v. Bauman, 1571 U.S. at 120-21; Monge v. RG Petro-Machinery (Grp.) Co., 701 F.3d at 614.  Tribal Vapors is headquartered in New Mexico and organized under the laws of New Mexico.  See Complaint ¶ 3, at 2; Tribal Vapor, VapersMap, https://www.vapersmap.com/shops/tribal-vapor-616-east-10th-street-alamogordo (last visited March 26, 2021)("VapersMap: Tribal Vapors Website"); Tribal Vapor, Vape Shops, https://smokeshops.com/business.php?id=2971 (last visited March 26, 2021)("Vape Shops: Tribal Vapors Website").[4]  As Snelling stated, and, as two third-party websites[5] confirm, Tribal Vapors' address is "616 E 10th St., Alamogordo, New Mexico 88310."   Complaint ¶ 3, at 2.  See VapersMap: Tribal Vapors Website; Vape Shops: Tribal Vapors Website.  Moreover, because Tribal Vapors does not have any other locations throughout the United States, and is

---

[4]Rule 201 of the Federal Rules of Evidence allows a court to, at any stage of the proceeding, take notice of "adjudicative" facts that fall into one of two categories: (i) facts that are "generally known within the territorial jurisdiction of the trial court;" or (ii) facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b), (f).  "Adjudicative facts are simply the facts of the particular case."  United States v. Wolny, 133 F.3d 758, 764 (10th Cir. 1998)(quoting Advisory Committee Notes to rule 201). A court has discretion to take judicial notice of such facts, regardless whether requested.  See Fed. R. Evid. 201(c). On the other hand, if a party requests that the court take judicial notice of certain facts, and supplies the necessary information to the court, judicial notice is mandatory. See Fed. R. Evid. 201(d).  Also, if the parties timely request an opportunity to be heard, the Court must grant such an opportunity "as to the propriety of taking judicial notice and the tenor of the matter noticed."  Fed. R. Evid. 201(e).  Here, the Court can take notice of "adjudicative" facts that relate to the Court's personal jurisdiction over the Defendants, because the facts are available on generally accessible websites on the world wide web.  The facts, therefore, fall into the second category of "adjudicative" facts under rule 201 of the Federal Rules of Evidence, in that the facts are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b), (f).

[5]The Court assesses third-party websites to confirm Tribal Vapors' address, because, to the Court's knowledge, Tribal Vapors does not operate a website of its own.

registered to do business in New Mexico, the Court agrees with Snelling that Tribal Vapors' "principal place of business" is in New Mexico. Complaint ¶ 3, at 2. See VapersMap: Tribal Vapors Website; Vape Shops: Tribal Vapors Website. In addition, on the third-party websites, Tribal Vapors advertises itself as a "vape shop," and provides its: (i) telephone number, which has a New Mexico area code; (ii) New Mexico address; (iii) hours of operation at the New Mexico address, and (iv) photographs from inside the shop. VapersMap: Tribal Vapors Website. "[B]ased on an appraisal of a corporation's activities in their entirety, nationwide and worldwide," Daimler AG v. Bauman, 571 U.S. at 121 n.20, the Court concludes that, under the Supreme Court's test, Tribal Vapor's contacts with New Mexico are "so 'continuous and systematic' as to render it essentially at home in the forum state." Daimler AG v. Bauman, 571 U.S. at 139 (quoting Goodyear, 564 U.S. at 919). Furthermore, under the Tenth Circuit test, Snelling's allegations demonstrate that (i) Tribal Vapors "solicits business" in New Mexico "through a local office or agents," given that its employees are all located in New Mexico, (ii) Tribal Vapors "sends agents" into New Mexico "on a regular basis to solicit business" from customers like Snelling, (iii) Tribal Vapors' internet advertising suggests that it "holds itself out as doing business in" New Mexico ;and (iv) with only one location, Tribal Vapors, necessarily does its total "volume of business" within New Mexico. Trierweiler v. Croxton, 90 F.3d at 1533. See Complaint ¶ 4, at 2. The Court, therefore, has general jurisdiction over Tribal Vapors.

> **B.     THE COURT DOES NOT HAVE SPECIFIC JURISDICTION OVER SMOKE FREE, BECAUSE (I) SMOKE FREE DOES NOT PURPOSEFULLY DIRECT ITS E-CIGARETTE PRODUCT SALES AND DISTRIBUTION AT NEW MEXICO RESIDENTS; AND (II) SMOKE FREE OPERATES A PASSIVE, INFORMATIONAL WEBSITE THAT IS GLOBALLY ACCESSIBLE AND DOES NOT SPECIFICALLY DIRECT ITS SALES AND DISTRIBUTION ACTIVITIES AT NEW MEXICO RESIDENTS.**

Snelling does not make a prima facie showing that the Court has specific jurisdiction over

Smoke Free.  Snelling concedes that the Court does not have general jurisdiction over Smoke Free,

because Smoke Free is a "Delaware corporation, with its principal place of business located at

2544 Campbell P., Suite 125, Carlsbad, California 92009."  Complaint ¶ 6, at 2.  Snelling argues,

however, that the Court has specific jurisdiction over Smoke Free, because Smoke Free

> markets, sells and distributes e-cigarette products and accessories, including the
> Subject Batteries purchased by Plaintiff which are at issue in this lawsuit. In
> addition, Defendant VaporBeast has conducted substantial, ongoing business in this
> state and has extensive, ongoing, and specific contacts with the State of New
> Mexico that include, but are not limited to, the following:
>
> At all times relevant herein, Defendant VaporBeast has had continuing contacts
> with New Mexico by supplying, selling, importing and distributing goods,
> including but not limited to the Subject Batteries, with the actual knowledge and/or
> reasonable expectation that they will be used in this State and which are in fact
> used, sold, distributed, and retailed in this State;
>
> Defendant VaporBeast sold or otherwise placed into its distribution chain the
> Subject Batteries that caused the injuries at issue in this matter;
>
> Defendant VaporBeast has received substantial compensation from the sale
> of its products in this state, including but not limited to MXJO IMR 18650 lithium
> ion batteries;
>
> In addition, Defendant VaporBeast's contacts with New Mexico principally
> relate to the placement of electronic devices, including lithium ion batteries, into
> the stream of commerce, and all of the conduct associated with placing those
> products into the stream of commerce in New Mexico and associated with this civil
> action are related to and connected with the placement of batteries used in electronic
> cigarette devices into the stream of commerce.

Complaint ¶ 9, at 3-4.

For the Court to exercise specific jurisdiction, Snelling must show that Smoke Free "has

purposefully directed [its] activities at residents of the forum, and the litigation results from alleged

injuries that arise out of or relate to those activities."  Burger King Corp. v. Rudzewicz, 471 U.S.

at 472 (1985).  "Specific jurisdiction . . . is premised on something of a quid pro quo: in exchange

for 'benefitting' from some purposive conduct directed at the forum state, a party is deemed to

consent to the exercise of jurisdiction for claims related to those contacts." Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1078 (no citation for quotation).

Furthermore, the Tenth Circuit has examined the problems relating to personal jurisdiction in the internet context, concluding that "it is necessary to adapt the analysis of personal jurisdiction to this unique circumstance by placing emphasis on the internet user or site *intentionally directing* his/her/its activity or operation *at* the forum state rather than just having the activity or operation accessible there." Shrader v. Biddinger, 633 F.3d at 1240 (emphasis in original).

> Actually, as *ALS Scan [Inc. v. Digital Serv. Consultants, Inc.,* 293 F.3d 707 (4th Cir. 2002)] acknowledges, the emphasis on intentionally directing internet content or operations at the forum state has its grounding in the "express aiming" requirement the Supreme Court developed in *Calder [v. Jones, 465 U.S. 783 (1984)]* to deal with the somewhat analogous question of specific jurisdiction based on content in nationally distributed print media. Thus, while the court has yet to flesh out a comprehensive position in a published opinion dealing with omnipresent internet activity like web sites and posts, the *ALS Scan* approach, which is fairly representative of most circuits that have addressed the matter, is compatible with our discussion of personal jurisdiction in *Dudnikov [v.. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1069-70].*

> This approach and its counterparts in other circuits have some immediate implications that are relevant here. The maintenance of a web site does not in and of itself subject the owner or operator to personal jurisdiction, even for actions relating to the site, simply because it can be accessed by residents in the forum state. *See, e.g. Johnson v. Arden,* 614 F.3d 785, 796 (8th Cir. 2010); *Carefirst of Md. v. Carefirst Pregnancy Ctrs., Inc.,* 334 F.3d 390, 401 (4th Cir. 2003); *Revell v. Lidov,* 317 F.3d 467, 471–76 (5th Cir. 2002); *cf. Soma Med. Int'l v. Standard Chartered Bank,* 196 F.3d 1292, 1297, 1298 (10th Cir. 1999)(holding operation of web site insufficient for general jurisdiction; web site not considered in analysis of specific jurisdiction because claims were not related to it). Similarly posting allegedly defamatory comments or information on an internet site does not, without more, subject the poster to personal jurisdiction wherever the posting could be read (and the subject of the posting may reside). *See, e.g., Johnson v. Arden,* 614 F.3d at 797; *Revell [v. Lidov],* 317 F.3d [467,] 475-76 [(5th Cir. 2002)]; *Young v. New Haven Advocate,* 315 F.3d 256, 258–59 (4th Cir. 2002). Consistent with the thrust of the *Calder*-derived analysis for specific jurisdiction in the internet context discussed above, in considering what "more" could create personal jurisdiction for such activities, courts look to indications that a defendant deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state.

Shrader v. Biddinger, 633 F.3d at 1241 (no citation for quotation).  The Tenth Circuit's approach to personal jurisdiction in the internet realm is consistent with its prior holding that "evidence of mere placement of advertisements in nationally distributed papers or journals does not rise to the level of purposeful contact with a forum required by the Constitution in order to exercise personal jurisdiction over the advertiser."  Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Co-op.., 17 F.3d 1302, 1305 (10th Cir. 1994).

First, Snelling has not made any showing that Smoke Free "purposefully directed" its activities at New Mexico or New Mexico residents.  Burger King Corp. v. Rudzewicz, 471 U.S. at 472.  Smoke Free has "purposefully directed" its activities at New Mexico or its residents if it has: (i) taken intentional action; (ii) the action was "expressly aimed" at New Mexico; and (iii) the action was taken with the knowledge that "the brunt of th[e] injury" would be felt in New Mexico. Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 1072 (citing Calder v. Jones, 465 U.S. at 789-90).  Snelling's Complaint alleges only that Smoke Free "markets, sells and distributes e-cigarette products and accessories, including the Subject Batteries purchased by Plaintiff," and Smoke Free "has conducted substantial, ongoing business in this state and has extensive, ongoing, and specific contacts with the State of New Mexico."  Complaint ¶ 7, at 2.  Snelling, however, does not substantiate or specify Smoke Free's "specific contacts" to New Mexico; rather, he proceeds to use generalized and conclusory characterizations that Smoke Free has (i) "had continuing contacts with New Mexico by supplying, selling, importing and distributing goods, including but not limited to the Subject Batteries, with the actual knowledge and/or reasonable expectation that they will be used in this State," (ii) "sold or otherwise placed into its distribution chain the Subject Batteries that caused the injuries at issue in this matter"; (iii) "received substantial compensation from the sale of its products in this state, including but not limited to

MXJO IMR 18650 lithium ion batteries";  and (iv) "placed electronic devices, including lithium

ion batteries, into the stream of commerce, and all of the conduct associated with placing those

products into the stream of commerce in New Mexico and associated with this civil action are

related to and connected with the placement of batteries used in electronic cigarette devices into

the stream of commerce."  Complaint ¶ 7, at 2-3.  Although the Court "must accept the plaintiff's

(properly documented) evidentiary proffers as true for the purpose of determining the adequacy of

the prima facie jurisdictional showing." Daynard v. Ness, Motley, Loadholt, Richardson & Poole,

P.A., 290 F.3d 42, 45 (1st Cir. 2002), at no point does Snelling show -- beyond mere statements

that Smoke Free's products entered New Mexico's "stream of commerce" -- that Smoke Free took

some form of intentional action that was "expressly" aimed at New Mexico, or New Mexico

purchasers, like Snelling.[6]   Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at

1072 (citing Calder v. Jones, 465 U.S. at 789-90).  Necessarily then, Snelling does not show that

Smoke Free took actions related to the sale of its lithium ion batteries with knowledge that "the

brunt of the injury" would be felt by New Mexico residents.  Dudnikov v. Chalk & Vermilion Fine

Arts, Inc., 514 F.3d at 1072 (citing Calder v. Jones, 465 U.S. at 789-90).

     In addition, under the Tenth Circuit's internet-based specific jurisdiction analysis, Smoke

Free might be subject to suit in New Mexico based on its website, if it had intentionally directed

its activities at New Mexico.  See Shrader v. Biddinger, 633 F.3d at 1241.  Several factors,

however, cut against a finding of specific personal jurisdiction based on Smoke Free's operation

---

[6]As the Court explained when outlining its findings of fact, when reviewing a default
judgment, the Court takes "'the well-pleaded factual allegations' in the complaint 'as true.'"
DIRECTV, Inc. v. Hoa Huynh, 503 F.3d at 854 (quoting Cripps v. Life Ins. Co. of North
America, 980 F.2d  at 1267, and citing Fed. R. Civ. P. 55(a); Benny v. Pipes, 799 F.2d at 495.
"However, a 'defendant is not held to admit facts that are not well-pleaded or to admit conclusions
of law.'"  DIRECTV, Inc. v. Hoa Huynh, 503 F.3d at 854 (quoting Nishimatsu Constr. Co. v.
Houston Nat'l Bank, 515 F.2d at 1206.

of a generally accessible, informational website.  See Shrader v. Biddinger, 633 F.3d at 1241.

First, Smoke Free's website is passive.  See Smoke Free Homepage, Vapor Beast,

https://www.vaporbeast.com (last visited March 26, 2021)("Smoke Free Homepage").  See also

Shrader v. Biddinger, 633 F.3d at 1241; Diener v. Trapeze Asset Mgmt., Inc., No. CV 15-0566

JB/LAM, 2015 WL 8332933, at *2 (D.N.M. Nov. 30, 2015)(Browning, J.).  The website provides

information about its products, which include e-cigarette devices, batteries, e-liquid, e-cigarette

accessories, and the brands that it carries, but, "it does not offer visitors the opportunity to invest

or interact with the site."  Diener v. Trapeze Asset Mgmt., Inc., 2015 WL 8332933, at *2.  See

Shrader v. Biddinger, 633 F.3d at 1241.  See also Smoke Free Home Page at 1.  Second, Snelling

does not allege that Smoke Free has utilized, nor can the Court find, any targeted advertisements,

links, or solicitations to New Mexico customers on Smoke Free's website, nor is Smoke Free's

website linked to any specific New Mexico-based e-cigarette, e-cigarette components, or e-

cigarette batteries databases, which might suggest that Smoke Free was intentionally targeting

New Mexico purchasers.  See Smoke Free Home Page at 1.  See also  Shrader v. Biddinger, 633

F.3d at 1241.  Furthermore, there are no other facts suggesting that Smoke Free maintains any

other websites or online listings that have a connection to New Mexico.  See Diener v. Trapeze

Asset Mgmt., Inc., 2015 WL 8332933, at *2; Smoke Free Home Page at 1.  Accordingly, the Court

does not think that, through its website, Smoke Free *"intentionally direct[ed]* his/her/its activity

or operation at" New Mexico "rather than just having the activity or operation accessible there."

Shrader v. Biddinger, 633 F.3d at 1240 (emphasis in original).  See Diener v. Trapeze Asset

Mgmt., Inc., 2015 WL 8332933, at *2.  See also Smoke Free Home Page at 1.  The Court thus

concludes that it does not have specific personal jurisdiction over Smoke Free, because (i) Snelling

offers no evidence showing that Smoke Free "purposefully directed" its activities at New Mexico

residents, <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. at 472; and (ii) although New Mexico residents and e-cigarette distributors can order products from Smoke Free's website, Smoke Free operates a passive website that is not "intentionally directed" at New Mexico customers, <u>Shrader v. Biddinger</u>, 633 F.3d at 1241.

C.   **THE COURT DOES NOT HAVE SPECIFIC JURISDICTION OVER SHENZHEN MXJO, BECAUSE I) SHENZHEN MXJO DOES NOT PURPOSEFULLY DIRECT ITS E-CIGARETTE PRODUCT SALES AND DISTRIBUTION AT NEW MEXICO RESIDENTS, AND I) SHENZHEN MXJO OPERATES A PASSIVE, INFORMATIONAL WEBSITE THAT IS GLOBALLY ACCESSIBLE AND DOES NOT SPECIFICALLY DIRECT ITS SALES AND DISTRIBUTION ACTIVITIES AT NEW MEXICO RESIDENTS.**

For similar reasons that specific personal jurisdiction does not exist as to Smoke Free, the Court holds that specific jurisdiction over Shenzhen MXJO is lacking.  Snelling concedes that the Court does not have general jurisdiction over Shenzhen MXJO, because Shenzhen MXJO is a "corporation organized and existing under the laws of the People's Republic of China, with a principal business address of Guangxinyuan Creative Park, No. 2005 Xingye Road, Xixiang Sub-District, Bao'an District, City of Shenzhen, People's Republic of China."  Complaint ¶ 8, at 3. Snelling argues, however, that the Court has specific jurisdiction over Shenzhen MXJO, because Shenzhen MXJO "is engaged in the business of manufacturing, designing, marketing, distributing, and selling 'vape energy products' such as the Subject Batteries."  Complaint ¶ 8, at 3 (no citation for quotation).  Relatedly, Snelling argues that the Court has specific jurisdiction over Shenzhen MXJO, because

> Defendant MXJO is engaged in the business of manufacturing, designing, testing, marketing, certifying, supplying, selling, importing and distributing lithium ion batteries including but not limited to the Subject Batteries purchased by Plaintiff.  In addition, Defendant MXJO has conducted substantial, ongoing business in this state and has extensive, ongoing, and specific contacts with the State of New Mexico that include, but are not limited to, the following:
>
> At all times relevant herein, Defendant MXJO has had continuing contacts

with the State of New Mexico by transacting substantial business in this state via manufacturing, designing, testing, marketing, certifying, supplying, selling, importing and distributing goods, including but not limited to the Subject Batteries, with the actual knowledge and/or reasonable expectation that they will be used in this state and which are in fact used in this state;

Defendant MXJO designed, manufactured, sold or otherwise placed into its distribution chain the Subject Batteries that caused the injuries at issue in this matter;

Defendant MXJO has received substantial compensation from the sale of its products in this state, including but not limited to MXJO IMR 18650 lithium ion batteries;

In addition, Defendant MXJO's contacts with New Mexico principally relate to the placement of electronic devices, including lithium ion batteries, into the stream of commerce, and all of the conduct associated with placing those products into the stream of commerce in New Mexico and associated with this civil action are related to and connected with the placement of batteries used in electronic cigarette devices into the stream of commerce.

Complaint ¶ 9, at 3-4.  See also id. at 3 n.1. ("'All MXJO batteries and chargers have passed many international testing and got certificates, like CE, RoHs, MSDS, un38.3 etc.[7]  You can be assured that they are safe and durable enough. Moreover, we are innovating and developing more products to meet customers' requirements.'")(quoting Shenzhen MXJO Homepage, Shenzhen MXJO, http://www.mxjotech.com/index.php/home/archive/index?id=2 (last visited March 26, 2021)("Shenzhen MXJO Homepage")).  Finally, Snelling concludes that,

Defendant MXJO has purposefully availed itself of the privilege of conducting business in the State of New Mexico, has transacted business in the State of New Mexico, contracted to distribute and supply its products in the State of New Mexico, regularly caused its products to be sold in the State of New Mexico,

---

[7]The terms "CE"; "RoHs"; MSDS"; and "un38.3" represent various types of Chinese-made lithium ion batteries that are publicly sold for use in e-cigarettes and medical equipment.  See Shenzhen Data Power Technology Limited, Made-in China, https://dtpbattery.en.made-in-china.com/product/CZGneOTdkfVj/China-CB-Ce-RoHS-Certified-13450-3-7V-650mAh-Cylindrical-Li-Polymer-Battery-for-Electronic-Cigarette.html (last visited March 29, 2021); Lithium battery UN38.3, SRC Testing Lab, http://src-cert.com/index.php?c=msg&id=716& (last visited March 29, 2021); Medical Equipment, Dongguan Perfect Amperez Technology Limited, http://www.patlcell.com/en/product/product-194-1.html (last visited March 29, 2021).

and this action arises out of business transacted in, as well as a tortious actions and/or omissions committed in whole or in part within New Mexico, and which resulted in injuries to Plaintiff in New Mexico.

Complaint ¶ 9, at 4.

First, as similar to the Court's conclusion that Snelling's evidence does not demonstrate Smoke Free's intentional directing of its activities at New Mexico residents, the Court concludes that Snelling does not make any showing that Shenzhen MXJO has "purposefully directed" its activities at New Mexico residents. Burger King Corp. v. Rudzewicz, 471 U.S. at 472. Although Snelling argues that Shenzhen MXJO has "plac[ed] electronic devices . . . into the stream of commerce," and "availed itself of the privilege of conducting business in the State of New Mexico," by "contracting to distribute and supply its product in the state of New Mexico," Complaint ¶ 9, at 4, Snelling does not offer evidence demonstrating that Shenzhen MXJO has taken any intentional action that was "expressly aimed" at New Mexico. See Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 107 (citing Calder v. Jones, 465 U.S. at 789-90). Likewise, Snelling does not show that Shenzhen MXJO's sells lithium ion batteries to New Mexico distributors with the knowledge that "the brunt" of any injury caused by those batteries, will be felt in New Mexico. Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d at 107 (citing Calder v. Jones, 465 U.S. at 789-90). Moreover, as comparable to Snelling's allegations about Smoke Free, Snelling's Complaint relies on conclusory allegations to argue that "MXJO has conducted substantial, ongoing business in this state and has extensive, ongoing, and specific contacts with the State of New Mexico." Complaint ¶ 9, at 4. See Lopez v. Delta Int'l Mach. Corp., No. CIV 15-0193 JB/GBW, 2016 WL 1408152, at *13 (D.N.M. Mar. 15, 2016)(Browning, J.)(holding that a plaintiff's complaint did not offer sufficient evidence to demonstrate that the Court had specific jurisdiction over the defendant, because the Complaint only alleged that the

defendant was "authorized to do business in New Mexico.").  As the Court explained above, the Court "must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing."  Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d at 45.  Here, however, Snelling provides no documents or evidence demonstrating that Shenzhen MXJO engages in activities in New Mexico, or directs intentionally its activities at New Mexico residents.  See Lopez v. Delta Int'l Mach. Corp., 2016 WL 1408152, at *13.

Furthermore, Shenzhen MXJO might be subject to suit in New Mexico based on selling e-cigarette products on its website, if the website, in selling the e-cigarette products, had "intentionally direct[ed] its internet content or operations" at New Mexico purchasers.  Shrader v. Biddinger, 633 F.3d at 1241 (citing Calder v. Jones, 465 U.S. 783; ALS Scan Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707).  It does not, however.  Rather, under Tenth Circuit law, Shenzhen MXJO operates a passive information website, in that it provides information about its chargers, batteries, accessories, authenticity, and safety hazards, but it "does not offer visitors the opportunity to invest or interact with the website."  Diener v. Trapeze Asset Mgmt., Inc., 2015 WL 8332933, at *15.  The Court's conclusion that Shenzhen MXJO's website is passive and information is buttressed by the website's content, which is generalized and tailored for a global audience, as opposed to being "deliberated directed" at one specific audience, let alone a New Mexico audience.  Shrader v. Biddinger, 633 F.3d at 1241.  See Diener v. Trapeze Asset Mgmt., Inc., 2015 WL 8332933, at *15.  See also Shenzhen MXJO Homepage.  For example, on its homepage, MXJO Shenzhen offers several informational descriptions of its company, its "vape energy" products, and its "product concept," which are generalized in their tone and content, as to appeal to all purchasers -- not a specific subset of purchasers from any one geographic entity.

Shenzhen MXJO Homepage at 1.

### WHO IS MXJO.

MXJO specialized in vape energy products for 5 years, we are so devoted to research and manufacture high performance lithium battery and intelligent battery charger. You could feel elegant design, pure color and high quality from MXJO. The unique is that MXJO look for all the time. We are also striving to make each of MXJO product become your vape sweet helper, bring you amazing vape experience.

### PRODUCT CONCEPT

We keep an open mind to do our products, so we come up with new product ideas, That is : Market Analysis + Innovative Design + High quality + brand spread.

Shenzhen MXJO Homepage.  Beneath these generalized descriptions, MXJO Shenzhen notes that it distributes its products to a global audience.  Here, although Shenzhen MXJO states that it exports to "many countries all over the world, such as USA," it makes no specific reference to New Mexico or New Mexico purchasers.  Shenzhen MXJO Homepage.

### WHY MXJO.

In the last few years, MXJO products were exported to many countries all over the world, such as USA, France, Russia, Southeast Asia ,Middle East, and so on.  It never stops and still grows rapidly.  All mxjo batteries and chargers have passed many international testing and got certificates, like CE, RoHs, MSDS, un38.3 etc.  You can be assured that they are safe and durable enough. Moreover, we are innovating and developing more products to meet customers' requirements.

Shenzhen MXJO Homepage.  Furthermore, in the "Contact Us" portion of Shenzhen MXJO's website, Shenzhen MXJO Homepage at "Contact Us", Shenzhen MXJO does not solicit any individualized contact with New Mexico distributors, sellers, or residents, nor does it provide specialized contact information for American purchasers, let alone New Mexico purchasers.  Finally, Shenzhen MXJO's Facebook page and Instagram page, which are linked at the bottom of its website, make no direct appeals to New Mexico residents, much less Snelling personally.  See

mxjo_tech, Shenzhen MXJO, https://www.instagram.com/mxjo_tech/ (last visited March 27, 2021); @mxjotech, Shenzhen MXJO, https://www.facebook.com/mxjotech/ (last visited March 27, 2021).  Based on Shenzhen MXJO's internet presence, the Court concludes that Shenzhen MXJO did not *"intentionally direct* his/her/its activity or operation at [New Mexico] rather than just having the activity or operation accessible there."  Shrader v. Biddinger, 633 F.3d at 1240 (emphasis in original)).  Accordingly, the Court concludes that it does not have specific personal jurisdiction over Shenzhen MXJO, because (i) Shenzhen MXJO does not intentionally direct any of its e-cigarette product selling activities at New Mexico residents, Burger King Corp. v. Rudzewicz, 471 U.S. at 472; and (ii) Shenzhen MXJO maintains a passive, informational online presence that similarly does not intentionally target New Mexico residents, Shrader v. Biddinger, 633 F.3d at 1241.

Ultimately, then, the Court concludes that it has general jurisdiction over Tribal Vapors, but it does not have general or specific jurisdiction over Smoke Free and Shenzhen MXJO. Accordingly, the Court dismisses Smoke Free and Shenzhen MXJO from the case, and will only evaluate Snelling's default motion as it pertains to Tribal Vapors.

## III.   THE COURT WILL ENTER DEFAULT JUDGMENT ON TRIBAL VAPORS' LIABILITY.

The Court concludes that it will enter default judgment, pursuant to rule 55(b), as to the Tribal Vapors' liability, because (i) Snelling properly served his summons and Complaint on Tribal Vapors pursuant to rule 4(m); (ii) Tribal Vapors has "failed to plead or otherwise defend" in response to Snelling's Complaint under rule 55(a); and (iii) Snelling properly obtained an entry of default from the Clerk of the Court of the District of New Mexico under rule 55(a), see Default Entry at 1.

## A.   SNELLING PROPERLY SERVED PROCESS ON TRIBAL VAPORS UNDER RULE 4(M).

Rule 4(m) of the Federal Rules of Civil Procedure requires a summons to be served within 120 days after the complaint is filed.

> If a defendant is not served within 120 days after the complaint is filed, the court -- on motion or on its own after notice to the plaintiff -- must dismiss the action without prejudice against that defendant or order that service be made within a specific time. But, if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m).  The plaintiff maintains the burden of establishing the validity of service on the defendant.  See F.D.I.C. v. Oaklawn Apartments, 959 F.2d at 174.  Here, Snelling avers that he (i) duly served the summons and complaint on Tribal Vapors on August 8, 2019, "which made its Answer due on or before August 29, 2019" under rule 12(A)(1)(a), Default Motion ¶ 2, at 1 (citing Kress Aff. ¶ 3, at 1, and Mera Aff. ¶ 1, at 1).  Accordingly, under rule 4(m), the Court concludes that Snelling's service of process on Tribal Vapors was proper.  As Snelling notes, however, upon proper service of process to Tribal Vapors, Tribal Vapors never filed an answer or defense within the allotted time respond, nor did Tribal Vapors file any responsive pleading to date.  See Default Motion ¶ 8, at 3.  Furthermore, there is no evidence that Tribal Vapors has made any belated attempts to participate in this litigation, which could include delayed filing, or attempted retention of counsel.  Cf. Dogs Deserve Better, Inc. v. New Mexico Dogs Deserve Better, Inc., No. CIV 13-0592 JB/GBW, 2016 WL 6396392, at *22 (D.N.M. Oct. 12, 2016)(Browning, J.)(concluding that the defendants' conduct in not responding to the plaintiff's service of process was not willful, despite the defendants' initial lack of response to the plaintiff's complaint, given that evidence showed that the defendants had retained counsel for litigation and negotiation purposes, and there was simply "a disconnect of thought amongst the defendants and counsel").  For the reasons outlined above, and in the absence of evidence to the contrary, the

Court can reasonably determine that Tribal Vapors' lack of response makes it an "essentially unresponsive party," which, in turn has "halted . . . the adversary process," and resulted in "interminable delay and continued uncertainty" as to Snelling's rights.   Noland v. City of Albuquerque, 2009 WL 2424591, at *1.

### B.   TRIBAL VAPORS HAS NOT PRESENTED A MERITORIOUS DEFENSE TO SNELLING'S PRODUCT LIABILITY CLAIMS.

As the Court discussed above, Tribal Vapors, has not responded to Snelling's summons and Complaint within the requisite time frame under rule 12(A)(1)(a), nor did it provide an excuse for its respective failure to respond.   See Default Motion ¶ 8, at 3.   Tribal Vapors' failure to respond, means, therefore, that it does not proffer a meritorious defense to Snelling's product liability claims.   Cf. Dogs Deserve Better, Inc. v. New Mexico Dogs Deserve Better, Inc., 2016 WL 6396392, at *23 (concluding that the defendants had "preferred a meritorious defense," because, in their belated response to the plaintiff's complaint, the Defendants had referenced as a defense the Volunteer Protection Act, which immunized them from the harm they had allegedly caused the plaintiffs "when acting within the scope of their responsibilities").   Unlike the defendants in Dogs Deserve Better, Inc. v. New Mexico Dogs Deserve Better, Inc., 2016 WL 6396392, at *23, here, the Tribal Vapors did not provide any form of responsive pleading in which it might have referenced one of the traditional defenses to negligence, strict products liability, or breach of implied warranties.   In the absence of any evidence to the contrary, the Court is left with no sound choice but to conclude that Tribal Vapors has not presented a meritorious defense to Snelling's product liability claims, which, in turn, favors the Court's entry of default on Tribal Vapors' liability.   See Pinson v. Equifax Credit Info. Servs., 316 Fed. Appx. at 749.

### C.   SNELLING PROPERLY OBTAINED THE CLERK OF THE COURT'S ENTRY OF DEFAULT.

After properly serving his summons and Complaint on Tribal Vapors, see Fed. R. Civ. P.

4(m), Snelling attests that "[n]o answer or other defense has been filed by any of the Defendants, and none of the Defendants [have] given any excuse for their failure to do so."  Default Motion ¶ 8, at 3 (citing Kress Aff. ¶ 9 at 2).  As the Court notes above, Tribal Vapors' failure to respond, in turn, means that Tribal Vapors has not presented a meritorious defense to Snelling's products liability claims.  See Pinson v. Equifax Credit Info. Servs., 316 Fed. Appx. at 749.  Next, pursuant to rule 55 of the Federal Rules of Civil Procedure, Snelling properly obtained a Clerk's entry of default, with the Clerk citing the Defendants' "fail[ure] to plead or otherwise defend as provided by the Federal Rules of Civil Procedure."  See Default Entry at 1.  Finally, under rule 55(b)(2), Snelling properly applied "to the court for a default judgment."  Fed. R. Civ. P. 55(b)(2).  See Default Motion ¶¶ 1-8, at 1-3.

Ultimately, then, upon reviewing Snelling's Default Motion, the Court enters default judgement as to the liability of Tribal Vapors.  See Fed. R. Civ. P. 55(b).

## IV.    THE COURT WILL NOT ENTER DEFAULT JUDMENT ON SNELLING'S $933,508.04 REQUESTED DAMAGES AMOUNT, BECAUSE (I) SNELLING'S REQUESTED GENERAL DAMAGES AND SPECIAL DAMAGES CANNOT BE MADE CERTAIN BY COMPUTATION, AND (II) SNELLING'S REQUESTED COSTS AND DISBURSEMENTS THAT HE INCURRED PURSUANT TO THE LITIGATION, ARE COSTS THAT ARE AWARDED AFTER JUDGMENT IS ENTERED, OR ATTORNEY'S FEES THAT MAY NOT BE AWARDED WITHOUT A HEARING.

For the reasons discussed in the Analysis' Part I, the Court enters default judgment as to liability against Tribal Vapors.  After considering the evidence that Snelling presents supporting his $933,508.04 requested damage amount based on Tribal Vapors' liability, however, the Court will not enter default judgement as to Snelling's damages, because, at present, Snelling's requested damages are not for "sum[s] certain," United States v. Craighead, 176 F. Appx. at 925, nor are they "susceptible of mathematical calculation," Flaks v. Koegel, 504 F.2d at 707.  Also, because Snelling requested a jury in his Complaint, and served the Complaint on Tribal Vapors, he must

present his request for damages to a jury.  See Complaint ¶ 199, at 54.

Upon entering default judgment, a district court takes all of the well-pleaded facts in a complaint as true.  See United States v. Craighead, 176 F. Appx. at 925; Flaks v. Koegel, 504 F.2d at 707 ("While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation." (citations omitted)).  "If defendant does not contest the amount prayed for in the complaint [by failing to answer] and the claim is for a sum certain or a sum that can be made certain by computation, the judgment generally will be entered for that amount without any further hearing."  United States v. Craighead, 176 F. App'x at 925 (alteration in original)(quoting 10A C. Wright & Miller, Federal Practice and Procedure § 2688 (3d ed.1998)).  See Fed. R. Civ. P. 8(d) ("Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading.").  A court may enter a default judgment for a damage award without a hearing if the amount claimed is "'one capable of mathematical calculation.'"  Applied Capital, Inc. v. Gibson, 558 F. Supp. 2d at 1202 (quoting H.B. Hunt v. Inter-Globe Energy, Inc., 770 F.2d at 148, and citing Venable v. Haislip, 721 F.2d at 300).  "It is a familiar practice and an exercise of judicial power for a court upon default, by taking evidence when necessary or by computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to recover and to give judgment accordingly."  C. Wright & Miller, § 2688 (quoting Pope v. United States, 323 U.S. at 12)).  "If the damages sum is not certain or capable of easy computation, the court may" conduct such hearings or order such references as it deems necessary.  Applied Capital, Inc. v. Gibson, 558 F. Supp. 2d at 1202 (citing Beck v. Atl. Contracting Co., 157 F.R.D. at 64).  See Fed. R. Civ. P. 55(b)(2)(B) ("The court may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to . . .

determine the amount of damages.").

In his Default Motion, Snelling moves the Court to enter a judgment in the total amount of $933,509.04.  See Default Motion ¶ 8, at 3.  He alleges that the total $933,509.04 sum is:

> comprised of the principle sum of $926,924.45, and costs of costs of $6,584.59, as laid out in the Affidavit of Andrew Dean Snelling ("Snelling Aff.") and accruing interest from the date of default at the rate of 8.75%, plus Plaintiff's attorneys' fees and costs and post-judgment interest as allowed by law.

Default Motion ¶ 8, at 3.  Snelling's Aff., in turn, provides a three-part categorized itemization of Snelling's damages, which includes: (i) "Special Damages," which Snelling characterizes as damages related to his "medical bills"; (ii) "General Damages," which Snelling characterizes as damages related to Snelling's "past and future pain, disability, emotional distress, disfigurement, future medical expense, and loss of earnings and earning capacity;" and (iii) "costs and disbursements I have necessarily incurred in pursuant of this products liability claim against the Defendants."  Snelling Aff. ¶ 5-6, at 2-3.  Snelling explains:

My damages resulting from the incident on July 29, 2016 are as follows:

**A.    SPECIAL DAMAGES:**

  a.    Medical Bills:

    i.    Itemization of Medical Bills from Gerald Champion Regional Medical Center, *July 29, 2016* **(true and accurate copies attached as Exhibit A) Total: $7,706.25**

    ii.   Itemization of Medical Bills from American Medical Response, *July 29, 2016* **(true and accurate copies attached as Exhibit B) Total: $396.20**

    iii.  Itemization of Medical Bills from Air Methods, *July 29, 2016* **(true and accurate copies attached as Exhibit C) Total: $59,999.00**

    iv.   Itemization of Medical Bills from Lubbock Aid Ambulance, *July 29, 2016* **(true and accurate copies attached as Exhibit D) Total: $670.00**

v.      Itemization of Medical Bills from University Medical Center, *July 29, 2016 - August 5, 2016* **(true and accurate copies attached as Exhibit E) Total: $8,221.00**

vi.     Itemization of Medical Bills from Alamogordo Home Healthcare and Hospice, *August 6, 2016 - August 30, 2016* **(true and accurate copies attached as Exhibit F) Total: $99,932.00**

**TOTAL SPECIAL DAMAGES: <u>$176,924,45</u>**

**B.     GENERAL DAMAGES**

a.      For past and future pain, disability, emotional distress, disfigurement, future medical expense, and loss of earnings and earning capacity **(true and accurate copies of my injuries and scarring attached hereto at Exhibit G and Exhibit H):**

**TOTAL GENERAL DAMAGES: <u>$750,000</u>**

Additionally, and attached hereto as Exhibit I, is an itemization of the costs and disbursements I have necessarily incurred in pursuant of this products liability claim against the Defendants.  The amount of costs incurred are $6,584.59.

Snelling Aff. ¶ 6, at 2-3 (emphasis and italics in original).

In his Complaint, Snelling brings products liability claims against Tribal Vapors, based on Tribal Vapors' sale of the ion lithium batteries that caused Snelling's burns.  <u>See</u> Complaint ¶¶ 51-197, at 13-53.  New Mexico recognizes products liability claims under theories of common law negligence. strict liability, and implied warranty of merchantability.  <u>See</u>  <u>International Paper Co. v. Farrar</u>, 1985-NMSC-046, ¶ 13, 102 N.M. 739, 700 P.2d at 645.  A plaintiff's successful products liability claim under any one of these theories could result in damages for injury-related medical bills, property damage, lost income, and pain and suffering.  <u>See</u> <u>Sharon Steel Corp. v. Lakeshore, Inc.</u>, 753 F.2d 851, 855-56 (10th Cir. 1985); <u>Parker v. E.I. DuPont de Nemours & Co.</u>, 1995-NMCA-086, ¶ 11, 121 N.M. at 124-25, 909 P.2d 1, 5-6; <u>Id.</u> at ¶¶ 33-34, 121 N.M. at 130, 909 P.2d at 11.  <u>See also</u> <u>International Paper Co. v. Farrar</u>, 1985-NMSC-046, ¶ 13, 102 N.M. 739, 700 P.2d

at 645.

Under a product liability claim, "a supplier in the business of putting a product on the market is liable for harm caused by an unreasonable risk of injury resulting from a condition of the product or from a manner of its use." N.M.R.A., Civ. UJI 13-1406.  See Stang v. Hertz Corp., 1972-NMSC-031, ¶ 6, 83 N.M. 730, 497 P.2d 732, 734; Trujillo v. Berry, 1987-NMCA-072, ¶ 5 n.1, 106 N.M. 86, 738 P.2d 1331, 1333 n.1 (stating that "the purpose behind the strict products liability doctrine is to allow an injured user . . . to recover against a supplier . . . without the requirement of proving negligence.").  Under New Mexico law, for a plaintiff to recover under strict products liability, the plaintiff must prove: (i) "that the product was sold in a defective condition unreasonably dangerous to the user or consumer or to his property"; (ii)  "that the seller was engaged in the business of selling such a product";  and (iii) "that the product was expected to and did reach the consumer without substantial change in the condition in which it was sold." Standhardt v. Flintkote Co., 1973-NMSC-040, ¶ 14, 84 N.M. 796, 508 P.2d 1283, 1290.

To recover on a product liability claim based on a negligence theory, a plaintiff must "establish (1) the existence of a duty owed to Plaintiff[], (2) a breach of such duty, (3) a causal connection between [the Defendants'] conduct and the injury to Plaintiff[], and (4) damages resulting from such conduct."  Parker v. E.I. DuPont de Nemours & Co., 1995-NMCA-086, ¶ 35, 121 N.M. 120, 130, 909 P.2d 1, 11 (citing N.M.R.A., Civ. UJI 13-1601).  New Mexico negligence law requires that "manufacturers and distributors of products have a duty to use ordinary care in producing products so as to avoid a foreseeable risk of injury caused by a condition of the product or the manner in which it is used."  Smith ex rel. Smith v. Bryco Arms, 2001-NMCA-090, ¶ 19, 131 N.M. 87, 94, 33 P.3d 638, 645 (citing N.M.R.A., Civ. UJI 13-1402).  Furthermore, the duty "exists as a matter of law," and when carrying out his or her duty, a "manufacturer must use

ordinary care -- that which a reasonably prudent supplier would use in the course of his business -- in formulating, designing, making, inspecting, testing, and packaging the product."  Mims v. Davol, Inc., No. CIV 16-0136 MCA/GBW, 2017 WL 3405559, at *4 (D.N.M. Mar. 22, 2017)(Armijo, J.)

Finally, New Mexico recognizes that the implied warranty of merchantability is implied by law and is independent of express warranties.  See International Paper Co. v. Farrar, 1985-NMSC-046, ¶ 13, 102 N.M. 739, 700 P.2d at 645.  To establish a claim for breach of the implied warranty of merchantability, a plaintiff must prove that the seller sold goods or products that fail to meet the statutory definition of "merchantable."  N.M.S.A. § 55-2-314.[8]  See also N.M.R.A.

---

[8]Section 55-2-314 defines "merchantable":

(1)    Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2)    Goods to be merchantable must be at least such as:

(a)    pass without objection in the trade under the contract description; and

(b)     in the case of fungible goods, are of fair average quality within the description; and

(c)    are fit for the ordinary purposes for which such goods are used; and

(d)    run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e)    are adequately contained, packaged and labeled as the agreement may require; and

CIV. UJI 13-430 (2008)(providing the same definition).  "[A] supplier breaches this warranty if the product is defective and is not fit for the ordinary purposes for which such product is used."  Pac. Indem. Co. v. Therm-O-Disc, Inc., 476 F. Supp. 2d 1216, 1225 (D.N.M. 2006)(Hansen, J.)("A manufacturer must use ordinary care in the designing, making, inspecting, and packaging of the product.  Ordinary care is that care which a reasonably prudent supplier would use in the conduct of its business.")(citing N.M.R.A. Civ. UJI 13-1404 (2006)).

Here, as the Court outlined above, based on the Defendants' liability for Snelling's lithium ion battery burns, Snelling first requests $176,924.45 in "Special Damages."  Snelling Aff. ¶ 6, at 2.  Snelling supports this damage request by attaching his medical bills, which include itemized computations of Snelling's medical expenditures related to his injuries.  Snelling Aff. ¶ 6, at 2 (citing GCRMC Billing Statements at 1-2; American Medical Response Billing Statements at 1-2; Air Methods Billing Statements at 1-2; Lubbock Aid Ambulance Billing Statements at 1; TTUHSC Billing Statements, at 1-3; Alamogordo Billing Statements at 1-2.  Snelling next requests $6,584.59, which he states is representative of the "costs and disbursements" that he incurred "pursuant to the products liability claim against defendants."  Snelling Aff. ¶ 6, at 2.  Snelling supports this damage request by attaching an itemized bill statement that demonstrates Snelling's expenditures related to his litigation against the Defendants.  See Snelling Aff. ¶ 6, at 2 (citing Johnson Becker PLLC Customer Balance Detail at 1-2).  Finally, Snelling requests $750,000.00

---

|       | (f)  | conform to the promises or affirmations of fact made on the container or label if any. |

|  (3)  | Unless excluded or modified (Section 2–316) other implied warranties may arise from course of dealing or usage of trade. |

N.M.S.A. § 55-2-314.

in "General Damages," which he characterizes as damages related to "past and future pain, disability, emotional distress, disfigurement, future medical expense, and loss of earnings and earning capacity." Snelling Aff. ¶ 6, at 2.  In support of the $750,000.00 request, Snelling offers a reference to "Exhibit G," and "Exhibit H," which are photographs documenting his injuries from the lithium ion battery burns.  Snelling Aff. ¶ 6, at 2 (citing Medical Photographs: 07/29/2016-08/08/2016 at 1-30; Medical Photographs: 08/08/2019 at 1-21).

The Court recognizes that, under New Mexico products liability law, Snelling is entitled to all injury-related damages, including lost income and pain and suffering, based on his products liability claims.  See International Paper Co. v. Farrar, 1985-NMSC-046, ¶ 13, 102 N.M. 739, 700 P.2d at 645.  Upon consideration of Snelling's request for default damages in his default motion, however, the pertinent question the Court must assess now is whether Snelling's three requested damage amounts, including Snelling's $176,924.45 "Special Damages" amount; his $750,000.00 "General Damages" amount, and his $6,584.59 "costs and disbursements" incurred "pursuant to the products liability claim," Snelling Aff. ¶ 6, at 2, are for "sum[s] certain or [] sum[s] that can be made certain by computation," United States v. Craighead, 176 F. Appx. at 925.  See Fed. R. Civ. P. 55(b)(1), 55(b)(2).  "If the damages sum is not certain or capable of easy computation," however, "the court may" conduct such hearings or order such references as it deems necessary. Applied Capital, Inc. v. Gibson, 558 F. Supp. 2d at 1202 (citing Beck v. Atl. Contracting Co., 157 F.R.D. at 64.  See Fed. R. Civ. P. 55(b)(2)(B) ("The court may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to . . . determine the amount of damages.").

Rule 55(b)(1)'s "sum certain" term appears only once in the Federal Rules of Civil Procedure, and is applicable only "if the defendant has been defaulted for failure to appear." KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d 1, 19 n.8 (1st Cir. 2003)(citing Fed. R. Civ. P.

55(b)(1)).  Nonetheless, the "sum certain concept" is foundational for a court's entry of default judgment, and, specifically,  is "relevant to the question under Rule 55(b)(2) of whether a further evidentiary hearing is necessary before the determination of damages."  KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d 1, 19 n.8 (citing Fed. R. Civ. P. 55(b)(2)).  Yet, despite a court's necessity in distinguishing "sum[s] certain," versus those that cannot "be made certain by computation," United States v. Craighead, 176 F. Appx. at 925, the Federal Rules of Civil Procedure neither offers a definitive "sum certain" definition, nor do the Rules offer clear categorizations of which requested damages types tend to fall into the "sum certain" umbrella. Fed. R. Civ. P. 55(b)(1), 55(b)(2).  Complicating matters for courts trying to determine if a moving party has presented a "sum certain" in his or her default judgment motion, is the fact that "the cases discussing the sum certain requirement of Rule 55 are few and far between and rather exiguous in their reasoning."  KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d at 19 n.7 (quoting Collex, Inc. v. Walsh, 74 F.R.D. 443, 450 (E.D. Pa. 1977)(Fogel, J.) and citing Byrd v. Keene Corp., 104 F.R.D. 10, 12 (E.D. Pa. 1984)(Pollak, J.)("Relatively few cases have raised the question of what qualifies as a 'sum certain' for the purposes of Rule 55(b).").  When assessing whether the district court had abused its discretion in entering default judgment on a plaintiff's requested damages amount in his default motion, the United States Court of Appeals for the First Circuit emphasized the paucity of "sum certain" case law of which to apply to the facts at hand.  KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d at 19 (quoting Fed. R. Civ. P. 55(b)(1)).  With relatively little guidance to refer to then, the First Circuit attempted to outline comprehensively its understanding of the "sum certain" term, KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d at 19:

> Following the entry of default, a district court can enter a final judgment without requiring further proof of damages only in limited situations.  For example,

no evidentiary inquiry is necessary if the claim is for a "sum certain."  See 10 Moore's Federal Practice ¶ 55.22[1] (2002)("In cases where the court has entered default judgment and the claim is for a sum certain, the court can enter the default judgment for the amount stated in the complaint."); accord Farm Family Mut. Ins. Co. v. Thorn Lumber Co., 202 W.Va. 69, 501 S.E.2d 786, 790 (1998)(indicating that "if the damages sought by the party moving for a default judgment are for a sum certain, or an amount which can be rendered certain by calculation, no evidentiary hearing on damages is necessary"); cf. Fed. R. Civ. P. 55(b)(1) (authorizing court clerk to enter default judgment *sine decreto* when claim is for sum certain and defendant has failed to appear).

Contrary to the district court's statement, this is not a sum certain case.  In the Rule 55 context, a claim is not a sum certain unless there is no doubt as to the amount to which a plaintiff is entitled as a result of the defendant's default.  See, e.g., Reynolds Sec., Inc. v. Underwriters Bank & Trust, Co., 44 N.Y.2d 568, 406 N.Y.S.2d 743, 378 N.E.2d 106, 109 (1978)("The term 'sum certain' in this context contemplates a situation in which, once liability has been established, there can be no dispute as to the amount due, as in actions on money judgments and negotiable instruments."); see also Interstate Food Processing Corp. v. Pellerito Foods, Inc., 622 A.2d 1189, 1193 (Me. 1993)("Such situations include actions on money judgments, negotiable instruments, or similar actions where the damages sought can be determined without resort to extrinsic proof.").  The First Circuit case cited by the district court in its July 27 order, Brockton [Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5 (1st Cir.1985)], was just such a case -- an action to collect on an unpaid certificate of deposit.  See Brockton [Sav. Bank v. Peat, Marwick, Mitchell & Co.], 771 F.2d at 13. The instant appeal is clearly not such a case.

As with a "sum certain," a hearing is not normally required if the claim is "liquidated."  See 46 Am. Jur. 2d Judgments § 313 ("As a general proposition, in the context of a default judgment, unliquidated damages normally are not awarded without an evidentiary hearing; that rule, however, is subject to an exception where the amount claimed is a liquidated sum or one capable of mathematical calculation.").  "'Liquidated' means adjusted, certain, settled with respect to amount, fixed.  A claim is liquidated when the amount thereof has been ascertained and agreed upon by the parties or fixed by operation of law." *Farm Family Mut. Ins.,* [202 W. Va. 69, 75,] 501 S.E.2d [786,] 791 [(1998)](quoting Hallett Constr. Co. v. Iowa State Highway Comm'n, 258 Iowa 520, 139 N.W.2d 421, 426 (1966)). The classic example is an enforceable liquidated damages clause in a contract. See 22 Am. Jur. 2d Damages § 683.  Another example would be a delinquent tax assessment.  United States v. Raleigh Rest., 398 F. Supp. 496, 498 (E.D.N.Y. 1975). KPS and Designs, however, vigorously dispute the issue of damages.  Likewise, KPS's damages have not been fixed by operation of law.  Finally, as the inconsistencies and inaccuracies in the complaint and the supporting affidavit amply demonstrate, KPS's claims are not capable of simple mathematical

computation.  Thus, KPS's complaint and its supporting affidavit do not state a liquidated claim.

Relying on the erroneous conclusion that KPS's claim stated a claim for a sum certain, the district court did not look beyond the complaint's *ad damnum* clause and an internally inconsistent supporting affidavit in fixing the base quantum of damages.  For the reasons explained above, this limited approach was an abuse of discretion requiring that we remand the matter to the district court for further consideration of the damages issue.  However, Designs is not necessarily entitled to an evidentiary *hearing* on remand.  In limited circumstances we have permitted district courts to dispense with a Rule 55(b)(2) hearing, even in the face of apparently unliquidated claims.  See, e.g., HMG, 847 F.2d at 919 (holding that district court, "intimately familiar with the case from years of travail," did not abuse discretion when it forwent hearing and calculated damages from "mortgage and loan agreements, certifications by the taxing authorities, and other documents of record").  Other circuits are in agreement.  See, e.g., Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 508 (2d Cir.1991)(holding that full evidentiary hearing not required when court had been "inundated with affidavits, evidence, and oral presentations by opposing counsel"); Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc., 722 F.2d 1319, 1323 (7th Cir.1983)(holding that district court did not abuse discretion by failing to hold hearing when amount claimed was "capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits").  We decline to decide whether the instant case would lend itself to resolution without an evidentiary hearing, leaving that determination to the sound discretion of the district court on remand.

KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d at 19-21.  Based on the First Circuit's definition of "sum certain," then, the Honorable Kermit V. Lipez, United States Circuit Judge for the First Circuit, emphasized that, when deciding whether to enter default judgment on the plaintiff's requested damages amount in his or her motion for default judgment, courts must be discerning in their assessment of a plaintiff's requested damages in his or her complaint or affidavit, even if the damage "is for a specific dollar amount."  KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d at 20 n.10.

Neither the fact that the complaint identifies a purported aggregate total, nor the fact that the affidavit attests to such a sum, automatically converts KPS's claim into a "sum certain".

Courts considering the question are clear that a claim is not for a "sum certain" merely because the demand in the complaint is for a specific dollar

amount.  A contrary holding would permit almost any unliquidated amount to be transformed into a claim for a sum certain simply by placing a monetary figure on the item of claimed damage, even though that amount has not been fixed, settled, or agreed upon by the parties and regardless of the nature of the claim.  *Farm Family Mut. Ins. Co.,* 501 S.E.2d at 791; *accord Zorach v. Lenox Oil Co.,* 1996 Mass. App. Div. 11, 13 (1996)("Merely requesting a specific amount in the complaint or statement of damages does not fulfill the sum certain requirement.").

KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d at 20 n.10.  In addition, Judge Lipez elaborated in detail upon the differences between the terms "sum certain" and "liquidated claim," and how "liquidated" or "statutory" damage claims are more likely to be "sum[s] certain," whereas unliquidated claims will more likely require further hearings.  KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d at 21 n.11.

> Some courts and commentators appear to use the terms "sum certain" and "liquidated claim" interchangeably. See, e.g., Farm Family, 501 S.E.2d at 791 ("Other jurisdictions considering the term 'sum certain' have suggested that its meaning is similar to 'liquidated amount.' "); 46 Am. Jur. 2d Judgments § 291 ("The 'sum certain' requirement is clearly met where the claim is for liquidated or statutory damages and clearly not met where the claim is for unliquidated damages."). Other authorities put a more distinguishing gloss on the terms. For example, Black's Law Dictionary (7th ed.1999) defines "sum certain" as
>
> 1. Any amount that is fixed, settled, or exact.
>
> 2. *Commercial law.* In a negotiable instrument, a sum that is agreed on in the instrument or a sum that can be ascertained from the document.
>
> Id. at 1449.  It defines a "liquidated claim" as "[a] claim for an amount previously agreed on by the parties or that can be precisely determined by operation of law or by the terms of the parties' agreement."  Id. at 240.
>
> The text of Rule 55 appears to distinguish between a "sum certain" and "a sum which can by computation be made certain" (i.e., liquidated damages). See Fed. R. Civ. P. 55(b)(1).  In deciding this appeal, we need not definitively delineate the respective ambits of the terms "sum certain" and "liquidated claim." It is enough for us to conclude that KPS's claim is neither one.

KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d at n.11.

Fourteen years later, using the First Circuit's definition as guidance, the Honorable Rya W.

Zobel, United States District Judge for the United States District Court for the District of Massachusetts, explained that, "[i]n the Rule 55 context, a claim is not a sum certain unless there is no doubt as to the amount to which a plaintiff is entitled as a result of the defendant's default." In re Acevedo, 577 B.R. 429, 435-36 (D. Mass. 2017)(Zobel, J.)(citing KPS & Assoc., Inc., 318 F.3d at 19).  Based on the First Circuit's "sum certain" definition, then, Judge Zobel did not enter default judgment on the Plaintiff Vicente Pérez Acevedo's requested damages, concluding that the requested damages were "not a sum certain case," because the allegations in Acevedo's complaint did not support clearly Acevedo's requested $260,602.07 related to the defendants' collective liability on claims related to their fraudulent transfer of real property.  In re Acevedo, 577 B.R. at 435.  In validating that Acevedo's requested damages were not for a "sum certain," Judge Zobel referenced that, at this point, it is "unclear how the amount relates to Acevedo's claims" against the defendants, and "whether it was an appropriate sum to be included in the damages calculation," because, "in support of his claim for damages," Acevedo only "included the mortgage amount that [the defendants] obtained to purchase the Property."  In re Acevedo, 577 B.R. at n.6.  Ultimately, then, as Judge Zobel concluded, the bankruptcy court erred, because it "did not look beyond Acevedo's affidavit in fixing the amount of damages."  577 B.R. at 436.  See In re The Home Restaurants, Inc., 285 F.3d 111, 114 (1st Cir. 2002)(clarifying that, in the context of a plaintiff's requested damages in his default judgment motion, "[a] hearing may be required, however, to set damages when the amount is in dispute or is not ascertainable from the pleadings").

The Court agrees with the First Circuit's "sum certain" standard, because it concludes that the First Circuit's distinction between situations where there is "doubt as to the amount to which a plaintiff is entitled as a result of the defendant's default," KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d at 19 (citing Reynolds Sec., Inc. v. Underwriters Bank & Trust, Co., 378

N.E.2d at 109), such as unliquidated damages situations versus situations where "there can be no dispute as to the amount due," such as liquidated damage situations, or "actions on money judgments and negotiable instruments . . . where the damages sought can be determined without resort to extrinsic proof," KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d at 19 (citing Interstate Food Processing Corp. v. Pellerito Foods, Inc., 622 A.2d at 1193), comports with supplementary treatises and understanding of the "sum certain" term, see 10A Wright & Miller, supra, § 2683.  Significantly, the First Circuit's standard aligns with Professor Charles Alan Wright's and Professor Arthur R. Miller's "sum certain" explanation, which their treatise outlines while describing what a plaintiff must provide in his or default judgment to "establish that the amount due is 'for a sum certain or one that can be made certain by computation, '" 10A Wright & Miller, supra, § 2683 (quoting Fed. R. Civ. P. 55(b)(1)):

> A plaintiff requesting the clerk to enter judgment by default must submit an affidavit to establish that the amount due is a sum certain or one that can be made certain by computation. This requirement obviously is met when the damages claimed are for a liquidated amount.  It also was held to have been satisfied in a case in which plaintiff's complaint demanded a judgment for the full amount of a check, or alternatively for one-half the amount of the check, and plaintiff requested a default judgment for the smaller of the two specific amounts.  The certainty requirement is not met, however, when there is only a generalized statement of the amount due in plaintiff's complaint . . . .

10A Wright & Miller, supra, § 2683.  The First Circuit's "sum certain" standard also comports with the treatise's emphasis on the principle that a plaintiff's requested damages sum does not automatically become a "sum certain" simply because the plaintiff requests a specific amount in his or her default motion or supporting affidavit.  Compare 10A Wright & Miller, supra, § 2683 ("Plaintiff cannot satisfy the certainty requirement simply by requesting a specific amount."), with KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d at 20 n.10 ("Neither the fact that the complaint identifies a purported aggregate total, nor the fact that the affidavit attests to such a sum,

automatically converts KPS's claim into a 'sum certain.'"). Rather, the key in determining whether

a sum certain exists, on which the First Circuit and the treatise seem to agree, is that the plaintiff

references record evidence, or supplementary documents or affidavits, that support the connection

between his or her requested default judgment damages amount and a defendant's liability under

the plaintiff's claims.  Compare 10A Wright & Miller, supra, § 2683 ("The amount of damages

sought by the assignee of contracts from buyers was not a sum certain, and thus the entry of a

default judgment by the clerk of the court was not proper . . . [because] the record contained no

explanation of how the assignee calculated the value of the tractor, the award sought included legal

bills, repairs, and miscellaneous costs attributed to the breach, the assignee failed to explain how

it calculated those amounts, and even if the assignee was entitled to a default judgment as to

liability, an evidentiary hearing likely would be necessary to support the monetary judgment."),

with KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d at 20 n.10 ("Courts considering the

question are clear that a claim is not for a 'sum certain' merely because the demand in the

complaint is for a specific dollar amount.   A contrary holding would permit almost any

unliquidated amount to be transformed into a claim for a sum certain simply by placing a monetary

figure on the item of claimed damage, even though that amount has not been fixed, settled, or

agreed upon by the parties and regardless of the nature of the claim.")(quoting Fed. R. Civ. P.

55(b)(1)).

> Plaintiff cannot satisfy the certainty requirement simply by requesting a specific amount.   Plaintiff also must establish that the amount requested is reasonable under the circumstances. Thus, in United States v. Miller, [9 F.R.D. 506 (M.D. Pa. 1949)(Follmer, J)], an action for treble damages under the Price Control Act[, 50 U.S.C. §§ 901-946], based on overcharges during one year, plaintiff computed the total amount of overcharges by examining defendants' sales sheets for only one month and projecting the amount charged to determine the overcharges for the entire year.   The court held that the amount due was not established sufficiently to be a "sum certain" or an amount that could be made certain.   And in Ace Grain Company v. American Eagle Fire Insurance Company, [11 F.R.D. 364

(S.D.N.Y. 1951)(Weinfeld, J.)], an action on a cargo policy in which a nonresident insurer defaulted, the loss as certified by a surveyor employed by the insurer was not a "sum certain" because the report represented the surveyor's opinion, which the insurer was not required to accept or be bound by. An allowance for attorney's fees, based on a percentage of the surveyor's estimate, likewise was not deemed a "sum certain."

10A Wright & Miller, supra, § 2683 (quoting Fed. R. Civ. P. 55(b)(1)).  Furthermore, the treatise cites several case examples that compare to Judge Zobel's application of the First Circuit's standard in  In re Acevedo, when Judge Zobel concluded that the bankruptcy court had erred in entering default judgment on the plaintiff's requested damages amount when it did not conduct further evidentiary hearings to establish proof of the plaintiff's requested damages beyond that which was established in the plaintiff's affidavit.  See In re Acevedo, 577 B.R. at 435.

The amount of damages sought by the assignee of contracts from buyers was not a sum certain, and thus the entry of a default judgment by the clerk of the court was not proper, in the assignee's action against the buyers for alleged breach of contracts, although the assignee requested a precise damages award because the certainty requirement was not satisfied simply by requesting a specific amount, the assignee sought recovery of the unpaid total of the remaining lease payments on a repossessed tractor minus the value of the tractor at the time of repossession, the record contained no explanation of how the assignee calculated the value of the tractor, the award included legal bills, repairs, and miscellaneous costs attributed to the breach, the assignee failed to explain how it calculated those amounts, and even if the assignee was entitled to a default judgment as to liability, an evidentiary hearing likely would be necessary to support the monetary judgment. AGCO Finance, LLC v. Littrell, 320 F.R.D. 45 (D. Minn. 2017).

Affidavit from the carrier's employee, stating that the company owed the carrier certain charges for the interstate transportation of freight, was insufficient to establish that the carrier was entitled to a default judgment for a sum certain, under Rule 55, absent documentation to corroborate the employee's affidavit. CSXT Intermodal, Inc. v. Mercury Cartage, LLC, 271 F.R.D. 400 (D. Me. 2010); Patray v. Northwest Pub., Inc., 931 F. Supp. 865, 869 (S.D. Ga. 1996).

The fact that plaintiff's claims against defendant were settled did not create a "sum certain" with regard to defendant's third-party claim when the claim was not otherwise one for which a sum certain was claimed, and thus, in light of the fact that the third-party defendant's interests were not directly represented in the settlement negotiations which led to the sum requested by defendant, it was necessary for defendant to present independent evidence of the reasonableness of

that amount before a default judgment could be entered against the third-party defendant under the rule permitting entry of a default judgment by the clerk.  Byrd v. Keene Corp., 104 F.R.D. at 12.

10A Wright & Miller, supra, § 2683, n. 8.

Ultimately, then, the Court agrees with the principles of a "fixed" or "liquidated" amount, "certainty," "corroborating evidence," and a clear connection between a plaintiff's requested default damages and the defendant's liability, as the First Circuit and Professors Wright and Miller emphasize in their characterization of rule 55(b)(1)'s "sum certain" term.  KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d at 19-21.  See 10A Wright & Miller, supra, § 2683.  Furthermore, with recognition of the finality of default judgment motions, and the importance of safeguarding the parties' rights, even in the case of an absent defendant, the Court, in turn, concludes that demonstrating a "sum certain" in a default judgment motion will be a high bar for plaintiff's to achieve, and will require there be "no doubt as to the amount to which a plaintiff is entitled as a result of the defendant's default."  KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d at 21 (citing Reynolds Sec., Inc. v. Underwriters Bank & Trust, Co., 378 N.E.2d at 109).  This high "sum certain" bar means, in turn, that even in the presence of a plaintiff's supporting affidavit and attachment of medical bills, without more evidence that can establish a clear connection between the plaintiff's asserted default judgment damages and the defendant's liability, the Court will exercise its discretion to conduct further evidentiary hearings to support the monetary judgment that it ultimately enters.

When a claim is not for a sum certain or a liquidated amount, the amount of the claim must be established before a default judgment can be entered. This usually requires an evidentiary hearing.  See Applied Capital, Inc. v. Gibson, 558 F. Supp. 2d 1189 (D.N.M. 2007)[(Browning J.).  If there is any doubt whether a claim is for a sum certain or an amount "which can by computation be made certain," the better approach is to seek a default judgment from the court (Rule 55(b)(2)) rather than entry of judgment by the clerk (Rule 55(b)(1)).

Don Zupanec, <u>Remedies: Default Judgment -- "Sum Certain" Claim</u>, 26 No. 5 Federal Litigator 15, May 2011.  <u>See</u> <u>KPS & Assocs., Inc. v. Designs By FMC, Inc.</u>, 318 F.3d at 21.  <u>See also</u> 46 Am. Jur. 2d Judgments § 313 ("As a general proposition, in the context of a default judgment, unliquidated damages normally are not awarded without an evidentiary hearing; that rule, however, is subject to an exception where the amount claimed is a liquidated sum or one capable of mathematical calculation.").

### A. THE COURT CANNOT ENTER JUDGMENT ON SNELLING'S REQUESTED SPECIAL DAMAGES AND GENERAL DAMAGES, BECAUSE THE AMOUNTS ARE NOT SUMS CERTAIN.

Based on the Court's definition of the "sum certain" standard, therefore, the Court cannot conclude that Snelling's requested "Special Damages" and "General Damages," represent "sum[s] certain" as to allow the Court to enter default judgment on the amount without a jury trial, Fed. R. Civ. P. 55(b)(1).  <u>See</u> <u>KPS & Assocs., Inc. v. Designs By FMC, Inc.</u>, 318 F.3d at 19.  First, the Court cannot conclude that Snelling's third requested "General Damages" $750,000.00 requested damages amount is a "sum certain" or "a sum that can be made certain by computation," given the speculative nature of the requested damages.  <u>United States v. Craighead</u>, 176 F. Appx. at 925. <u>See</u> <u>Flaks v. Koegel</u>, 504 F.2d at 707; <u>Applied Capital, Inc. v. Gibson</u>, 558 F. Supp. 2d at 1202. <u>See also</u>  Snelling Aff. ¶ 6, at 2.  The photographs of Snelling's injuries alone in support of the $750,000 "General Damages" sum, without more, may be sufficient evidence with which the jury may use to calculate accurately Snelling's damages based on  "past and future pain, disability, emotional distress, disfigurement, future medical expense, and loss of earning and earning capacity," Snelling Aff. ¶ 6, at 2 -- a damages category that, by nature, is not generally "susceptible of mathematical computations," <u>Flaks v. Koegel</u>, 504 F.2d at 707, but a jury should decide the sufficiency of that evidence, not the Court.

Second, "[n]either the fact [that Snelling's] complaint identifies a purported aggregate

total, nor the fact that the affidavit attests to such a sum, automatically converts [Snelling's] claim into a 'sum certain.'" KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d at 20 (quoting Fed. R. Civ. P. 55(b)(1)).  See Fed. R. Civ. P. 55(b)(2).  Accordingly, despite that Snelling attaches itemized medical and legal bills to his affidavit to support his requested $176,924.45 "Special Damages" amount, Snelling Aff. ¶ 6, at 2,  the Court cannot conclude that "there is no doubt as to the amount to which [Snelling]  is entitled as a result of the defendant's default." KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d at 19-20 (citing Reynolds Sec., Inc. v. Underwriters Bank & Trust, Co., 378 N.E.2d at 109 ("The term 'sum certain' in this context contemplates a situation in which, once liability has been established, there can be no dispute as to the amount due, as in actions on money judgments and negotiable instruments."); Interstate Food Processing Corp. v. Pellerito Foods, Inc., 622 A.2d 1189, 1193 (Me. 1993)("Such situations include actions on money judgments, negotiable instruments, or similar actions where the damages sought can be determined without resort to extrinsic proof.").  The Court concludes that "doubt" still exists as to the proper amount of Snelling's requested "Special Damages" sum, because Snelling's requested sum is not for a  "liquidated amount" nor is the amount "fixed by operation of law," unlike an "enforceable liquidated damages clause in a contract,"  or a "delinquent tax assessment." KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d at 20 (citing Am. Jur. 2d Damages, 683).  Moreover, although Snelling states in his affidavit that his requested medical damages occurred between July 29, 2016 -- the day of the lithium ion batteries incident -- and August 8, 2019 -- three years and twenty days after the lithium ion batteries incident, see Medical Photographs: 07/29/2016-08/08/2016 at 1-30; Medical Photographs: 08/08/2019 at 1-21, the Court concludes that a jury trial is required so that Snelling can offer greater evidence as to substantiate the connection between the bills and the lithium ion batteries injury.  See KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d at 20.

See also In re Acevedo, 577 B.R. at 436.  Furthermore, as similar to Judge Zobel's conclusion in

In re Acevedo, here, the Court concludes that, because Snelling supports his requested damages

with his own affidavit, and does not attach affidavits from any other medical practitioners or

witnesses, it would be error to "not look beyond [Snelling's] affidavit in fixing the amount of

damages."  In re Acevedo, 577 B.R. at 436.  Specifically, at present, Snelling does not offer any

affidavit supporting that all of his medical bills are related to the accident, or that the medical bills

are reasonable.  Snelling Aff. ¶ 6, at 2.  Furthermore, Snelling does not offer any documentation

supporting that he did not have any pre-existing health conditions that the injury did not cause or

did not aggravate.  With nothing in the record adding certainty or context to Snelling's medical

bills and injuries related to the Lithium Ion Batteries incident, the Court declines to conclude that

Snelling's requested "General Damages" are a "sum certain" under rule 55(b)(1) of the Federal

Rules of Civil Procedure.  See KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d at 20.  See

also In re Acevedo, 577 B.R. at 436.  Certainly, a jury may conclude that Snelling is entitled to

these damages based on the evidence, but the Court cannot say now, without more, that Snelling's

medical bills satisfy rule 55(b)(1)'s "sum certain" standard.

   **B.    THE COURT CANNOT ENTER JUDGMENT ON SNELLING'S REQUESTED COSTS AND DISBURSEMENTS THAT HE INCURRED PURSUANT TO THE LITIGATION, BECAUSE THE AMOUNT REPRESENTS (I) COSTS THAT ARE AWARDED AFTER JUDGMENT IS ENTERED, OR (II) ATTORNEY'S FEES THAT MAY NOT BE AWARDED WITHOUT A HEARING.**

   Finally, even if the Court were to conclude that Snelling's requested $6,584.59  "costs and

disbursements" amount is a "sum certain" under rule 55(b)(1), the Court should not enter default

judgment as to the $6,584.59 amount, because these "costs and disbursements" are costs and

litigation expenses, which Snelling's attorney incurred while acting on Snelling's behalf in the

current litigation.  See Johnson Becker PLLC Customer Balance Detail at 1-2.  Rule 54(d)(1) of

the Federal Rules of Civil Procedure provides that, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs -- other than attorney's fees -- should be allowed to the prevailing party." Fed. R. Civ .P. 54(d)(1). The Tenth Circuit "had held that Rule 54(d) creates a presumption that the prevailing party shall recover costs." Klein v. Grynberg, 44 F.3d 1497, 1506 (10th Cir. 1995)(citations omitted).  The district court has broad discretion in deciding whether to award costs.  See Howell Petroleum Corp. v. Samson Resources Co., 903 F.2d 778, 783 (10th Cir.1990).  Moreover, the district court "must provide a valid reason for not awarding costs to a prevailing party." Utah Animal Rights Coalition v. Salt Lake County, 566 F.3d 1236, 1245 (10th Cir. 2009).  "[T]he burden is on the prevailing plaintiffs to establish the amount of compensable costs and expenses to which they are entitled." Mares v. Credit bureau of Raton, 801 F. 2d 1197, 1208 (10th Cir. 1986)(citations omitted).  With regard to the award of attorney's fees and costs, the Tenth Circuit follows the "American Rule," under which parties to a lawsuit ordinarily pay their own attorney's fees.  Pound v. Airosol Co., 498 F.3d 1089, 1100 (10th Cir. 2007)(citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240 (1975)).  "There are several exceptions to this principle. Most notably, there are certain statutory fee-shifting provisions that permit a court to order one party to pay the fees and costs of another." Pound v. Airosol Co., 498 F.3d at 1100 (citing Bennett v. Coors Brewing Co., 189 F.3d 1221, 1238 (10th Cir. 1999)).  Under the American Rule, each party generally pays its own attorney's fees, unless there is a contract or a statute specifying otherwise.  See Marx v. Gen. Revenue Corp., 668 F.3d 1174, 1179 (10th Cir.2011); Mountain Highlands, LLC v. Hendricks, No. CIV 08-0239 JB/ACT, 2010 WL 1631856, at *3 (D.N.M. April 2, 2010)(Browning, J.).

Here, the Court concludes that Snelling's requested "costs and disbursements" are costs or partially attorney's fees, because when requesting the $6,584.59 sum, Smelling references only an

itemized statement from his attorney at Johnson Becker PLLC.  See Snelling Aff. ¶ 6, at 2-3 ("Additionally, and attached hereto as Exhibit I, is an itemization of the costs and disbursements I have necessarily incurred in pursuant of this products liability claim against the Defendants.  The amount of costs incurred are $6,584.59.").  See also Johnson Becker PLLC Customer Balance Detail at 1-2.  The Johnson Becker PLLC Customer Balance Detail, in turn, includes Snelling's attorney's itemized costs related to the litigation, which include costs relating to: (i) retrieving Snelling's records from Gerald Champion Regional, University Medical, UMC Health Systems, Air Methods, and Lubbock Aid Ambulance; (ii) registering with the "Supreme Court Lawyer Registration"; (iii) paying for international service of process to Shenzhen MXJO; and (iv) paying for admission pro hac vice to represent Snelling in the District of New Mexico.  See Johnson Becker PLLC Customer Balance Detail at 1-2   Under Tenth Circuit precedent, however, the Court should not enter default judgment on this amount, because: (i) Snelling's requested "costs and disbursements" are more like taxable costs, which are awarded after judgment is entered, see D.N.M.LR-Civ. 54.1;[9] and (ii) in the default judgment context, "attorney's fees may not be awarded without a hearing to determine the amount,"  Hunt v. Inter-Globe Energy, Inc., 770 F.2d

---

[9]Rule 54 of the District of New Mexico Local Rules of Civil Procedure provides that:

**54.1 Motion to Tax Costs**. A motion to tax costs must be filed and served on each party within thirty (30) days of entry of judgment. Failure to file and serve within this time period constitutes waiver of a claim to costs. The motion must comply with the requirements of D.N.M.LR-Civ. 7 and must include:

- an itemized cost bill documenting costs and including receipts as required by rule or statute; and

- a party's affidavit that the costs are allowable by law, correctly stated and necessary to the litigation.

D.N.M.LR-Civ. 54.1.

at 148 ("Further, we have held that a court may enter a default judgment with a hearing only if the amount claimed is a liquidated sum or one capable of mathematical calculation.   Similarly, attorney's fees may not be awarded with a hearing to determine the amount.")(citing Venable v. Haislip, 721 F.2d at 297).

Ultimately, then, although the Court recognizes the possibility of Snelling's burn-related injuries being severe, because (i) Snelling's "General Damages" and "Special Damages" are, at present, not "capable of mathematical calculation," Snelling Aff. ¶ 6, at 2; United States v. Craighead, 176 F. Appx. at 925; and, (ii) Snelling's "costs and disbursements" that he incurred "pursuant to the products liability claim against defendants," are costs that are awarded after judgment is entered, Snelling Aff. ¶ 6, at 2; see D.N.M.LR-Civ. 54.1, or attorney's fees that "may not be awarded without a hearing to determine the amount," Hunt v. Inter-Globe Energy, Inc., 770 F.2d at 148, the Court at this time, will not enter default judgment for Snelling's total damages award without a jury trial as to establish the "quantum of damages" amount by proof, Flaks v. Koegel, 504 F.2d at 707.  The Court can then determine costs after the judgment is entered.  See D.N.M.LR-Civ. 54.1.  See also D.N.M.LR-Civ. 54.2.

## V.    **THE COURT WILL SET A DATE FOR A JURY TRIAL ON DAMAGES.**

Because Snelling requested a jury in his Complaint, and properly served that Complaint on Tribal Vapors, and because the Court must determine the amount of damages Snelling is owed based on Tribal Vapors' liability, the Court will set a date for a jury trial on Snelling's damages.

> When a court must determine the amount of damages after a default judgment, rule 55(b)(2) of the Federal Rules of Civil Procedure authorizes the court to "conduct such hearings or order such references as it deems necessary and proper and shall accord a right of trial by jury to the parties when and as required by any statute of the United States.

Mitchell v. Bd. of Cty. Comm'rs of Cty. of Santa Fe, No. CIV 05-1155 JB/ALM, 2007 WL

2219420, at *9 (quoting Fed. R. Civ. P. 55(b)(2)).  Furthermore, rule 38(d) provides that, once made, "a demand for trial by jury . . . may not be withdrawn without the consent of the parties." Fed. R. Civ. P. 38(d).  The Court discussed the right to a jury trial after entry of default in Mitchell v. Bd. of Cty. Comm'rs, 2007 WL 2219420, at *11-13.  "The Court notes that many cases have held 'that the protection of rule 38(d) is extended to the defendant after the entry of default, when rule 55(b)(2) requires a determination of damages.'"  Mitchell v. Bd. of Cty. Comm'rs, 2007 WL 2219420, at *12 (quoting Kormes v. Weis, Voisin & Co., Inc., 61 F.R.D. at 610 (ruling that the jury demand associated with the damages hearing could not be unilaterally withdrawn in a case where the defendant made an appearance))(citing Bass v. Hoagland, 172 F.2d 205, and Cinque v. Langton, 8 Fed. R. Serv. 55 b.224, case 1). The Court held that rule 38(d)'s plain language requires that the party against whom default is entered must give his or her consent to allow the other party to withdraw a jury demand.  See Mitchell v. Bd. of Cty. Comm'rs, 2007 WL 2219420, at *11-13. See also Fed. R. Civ. P. 38(d).

In Part II, the Court determined that (i) Snelling's "General Damages" and "Special Damages" are, at present, not "capable of mathematical calculation," Snelling Aff. ¶ 6, at 2; United States v. Craighead, 176 F. Appx. at 925; and, (ii) Snelling's "costs and disbursements" that he incurred "pursuant to the products liability claim against defendants," are costs that are awarded after judgment is entered, Snelling Aff. ¶ 6, at 2; see D.N.M.LR-Civ. 54.1, or attorney's fees that "may not be awarded without a hearing to determine the amount," Hunt v. Inter–Globe Energy, Inc., 770 F.2d at 148.  To establish Snelling's damages by proof, therefore, the Court, pursuant to rule 55(b)(2), must "conduct such hearings or order such references as it deems necessary and proper."  Fed. R. Civ. P. 55(b)(2).  In addition, the Court can determine costs after the judgment is entered.  See D.N.M.LR-Civ. 54.1.  See also D.N.M.LR-Civ. 54.2.

Furthermore, in Part I, the Court determined that Snelling properly served his summons and Complaint on Tribal Vapors, pursuant to rule 4(m).  <u>See</u> Fed. R. Civ. P. 4(m).   In the Complaint, Snelling requested a trial by jury.  <u>See</u> Complaint ¶ 199, at 54 ("Plaintiff herby demands a trial by jury.").  Because Snelling has not withdrawn the jury demand, and, because Tribal Vapors has not  appeared in any capacity in this case, under rule 38(d), the Court must hold a jury trial on damages.  <u>See</u> Fed. R. Civ. P. 38(d) ("[A] demand for trial by jury . . . may not be withdrawn without the consent of the parties.").  Moreover, even if Snelling had attempted to withdraw the jury demand, because the Court has held that a party against whom default is entered -- in this case, Tribal Vapors -- must give consent to allow the other party to withdraw a jury demand, then the Court would still be obligated to hold a jury trial on damages, because Tribal Vapors has not consented to Snelling's withdraw.  <u>See</u> <u>Mitchell v. Bd. of Cty. Comm'rs</u>, 2007 WL 2219420, at *11-13.  <u>See</u> <u>also</u> Fed. R. Civ. P. 38(d).

Ultimately, then, the Court will set a date for a jury trial to determine Snelling's damages.

**IT IS ORDERED** that (i) the Plaintiff's Motion for Entry of Default as to Defendants Tribal Vapors, Smoke Free Technologies, Inc. d/b/a Vaporbeast.com, and Shenzhen MXJO Technology Co., Ltd., filed March 30, 2020 (Doc. 8), is granted in part and denied part; (ii) Tribal Vapors and Smoke Free Technologies, Inc, d/b/a Vaporbeast.com are dismissed based on the Court's lack of personal jurisdiction; (ii) the Court enters default judgment as to Tribal Vapors' liability; (iii) Tribal Vapors shall provide the Pretrial Order to the Court no later than May 12, 2021; (iv) a Pretrial Conference is set for May 13, 2021 at 2:30 p.m.; and (v) the Jury Selection/Jury Trial is scheduled on the Court's trailing docket commencing May 24, 2021 at 9:00 a.m.

_____
UNITED STATES DISTRICT JUDGE

- 108 -

*Counsel:*

Dennis K. Wallin
Alisa Lauer
The Spence Law Firm NM, LLC
Albuquerque, New Mexico

--and--

Adam J. Kress
Johnson Becker, PLLC
St. Paul, Minnesota

       *Attorneys for the Plaintiff*